1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                    ORLANDO DIVISION

3          Docket No. 6:11-cv-137-ORL-22DAB

4   . . . . . . . . . . . . . .
    INDYNE, INC.,                    :
5                                    :        Orlando, Florida
              Plaintiff             :        May 9, 2012
6                                    :        10:02 a.m.
                   v.                :
7                                    :
    ABACUS TECHNOLOGY               :
8   CORPORATION, JERRY RENINGER :
    and MATTHEW BOYLAN              :
9                                    :
              Defendant             :
10  . . . . . . . . . . . . . .

11

12        TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
            BEFORE THE HONORABLE ANNE C. CONWAY
13             UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16

17  For the Plaintiff:   Jeff Dyess
                         Douglas Patin
18

19  For the Defendant:   C.Joel Van Over
                         T. Todd Pittenger
20

21
    Court Reporter:      Sandra K. Tremel, RMR/CRR
22                       (407)245-3110

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer-aided transcription.

```
 1              P R O C E E D I N G S
 2         THE COURT:  Case number 2011-137, InDyne, Inc., v.
 3   Abacus Technology Corporation.
 4      Could we have appearances, please?
 5         MR. JUSTICE:  Tom Justice, local counsel on behalf
 6   of InDyne, Inc.
 7      I'd like to introduce Douglas Patin and Jeffrey Dyess,
 8   both of the law firm of Bradley, Arant, Boult & Cummings.
 9      With the Court's permission, Mr. Patin will be arguing
10   against the government contract motion and Mr. Dyess in
11   opposition to the copyright motion.
12         THE COURT:  All right.
13         MR. JUSTICE:  I also have Claire White here to my
14   left, who is in-house counsel for InDyne.  We have two
15   InDyne representatives here today as well, Tom Niemeyer and
16   Bob Trujillo.  Mr. Niemeyer was the project manager on the
17   contract at issue and Mr. Trujillo was the InDyne IT
18   manager.
19         THE COURT:  All right.
20         MR. PITTENGER:  Todd Pittenger with Akerman
21   Senterfitt on behalf of Abacus Technology Corporation, Jerry
22   Reninger, and Matthew Boylan.
23      With me is co-counsel Joel Van Over with Pillsbury,
24   Winthrop in Washington, D.C.  She's going to do the
25   argument.
```

1         We also have with us Steve Kong, an outside lawyer for

2    the defendants, and Don Sherwin, general counsel for Abacus,

3    and Dennis Yee, the president of Abacus.

4              THE COURT:  All right.  Ms. Van Over, it's your

5    motion.

6         Why don't we divide each motion into 20 minutes to the

7    side.

8              MS. VAN OVER:  Your Honor, Abacus -- I'm

9    representing Abacus, as well as Jerry Reninger and Matt

10   Boylan.  I'm going to refer to the defendants, however, as

11   Abacus just as a shorthand, but I don't mean to exclude the

12   other two individuals.

13             THE COURT:  Yes.

14             MS. VAN OVER:  Your Honor, I'd like to ask you

15   first, I would like to reserve some time on both motions for

16   rebuttal.  If you would like me to do that now aside from my

17   20 minutes, then I think I'll --

18             THE COURT:  Well, whatever time you have left with

19   the 20 minutes you can use for rebuttal.

20             MS. VAN OVER:  Okay.  Thank you, Your Honor.

21        Let me begin, Your Honor, by just outlining very

22   briefly how we got here in this case.  Abacus copied some

23   code from an InDyne server with -- that was actually

24   provided by Jerry Reninger, who was the IT lead for the

25   transition from the InDyne KICS Contract to the Abacus

1    contract called IMCS.  Both contracts were for NASA at KSC,

2    Kennedy Space Center.  They concerned some of the same

3    performance requirements, many of the same performance

4    requirements, but the IMCS contract included additional

5    ones.

6        When the code was copied at issue here, it was intended

7    to be provided so that Abacus could establish a temporary

8    KICS or IMCS website for NASA and only for NASA on a

9    temporary basis, because NASA had requested a website

10   because of a shuttle launch, and they wanted the website to

11   be similar to the KICS website because everyone was used to

12   the structure of that website.

13       So Abacus working with Jerry Reninger, who they

14   believed was the appropriate person to work with on this

15   matter, did download code and did use some of the code it

16   downloaded to establish a temporary website.

17       We, however, do divide the issues for purposes of the

18   motions I'll discuss in just a minute into two sections, the

19   website code and the PIMS code that InDyne has asserted.

20   And from what we have been able to determine, PIMS is a

21   group of function modules that perform functions like

22   recording time charges online, putting in a requisition

23   form, and then collecting that -- those requests into a

24   database and managing the data.

25       However, since the litigation has developed, InDyne has

1  taken the position that the website and the PIMS code are

2  not really different, they're -- and they are all muddled

3  together, it is true.  However, it is important, because

4  Abacus used website code, it never used any PIMS application

5  modules ever for standing up the temporary website for NASA,

6  nor commercially or for any other purpose.

7      So there is no proof in this case, no evidence

8  whatsoever of commercial use of any InDyne software.

9  There's evidence of temporary use of code to stand up a

10  website; however, no access to any of the PIMS modules was

11  available through this temporary website for NASA.

12      The only other salient point by way of background is

13  that when InDyne complained that its code had been used to

14  establish this website for NASA, and that Abacus immediately

15  developed an independent website from scratch and put that

16  website up within 21 days of the beginning of its contract

17  and returned all of the code it copied to InDyne.  It did

18  not make a copy of the hard drives or the jump drives that

19  it had the code on.  It returned the original code and did

20  not retain a copy.

21      The two motions for summary judgment, Your Honor, are

22  independent.  I'm going to begin by discussing today

23  Abacus's motion for summary judgment based on the government

24  contract aspects of this case.  However, I'd like to begin

25  with reviewing some of the discrete, undisputed facts,

1  recognizing, Your Honor, that one of the tasks here, there

2  are many disagreements between the parties, I think that's

3  evident from the briefs, but on the facts that are necessary

4  to decide both motions, there is no dispute.

5      And I'll address that in two ways.  First, in

6  opposition, InDyne has put forward some declarations that

7  are very summary level, that don't have citations to any

8  specific evidence in the case.  They're essentially

9  opinions.  Mr. Trujillo has offered his legal opinion about

10  the meaning of a regulation, which he is not competent to

11  do, and we have cited case law.  That should not be

12  considered by the Court.  Mr. Trujillo has absolutely no

13  credentials for that sort of thing and it's a legal matter

14  for the Court's area, not an individual, whether an expert

15  or not.

16      Secondly, Mr. Fuji Nguyen's declaration, while long,

17  does not -- it's a top-level opinion or summary level

18  carefully crafted declaration; however, it's belied by the

19  contemporaneous evidence that we have put forward in

20  Abacus's motion in many, many, many exhibits.

21      And I offer to you, Your Honor, that getting by a word

22  game here is really the only issue.  The deposition

23  testimony that Abacus has put forward which conflicts with

24  much -- all of the salient points of Mr. Fuji Nguyen's

25  declaration, and Mr. Nguyen does not deal with any specific

1  evidence that Abacus put forward, nor does InDyne's briefs

2  deal with any of the specific evidence that InDyne put

3  forward, so it's uncontested.

4      The exhibits that Abacus has offered to this Court are

5  not disputed, and those exhibits create a distinguished

6  paper trail showing that InDyne developed substantial

7  software specifically for NASA, specifically to perform the

8  KICS Contract, that there is substantial evidence that much

9  of that code was paid for by NASA, either through direct

10  charges to NASA, through the time of individuals working

11  full-time on the NASA contract like Deb Bencich,

12  Mr. Marcouillier, and indirectly through a G&A pool that was

13  charged -- with a contract G&A pool charged directly to

14  NASA.

15      While it is definitely true, and we concede that, that

16  some code development was charged to an IR&D account, we're

17  not considering that.  There's sufficient evidence in this

18  record to show substantial development of code on behalf of

19  NASA charged to NASA through G&A indirect cost pools to

20  support Abacus's motion for summary judgment on the

21  government contracts issue.

22      At a top level, the facts that are undisputed that are

23  critical in this case are three or four.  First, as you

24  know, Your Honor, InDyne is asserting copyright infringement

25  of code they call PIMS version 2, which was published in

1    1993.  So in order to determine what PIMS version 2 is, one

2    would have to go to the code as it existed when it was

3    published in 1993 and look at it and determine what it was.

4         That's not possible because InDyne did not retain a

5    copy of PIMS version 2 that it developed and published in

6    1993, which is the code that it represented to the copyright

7    office that it was registering for purposes of this suit in

8    November of 2008.

9         Since the registration was over five years after the

10   publication date, there is absolutely no presumption of

11   validity of the copyright or the statements in the copyright

12   or the registration.  And they were untrue because PIMS

13   version 2 did not exist on the registration date.  These are

14   undisputed facts.

15        And Mr. Fuji Nguyen has explained this in his

16   declaration and in his deposition in a slightly different

17   way.  He cobbled together for registration purposes what he

18   represented to the copyright office as the first 25 and the

19   last 25 pages of PIMS version 2 that he was registering, the

20   1992 -- '3 PIMS version 2.  However, PIMS -- the copies were

21   not the first and last of any set of code that was PIMS

22   version 2.  It was taken -- however, Mr. Nguyen wanted to

23   take it from two separate servers as example of code that he

24   wanted to deposit.  And they were taken, the code was taken

25   from two active servers.

1      So the first really critical fact is that PIMS

2  version 2 doesn't exist.  And why is that a problem?  It's a

3  problem for two reasons.  PIMS version 2 is a derivative

4  work of PIMS version 1.  So PIMS version 2, if we had it

5  today, would include PIMS version 1 code.  And the code

6  that's being asserted here, even though not really PIMS

7  version 2 but actually the KICS version, the version that

8  was used on the KICS NASA contract as what has been asserted

9  in this case, that code includes PIMS version 1.  But PIMS

10 version 1 is not registered and cannot be asserted here.

11 However, InDyne does not have a copy of PIMS version 1

12 either.  So removing PIMS version 1 unprotected code from

13 PIMS version 2 is not possible, and removing PIMS version 1

14 from the version asserted here, which is the KICS version of

15 PIMS version 2, is also not possible.

16     That is a clear problem of proof because under

17 uncontroverted case law, in dealing with software copy

18 infringement, an abstraction-filtration test must be

19 performed which removes code that can't be asserted for

20 many, many reasons, and removing code that is not

21 protectable in this case.  And since we're dealing with NASA

22 developed -- code developed for NASA, that would have to be

23 removed too.  But that can't be done either because although

24 it is standard and required by federal regulations, InDyne

25 did not develop a practice of tracking the code that it

1  developed for NASA on the KICS Contract.  It cannot show the
2  code that it developed or modified or enhanced or added or
3  whatever word you want to use.  I use the term "developed."
4  InDyne cannot show that.  And InDyne cannot also show how
5  that code development for NASA on the KICS Contract was paid
6  for.  We do, however, have evidence that much of it was paid
7  for by NASA either as a direct charge through the time
8  charges that I referenced earlier or through a G&A indirect
9  charge.
10      So the failure of proof is substantial and decisive,
11  Your Honor, and the basis of our motions in large measure.
12      There's one other thing that I find very significant
13  that InDyne also did not keep or track or maintain.  The
14  evidence is very, very clear in the contemporaneous records
15  supporting our motion on the government contracts motion
16  that Deb Bencich was the website developer for InDyne on the
17  KICS Contract.  E-mails say things like, from Mr. Fuji
18  Nguyen, whose declaration is in evidence, "Deb Bencich, Web
19  Developer.  Let's provide Deb with some portal examples" --
20  which I take to be code -- "so that she can build a KICS
21  website."  Yet Mr. Fuji Nguyen says that she didn't develop
22  the KICS website.
23      There are many, many, many, many exhibits that
24  demonstrate that is not true.  The only way in which, when
25  one looks at a declaration and struggles with such meaning,

1    is that it's very carefully crafted and they don't define

2    what they mean by the terms and they're defining them

3    differently, not in the way that one would normally define

4    them.  But in the normal -- the normal way anyone would look

5    at and read the e-mails, the contemporaneous documentation,

6    what was being done, Deb Bencich worked a lot.  She was the

7    web developer full-time for five years on the KICS Contract.

8    She was also in charge of implementing every piece of PIMS

9    software, these modules that I mentioned.

10       The evidence shows that she developed the KICS home

11   page, the KICS internal home page, and the KICS external

12   home page.  The external home page is the page that a user

13   sees when one goes on a website that's interactive that has

14   links that you can click to and it takes you to other

15   information.

16       The internal website or internal home page is the one

17   that then directs the user from the external home page to

18   where they need to go to get all the information, put it

19   together to display properly.

20       Those are the backbone of a website.  And the evidence

21   is incredibly strong that Deb Bencich developed those, as

22   well as all the content of the website.  And as we all know,

23   copyright protects content.  It doesn't protect the function

24   of a website.  It doesn't protect the processes of the

25   website, or anything like that.

1    Nevertheless, there is testimony that Mr. Nguyen from

2    corporate provided Ms. Bencich with a skeleton for a

3    website.  And there's testimony that it was a high-level

4    skeleton, a header, a footer, you know, the basic -- you

5    know, the KICS header that had to be on each page of a

6    website, a footer.  But no content.

7    The first critical point is that even though InDyne

8    seems to make this central to their argument, it doesn't

9    have a copy of this.  It didn't retain anything.  It didn't

10   retain whatever this so-called template was or skeleton was

11   to produce in this litigation.  So we don't have it.

12   What we do have is InDyne's argument that it was like a

13   .DOT doc file.  So if you go on your computer to a Word

14   document, you want to create a Word document, you get a

15   template, you get a empty, blank page with some buttons that

16   you can do for fonts, font size and font colors, et cetera,

17   and other things.

18   And assuming that that is true, which we have no reason

19   to think it's not true for purposes of this motion, a blank

20   page even with little buttons is not a copyrightable thing.

21   So whatever was provided to Ms. Bencich, if anything,

22   other than just for her to look at, and like the e-mail

23   said, to use as an example so she could build a website,

24   it's not relevant to this case.  Because a .DOT file is not

25   copyrightable, and any structure, cold fusion structure that

1  might have been present is not copyrightable either because

2  that's a structure and function issue in the realm of

3  patents, not copyrights.  Original expression or content is

4  the realm of copyright.

5      Why is this important?  Breaking it down simply on the

6  government contracts motion, the evidence is extraordinarily

7  solid and undisputed that development did occur on the

8  website and the PIMS modules.  There is a dispute about how

9  much, but that's not relevant for purposes of this motion.

10 There's also a dispute about whether you call it development

11 or operations and maintenance.  But the e-mails are very

12 solid on actually what occurred.

13     By way of one example, the safety module, there's an

14 e-mail in March 2004 -- or May 2004 maybe -- March, sorry,

15 three months after the KICS Contract began and then started

16 performing that says, "We finally have enough information to

17 develop the quality module."

18     This is the PIMS module that is claimed in this

19 lawsuit.

20     Well, it was developed on the contract to meet contract

21 requirements for NASA.  Deb Bencich didn't do all of the

22 development, but there's an e-mail thanking her for how much

23 effort and time she spent on this module and also on other

24 modules, and there are time charges to NASA in the time

25 period of this development both directly and through the

1  indirect G&A charges.

2       So there's substantial evidence of development, and

3  it's really -- it's not disputed that customization,

4  enhancements, changes, whatever you want to call them, were

5  done to meet NASA contract requirements, and no one can tell

6  what code that is.  That's not possible because no copy was

7  retained or tracked.  It's very easy to track development in

8  a variety of ways, and it wasn't done here.

9       Why is that important to the government contracts

10  motion?  Your Honor, it's important for two reasons.  NASA

11  obtains the rights to use code or anything else, any other

12  kind of data, the government calls it data, that was first

13  produced in performance of a federal contract because -- and

14  they -- NASA obtains those rights to use for its -- on its

15  behalf to allow others to use this data produced -- first

16  produced in the performance of a government contract

17  automatically.  It arises from the regulations and the

18  contract clause that was in InDyne's contract.

19       The law is that when a contractor can't show what code

20  was developed for NASA and paid for by NASA, instead

21  integrates it into other code that asserts it developed at

22  private expense, the government gets the rights to all of

23  the code.  Because it's the burden on the contractor, when

24  they're being paid hundreds of millions of dollars in this

25  instance, and when the website is central to the performance

1   of the contract, the modules, these PIMS modules are offered

2   up to meet requirements of the contract, the burden is on

3   the contractor to be able to demonstrate, if it doesn't want

4   the government to have rights in all the code, what portions

5   of the code the government has rights in.

6       Inslaw and Ervin are the two cases that are most on

7   point here, and they explain the regime of that very issue

8   when there is no ability to determine the separate code

9   issues, that the government gets full rights.

10      I'm almost done with this point.  But InDyne argues

11  that the Defense Department regulation should control here

12  instead.  That regulation has no application to this case.

13  This is not a Defense Department case.  This is a NASA case.

14  NASA is a civilian agency.  The regulations in the contract

15  are the ones that Inslaw and Ervin deal with.

16      Even though the Inslaw and Ervin cases, 2005 and 2008,

17  do rely in part on an older Bell case, Bell Helicopter case

18  that was decided under DOD regulations, that case was

19  decided when the DOD regulations were just like today's

20  civilian regulations that apply here.  Bell Helicopter was

21  decided before DOD changed its regulation, even though it's

22  not relevant, it was changed in 2005, I believe -- 1995, I

23  beg your pardon.

24      But the Bell case was decided under the regime that

25  applies, even though it was in DOD, that's similar today to

1    the civilian rule.  So it's perfectly natural that Ervin and

2    Inslaw would cite to that case.

3              THE COURT:  Your time is up for this part.

4              MS. VAN OVER:  For the government contracts?

5              THE COURT:  Right.

6              MS. VAN OVER:  Okay.

7              THE COURT:  I want to hear from the defense -- I

8    mean the plaintiffs.

9              MS. VAN OVER:  Thank you, Your Honor.

10             MR. PATIN:  Good morning.  Douglas Patin for

11   InDyne.

12        There are very significant factual disputes in the

13   record.  And as a background point, we want to note that the

14   PIMS software code that was at issue in this case had been

15   fully developed by InDyne and installed by InDyne before the

16   beginning of this contract.

17        As a factual matter --

18             THE COURT:  Do you have a copy that?

19             MR. PATIN:  Pardon me?

20             THE COURT:  Do you have a copy of that code?

21             MR. PATIN:  We don't have a copy of that specific

22   code, but we have a copy of various portions of that code.

23   Mr. Dyess is going to go into the details of what we do have

24   a copy of.

25        But at the time the contract began, PIMS had been fully

1    developed, including what's called a home page module, which

2    is a module used to set up a website.  And to say that

3    Debbie Bencich developed this website module is inaccurate.

4    We cite in our statement of disputed facts from

5    Ms. Bencich's deposition at page 70 that:  "The technical

6    design of the website was given to me day one, and I never

7    changed it.  And then on December 23rd, 2003, when I sat

8    down at my work station, we had a website with basic

9    content."

10        So there are two elements of this case.  One is the

11   website module and the fact that they copied source code and

12   used that source code to set up a website, and then all the

13   other PIMS modules, which they contend they never used but

14   they copied it in any event.  And that's a copyright

15   infringement.  Whether they used it or not before we caught

16   them with the improper taking of that property doesn't

17   matter under the copyright statute.

18        So we have a very basic dispute of material facts

19   concerning that the PIMS that is the subject of our

20   copyright of registration was fully developed before the

21   beginning of this contract, was not first produced in this

22   contract.  We also have dispute over whether or not any of

23   these PIMS modules were deliverables under the contract.

24        And Mr. Bob Trujillo is not being proffered as some

25   legal expert on statute or regulations.  He was the IT

manager for the KICS Contract.  He -- what we're citing is a

contract clause that he was required to manage during the

course of the contract.  He was there at the beginning of

the contract, he was there at the end of the contract, and

he factually states that none of these PIMS modules were

ever delivered to the government.  Whatever -- on a

government server.

     And so factually, for these clauses to even come into

operation, you have to show that the software code was

either first produced in the performance of the NASA

contract or delivered.  And Mr. Trujillo, who was the person

managing that effort, has presented testimony that neither

of those things happened on this contract.

     Concerning who paid for the PIMS, we have -- we have

affidavits from Mr. Miller and Mr. Nguyen that all of the

PIMS software code development effort was charged to IR&D or

an InDyne code called InDyne Commercial Products Company.

IR&D, even under the Bell Helicopter case, is considered to

be developed at private expense.

     So take apart the DFARS dispute that we have and

whether or not that is relevant to the Court's final

decision, the Bell Helicopter case and the two cases cited

by the government -- by Abacus, Ervin and Inslaw, both cite

Bell Helicopter, and Bell Helicopter says, if it's IR&D,

that's private expense.

1      And while there were enhancements after the contract

2  began, those enhancements to the software code were charged

3  to IR&D, which under the older version of the clause is not

4  considered a government expense.

5      And that's in Mr. Miller's affidavit, and it's also in

6  Mr. Nguyen's affidavit.

7      Now, to the extent that Debbie Bencich was involved

8  with the website, she took the software code that was

9  installed for the website, took the structure, took all the

10 forms, and during the course of the contract would populate

11 it with content, names, addresses, give password

12 authorizations.  That's not the subject matter of our

13 copyright claim.  And to say that Debbie Bencich developed

14 PIMS software code is not what the record reflects.

15     She testified, and we have cited it in our statement of

16 disputed facts, that she did not change the code, the

17 technical design was given to her and she worked it to

18 populate it with information.

19     Therefore, all this argument that we didn't mark the

20 PIMS with proper proprietary legend is irrelevant because it

21 was not a deliverable under the contract.  It was never

22 given to the government under the contract.  And the case

23 law and the language in the contract clause that the

24 defendant relies upon for marking proprietary data simply

25 doesn't apply if it's never given to the government during

1   the course of the contract.

2       So we feel that the record establishes some very basic

3   disputed factual issues which preclude summary judgment.  We

4   dispute that it was first produced during the contract.  We

5   dispute that it was a deliverable under the contract.  To

6   the extent that there was any enhancements made to the PIMS

7   software code, it was charged to IR&D or to the InDyne

8   commercial products, which also was never charged to the

9   government.

10       And therefore, on all three grounds, it wasn't produced

11  during the course of the contract, it wasn't delivered, and

12  whatever enhancements were made to the code that we're

13  arguing was improperly taken was never charged to the

14  government.  And under the Bell Helicopter case, IR&D is

15  considered a private expense.

16       Finally, as a background point, Mr. Reninger was not in

17  charge of any PIMS transition.  He was in charge of the

18  Maximal.  And that's a specific software suite that was

19  going to be given back to the government.  Mr. Trujillo's

20  affidavit goes into that.

21       This was done completely secretly and out of order,

22  Your Honor.  We had a transition team in place where we had

23  meetings on a regular basis with Abacus and NASA.  Not once

24  did NASA ask InDyne to transfer any website.  Not once did

25  Abacus ask during that transition period or during any of

 1  those meetings, can we have access to the website so we can

 2  stand something up?  Instead, under very suspicious

 3  circumstances, an Abacus employee came in, Mr. Reninger

 4  violated all security protocol by letting him use his

 5  password and his ID to go in and copy what he told

 6  Mr. Boylan was proprietary material.  He told Mr. Boylan,

 7  PIMS is proprietary, and our statement of facts demonstrate

 8  that Mr. Boylan, in fact, did copy proprietary material.

 9       And for those reasons, Your Honor, we believe that the

10  motion for summary judgment on the government contracts

11  issue should be denied.

12            THE COURT:  All right.  Do you wish to briefly

13  respond on that?

14            MS. VAN OVER:  I have a -- yes, Your Honor, I'll

15  be brief.

16       Your Honor, the statements of opposing counsel and the

17  declarations, with all due respect, do not dispute any of

18  the evidence that we have put in to support the development

19  of the website in PIMS on behalf of NASA.

20       And I -- Your Honor, they don't refer to any

21  contemporaneous evidence.  They present no contemporaneous

22  evidence.  They refer to none of Abacus's contemporaneous

23  evidence that is all uniformly to the contrary.  They play

24  games with whatever the word "development" means.

25       I offer Exhibit 76, which is InDyne's own description

1  of what development activities are that it is speaking in

2  conflict with.

3       But very, very briefly, just to point to a few of those

4  very key exhibits, Exhibit 14, Ms. Bencich:  "I considered

5  what I was doing web development."

6       That's Deb Bencich's testimony.  They don't want her to

7  be a web developer.  She was a titled web developer.  She

8  was responsible for the web.  She developed the KICS

9  website.  She said, "Yes, I considered what I was doing to

10 be web development."

11      She said, "Now, a task is a developer versus someone

12 doing maintenance, it might be the same to edit a CFN file,"

13 which is a code file at issue here, or a sequel file.

14      "I do put web development on my tax return every year."

15      Exhibit 14, again, web -- "Ms. Bencich, the KICS

16 external home page, is that part of the content you

17 developed?"

18      "Answer:  I developed a KICS external page, content

19 page, yes.

20      "Did you also develop a KICS internal home page?

21      "Answer:  Yes."

22      Mr. Nguyen's requesting Bencich to provide -- to be

23 provided with a portal example so she can build the KICS

24 home page, Exhibit 69.  Exhibit 17 and Exhibit 60, 61

25 through 69 all detail development on behalf of NASA by

1  Ms. Bencich and others at corporate.  And their time was

2  charged not to IR&D.  Ms. Bencich never charged a penny of

3  her time to IR&D.  It was all charged to NASA.

4  Mr. Marcouillier, the same thing.

5       And even -- and we have put in time records, time

6  sheets.  None of that is rebutted by InDyne.  There's not a

7  word in their brief nor in this argument about what those

8  time sheets were for that were billed to NASA, but they're

9  by the developers at corporate and they're billed to NASA.

10      So, Your Honor, with all due respect, I don't think the

11  statements, these generalized, broad statements are

12  supported by any evidence in the record, Your Honor.

13           THE COURT:  All right.  Let's go on to your other

14  motion.

15           MS. VAN OVER:  May I get a glass --

16           THE COURT:  Yes.

17           MS. VAN OVER:  Your Honor, I have reviewed some of

18  the facts with you that are also relevant to Abacus's motion

19  for summary judgment on the copyright case.  The failure to

20  have a copy of PIMS version 2 as it was published in 1993

21  and represented to the copyright office as the code that was

22  being registered does not exist.  PIMS version 1 doesn't

23  exist, so that can't -- the code is not registered and it

24  can't be asserted here.  It can't be removed.  The NASA code

25  is not -- hasn't been tracked.  We only have these broad

1  statements by InDyne.  There was an easy way to -- for them

2  to demonstrate that, but they failed to do it.

3      InDyne's own expert, Mr. Jackson, in Exhibit 71, says,

4  "No, I've seen nothing to indicate that InDyne can show what

5  code was developed for NASA or how it was paid for."

6      So that code, we can't eliminate that code from PIMS

7  version 2 either.  And if any of that code had been

8  maintained, what's been produced in this case is the KICS

9  version of PIMS, you know, as of 2011, and the 1993 version

10 doesn't exist.  I mean the 2003.  I misspoke.  I apologize.

11 It's the 2003 version that doesn't exist, which is the

12 version of PIMS 2.  So if I have used a different date, I

13 apologize.

14     But if a copy of PIMS version 2 from 2003 and PIMS

15 version 1 from 1997 had been retained, we could take those

16 copies and compare them to the 2011 KICS, PIMS, and website

17 version that's been produced in this case and have some

18 chance of figuring out what code should not be asserted

19 here.  We have no way to do that.

20     In Exhibit 47 that we have presented, we've presented

21 our expert's efforts to filter some code based on what he

22 has, but he doesn't have the tools because the tools are not

23 in evidence to filter and conduct an abstraction test even

24 if that's our burden to determine what's not protectable as

25 a defendant.

1    Our expert, who is an exceedingly fine expert, can

2    filter some code, but he can't -- he just doesn't have the

3    tools.  It's a guessing game, Your Honor.  What's been

4    presented here is a guessing game, and that's not an

5    appropriate jury question.  It's appropriate legal

6    determination on a failure of evidence.

7    In the case law in the copyright area, there are a lot

8    of cases in this area that talk about a failure of proof,

9    and they do that from several perspectives.  One is not

10   having a bona fide copy of what was published and what was

11   registered with the copyright office as your registered

12   code.  That's one focus.  The second focus is the best

13   evidence rule.  And as Your Honor knows better than I do,

14   the best evidence rule requires strong evidence that

15   whenever a copy is offered in evidence, that it is a true

16   copy of the original.

17   That's not possible here.  And the case law recognizes

18   that in the copyright area, copyright infringement area,

19   which -- where the specific code is so critical, not to have

20   evidence that you have a bona fide copy of what you're

21   actually claiming is your copyrighted software has been the

22   grounds for dismissal in a number of cases, all of which are

23   cited in our brief.

24   The basic issue being when you mix code, as has been

25   done here, and there's no way to unravel it, even though

```
 1   tools are well developed for doing that and it's easy to
 2   keep a copy, and many people escrow their codes so that if
 3   they ever want to assert it, they have a copy of the code
 4   that they've registered, that they've published as
 5   copyrighted code and registered with the copyright office,
 6   and that hasn't happened here.
 7        Your Honor, the cases -- the Airframe case is a 2011
 8   case.  And its perspective of this, when you have a failure
 9   of proof and a failure of bona fide copies, or here we need
10   additional evidence, not just the original copy of PIMS
11   version 2 because PIMS version 1 has to be extracted, and we
12   don't have that copy, and we don't have a copy of the NASA
13   code which has to be extracted.  So we have a worse case
14   than many of the cases under consideration that we have
15   cited.
16        But the substantial similarity test, which I have
17   outlined to you briefly, is a comparison between the copied
18   code and the copyright and registered code to determine
19   whether there's substantial similarity taken as a whole.
20        But the substantial similarity test only occurs on the
21   protectable elements of the code, which requires this
22   abstraction-filtration test kit removing code that's not
23   original, that here our client had a right to use because it
24   was paid for by NASA.
25        And by the way, I did not -- I neglected to mention to
```

 1  you that NASA has provided a declaration that we have

 2  included here of a high-level NASA official who was involved

 3  in both the InDyne KICS Contract and the Abacus IMCS

 4  contract, and he has made it clear that any code that was

 5  paid for by NASA, Abacus had a right to use on NASA's

 6  behalf.

 7       And, in fact, we also put in Sheila McJunkin's

 8  declaration.  Sheila McJunkin has been on three contracts

 9  for NASA, the InDyne contract and the predecessor contract,

10  the CSOC contract, which was the contract before InDyne's

11  KICS Contract, and she's now working for Abacus on the IMCS

12  contract.  She's got a long, long history of working at KSC.

13  She is the one that transmitted the CSOC website, the

14  website, the NASA CSOC website to InDyne when she started

15  working with InDyne and all of the legacy applications and

16  code that had been developed by contractors prior to the

17  KICS Contract.  She personally transmitted it to InDyne for

18  use.  And e-mails, there are e-mails connected with her

19  declaration where she's thanked by Deb Bencich, the web

20  developer, for providing her with the CSOC website code.

21       But we don't know which CSOC website code might be in

22  the asserted code here either because there's no copies of

23  that.  That wasn't retained or produced in this litigation.

24       But I did want to only use that declaration for one

25  last point, which is to -- the intent issue is something

1  that I know InDyne is big on, but the McJunkin declaration
2  makes it clear that it has been standard operating procedure
3  to transfer the website from contractor to contractor.  And
4  she did it to InDyne, and so Abacus had no reason to think
5  they couldn't use the website.  And indeed, the independent
6  website that Abacus has developed 21 days after it used some
7  of the code from InDyne belongs to NASA.  It was developed
8  just like the KICS code, KICS website was with NASA money by
9  people working full-time on the contract, and it belongs to
10 NASA, and it will be transmitted to the follow-on
11 contractor.
12     Back to the copyright issue.  I think that, briefly,
13 the case law establishes that a case simply cannot go
14 forward when there is an utter and complete failure of proof
15 by failing to have a copy of code that is the code asserted
16 in the complaint, and a copy -- failure to have a copy of
17 the code that was represented to the copyright office as the
18 published copyrighted code, the 2003 PIMS 2 version which
19 doesn't exist.
20     The -- setting aside the inherent issue of fairness
21 here, some courts do even say -- and this is in reference,
22 in all honesty, to a best evidence rule, applying that to
23 the failure to have the code, that it -- to allow a
24 reconstruction, you know, or like we have here a
25 conglomeration of code that clearly is not the asserted

1    code, but we have no way to figure out what is, so I'm

2    calling it a reconstruction, because Mr. Fuji Nguyen grabbed

3    25 pages to give to the copyright office from two separate

4    servers, and they weren't the beginning or ending of any,

5    you know, logical set of code, that in such an area, to

6    permit a reconstruction is to invite fraud, because no one

7    will ever know.  And I think that is at the rock bottom

8    principle for why the best evidence rule has been applied in

9    copyright infringement cases, reasonably strictly, to

10   require a copy, and there is no proof here that there is a

11   copy that even approximates the copyrighted code, Your

12   Honor.

13       And I'd like to reserve the rest of my time, Your

14   Honor, for rebuttal.

15           THE COURT:  All right.

16           MS. VAN OVER:  Thank you.

17           MR. DYESS:  Thank you, Your Honor, for allowing us

18   to split the argument on this.

19       A few points.  Ms. Van Over made the statement that the

20   case law provides that a case cannot go forward where there

21   is an utter failure of the proof of code, and we would agree

22   with that, but that is not what we have in this case.

23       Ms. Van -- I'm sorry, the defendants speak through

24   their copyright motion as if the PIMS source code is a

25   monolithic singular thing.  It is not.  The evidence

1  presented to this Court is that it is a collection of source

2  code files organized by module that consists of somewhere in

3  the neighborhood of 12,600 code files.

4      The evidence in this case that we have presented, and

5  while they dispute this fact in which to present evidence

6  critical of that, is that some 8,000 of those 12,000 files

7  of code were created and last modified between the years of

8  2000 and 2003, which is what our declaration testimony

9  establishes is when the PIMS version 2 code was created.

10      Therefore, we -- we do not dispute because we cannot

11  dispute that we have an intact copy of the PIMS version 2

12  code as it existed in August 2003.  What we do have and what

13  we have presented to the Court and what the two experts

14  apparently agree on is that there is this collection of

15  some, using rough numbers, 66 percent of the code that was

16  the version 3 code as it existed in August of 2003.

17      So to say that there is an utter failure of proof of

18  code is not correct.  That code has been presented, the

19  experts have evaluated it and they have opined on it.  And

20  while there will be presentation to a jury as to filtration

21  and different aspects of the code, the comparison has also

22  been done, and their expert doesn't agree that, yes, that's

23  what they copied.  And that is the fundamental issue in the

24  infringement case is the copying of code.

25          THE COURT:  Is it your contention that none of the

1    code was written during the course of the contract, that it

2    was all finished before the contract?

3              MR. DYESS:  The code was originally -- all of the

4    modules for PIMS version 2 were written before the contract.

5    Were the -- were files modified after the contract start

6    date, yes, Your Honor, we believe that the evidence does

7    show that.  That's not disputed.  We don't dispute that

8    fact.

9         What we do have is this collection of roughly

10   65 percent of the code that was not modified during the

11   contract, and that is a basis, after a trier of fact goes

12   through the abstraction-filtration-comparison test, can

13   find, if they did copy that code, which did exist, which the

14   proof shows it did exist in August of 2003, then you have a

15   copyright infringement.  We have proven our copyright

16   infringement case.

17             THE COURT:  So it doesn't matter whether it's the

18   complete PIMS rather than just portions of it?

19             MR. DYESS:  We don't believe so, Your Honor.  And

20   the foundation for that is in the

21   abstraction-filtration-comparison test itself.

22        If you'll indulge me just a minute, Your Honor, this is

23   how the 11th Circuit in the Bateman case describes the

24   abstraction-filtration-comparison test:  In ascertaining

25   substantial similarity under this approach a Court -- and

 1  here it's talking about the trier of fact in that context --
 2  would first break down the allegedly infringing program into
 3  its constituent structural parts.  Then by examining each of
 4  those parts for such things as incorporated ideas,
 5  expression that is necessarily identical to those ideas and
 6  elements that are taken from the public domain, a Court
 7  would then be able to sift out all nonprotectable material,
 8  left with a kernel or possible kernels of creative
 9  expression.  After following this process of elimination,
10  the Court's last step would be to compare this material with
11  the structure of an allegedly infringing program.  The
12  result of this comparison will determine whether the
13  protectable elements of the programs at issue are
14  substantially similar so as to warrant a finding of
15  infringement.  The process of the
16  abstraction-filtration-comparison test necessarily narrows
17  it down to these kernels of original expression of code.
18       So yes, Your Honor, to answer your question, we don't
19  think it does matter that we have the entire intact version
20  as existed in August 2003.  That's an issue of filtration
21  that a jury will certainly have to consider, but it is not a
22  reason for not allowing us to go forward presenting any
23  proof of what that code was in August of 2003.
24            THE COURT:  All right.
25            MR. DYESS:  To finish that point, Your Honor, the

1  defendants asserted in a number of places in their reply on

2  the copyright summary judgment motion that no original codes

3  exist.  That argument is made several times.  And again,

4  Your Honor, the evidence is that a significant portion of

5  that code, original code, does still exist.

6          THE COURT:  That's the 66 percent that you're

7  talking about?

8          MR. DYESS:  Yes.

9          THE COURT:  And it's your contention that the

10  entire 66 percent was made before the contract with NASA

11  started?

12          MR. DYESS:  Yes, Your Honor.  The metadata

13  associated with that code that can be extracted from the

14  code files in which the experts have done show the dates of

15  creation and the dates they were last modified that are

16  before the date of first publication.  That's the evidence

17  we have submitted to the Court.

18     Ms. Van Over -- the defendants, I'm sorry, Your Honor,

19  speak in their brief of this being an impermissible

20  reconstruction.  Your Honor, the reconstruction cases that

21  are relied upon to speak in terms of -- the Court

22  shouldn't -- or a jury shouldn't consider reconstruction

23  because that would encourage fraud in copyright infringement

24  cases.

25     Let's talk about what a reconstruction is in the

```
 1   copyright context.  This is from one of the principal cases
 2   cited by the defendants in their motion.  It's the Torres
 3   case from the First Circuit, 2007 case:  "To reconstruct
 4   something is to construct again or to rebuild or to make
 5   over or to recreate in the mind from given or available
 6   information.  Given these definitions, a reconstruction is
 7   not a copy, a reconstruction is created without an original,
 8   whereas, a copy is made from an original.  Reconstructions
 9   created from memory without access to the original work
10   could not serve as valid copies for copyright registration
11   purposes."
12        What we have here is not a reconstruction of code, and
13   the cases they point to don't provide the Court with any
14   authority to find that it is.
15        Two of the cases that defendants cite, the Coles case
16   and the Torres case, deal with the deposit of a song as
17   copyright material.  And in both of those cases, the
18   plaintiff in the case, when registering for his copyright,
19   did not have an original version of the song, not the
20   written material or a recorded version of the song.  So what
21   he did was at the time of registration from memory sang the
22   song or played the song into a tape recorder and submitted
23   that to the copyright office and said, "Here is our deposit
24   copy."
25        Well, Your Honor, the Court's finding that those were
```

1   not permissible said you can't create from memory after the

2   fact something that existed prior and let that stand as your

3   legitimate deposit for your copyright registration.

4       That's not what happened in this case.  The evidence we

5   have submitted shows that Mr. Nguyen, the CTO for InDyne,

6   went to InDyne's servers and copied the code that existed on

7   those servers as of the time that he made the registration,

8   and also produced the copyright disk in this case.  He did

9   not go back and reconstruct any code files.  He didn't

10  redact material from code files on the premise that I

11  remember this code said this file said this at the time.  He

12  didn't do any of those things, nor did anybody from InDyne.

13  Nothing was reconstructed.

14      The files that were registered and the files that were

15  produced were copies taken directly from InDyne's computer

16  servers without any reconstruction or repair at all by

17  InDyne.  Therefore, they are just simply not a

18  reconstruction.  They aren't.  And the cases calling them a

19  reconstruction the defendants used just simply don't apply

20  in this case.

21      Back to the point of failure of proof.  The defendants

22  have cited a number of cases where they say that the failure

23  of proof was the issue at summary judgment, and that's the

24  reason they should be entitled to summary judgment in this

25  case.  But an analysis of those cases as to what the failure

```
 1   of proof was shows why summary judgment is not appropriate
 2   in this case.
 3       The Airframe case, which is the principal case cited by
 4   the defendants, did involve software, but summary judgment
 5   was appropriate because the plaintiff had a complete lack of
 6   evidence of what was copied.  In that case, the -- and
 7   that's a Fifth Circuit case -- I believe that's a First
 8   Circuit case, I'm sorry -- the Court said:  "The plaintiff
 9   must necessarily establish the content of the copyrighted
10   work that it contends was infringed to survive summary
11   judgment.  In the present case, Airframe, the plaintiff, was
12   required to present sufficient evidence of copying including
13   substantial similarity with respect to at least one of
14   allegedly infringing source code versions copied -- covered
15   by its copyright registration."
16       What the plaintiff did not present there is any
17   evidence, any evidence of the code it alleges was infringed.
18   And the Court said, having presented no evidence sufficient
19   to prove the content of its registered source code,
20   plaintiff can't show that any of its registered work is
21   substantially similar to the allegedly infringing program.
22       That's just not what we have here.  Again, we have
23   submitted all of our code.  We have tendered that code to
24   the Court.  We've produced it to the other side, and the
25   experts have analyzed it.  And 8,000 files of the 12,000
```

1   files are the code as it existed in August 2003 as the date

2   of publication.  There's simply not a failure of proof in

3   this case.

4        And, Your Honor, one last issue.  In their brief and

5   reply, the plaintiffs attacked the validity of the

6   registration, the PIMS registration.  The point we would

7   like to make there is that registration is a technical

8   formality to bring the copyright infringement lawsuit.  It

9   is not a basis for this Court's jurisdiction.  The Supreme

10  Court has reversed a long line of circuit court cases saying

11  that.  Rather, it is once you comply with the formalities of

12  registration, you have the ability to go forward with your

13  suit.

14       Now, a registration can be invalidated, but in order

15  for a -- and first, we have submitted proof that we

16  submitted a registration, we submitted the deposit with

17  first and last 25 pages of code, we paid the fee, and a

18  registration certificate was issued.  And we're not claiming

19  that raises any presumption as to our ownership, but there's

20  no dispute that those things occurred.

21       In order to invalidate that registration, the

22  11th Circuit has said that it is the defendant's burden to

23  offer proof of scienter meaning that we ended to mislead the

24  copyright office.  And without proof of our intent to

25  mislead the copyright office, the effort to invalidate a

1    registration must fail.

2         There is no, absolutely no evidence in this case that

3    InDyne intended to mislead the copyright office.  It is not

4    sufficient to show that mistakes were made in the

5    registration.  They must show proof that we intended to

6    mislead it.  If we didn't and they don't have that evidence,

7    the Court should not invalidate the registration and it's

8    not a basis for granting summary judgment in this case.

9         Thank you, Your Honor.

10             THE COURT:  All right.

11             MS. VAN OVER:  Your Honor, although it would --

12   although InDyne could certainly have asserted what it

13   considered to be its PIMS version 2 as of 2003, it did not.

14   Therefore, it must do a reconstruction.

15        And the argument just presented to you that 60 percent

16   of the code somehow magically is proven to be PIMS version 2

17   is not accurate.  There is nothing in the code that says,

18   I'm PIMS version 2 or I'm PIMS version 1.  There's nothing

19   except a statement that -- by InDyne that "We developed PIMS

20   version 2 from 2000 to 2003."

21        There's not one contemporaneous document, anything to

22   demonstrate that.  Wouldn't you think a software code

23   developer would have something?  There's no evidence of that

24   fact.

25        And even assuming arguendo that the metadata does not

1  show, it's argument and inference about what the metadata

2  shows.  Metadata is metadata.  It's not -- it's not a code

3  deposit.  It's not tracking of code to show, which is easy

4  to do, when it was developed or why it was developed or for

5  what purpose.

6      Commented code is discussed in our brief, and it's a

7  very simple process.  And it wasn't done.  There were tons

8  of ways to make data in the code reflect what they're trying

9  to say now that this metadata shows, and it just does not.

10  But even let's assume arguendo it did, they have no way of

11  showing what's version 1.  And version 1 is not registered,

12  it's not protected, and it's smooshed together in the code

13  they have asserted here.

14      The last modified date, and I don't believe there's any

15  dispute on this, there is an issue on created date but not

16  last modified date.  It's possible to see a last modified

17  date for a file of code, but it's the last modified date.

18  The code could have been changed 20 times before that at

19  different times, and you won't have any idea of that.  So

20  PIMS version 1 code could have been modified 50, 60,

21  70 times, have a last modified date of 2005, and you

22  wouldn't have any way of determining that it should be

23  excluded from the asserted code.  No way at all.

24      So it's just not true that you don't have to

25  reconstruct the code to assert it.  But really what InDyne

1  wants to do is impose a reconstruction on Abacus without

2  supplying tools to Abacus to do that.

3      And this is a very unusual case.  It's our position, as

4  I believe the Court understands, in the government contracts

5  motion, 100 percent of the code should be filtered out

6  because it was the KICS version of PIMS 2 that's asserted in

7  this case from 2011.  That's when the copy was made from two

8  active servers.

9      So there's absolutely no reason -- those are admitted

10  facts -- there is no reason to think that this is not a

11  reconstructed version.  It's not reconstructed in the same

12  way as the specific case that InDyne's counsel drew to your

13  attention.

14      But the underlying premise in all of the cases is the

15  same, that there has to be evidence sufficient to

16  demonstrate whether there has been sufficient copying.  You

17  know, it has to be sufficiently significant to do a

18  side-by-side substantial similarity comparison that's based

19  on consideration of the entire work.  We don't have the

20  entire work.

21      So whatever analysis InDyne is asking to be done here

22  is inherently based on guessing and reconstruction and

23  interpretation, which it's not -- it shouldn't be our burden

24  to do, and I think the case law does not impose that burden

25  on the defendant, Your Honor.

1    I think I have one more point.

2    I guess just, you know, we have put our declaration,

3  our expert's declaration in evidence, but I think a review

4  of the declaration demonstrates just how impossible the task

5  really is to do in any principled way.  And I'd like to

6  close with this example.

7    InDyne has testified that it used PIMS on a variety of

8  federal contracts, developed PIMS 1 for federal contracts

9  and has developed PIMS 2, PIMS 2 for certain federal

10  contracts, and then it customizes and changes code to meet

11  government requirements on each contract.  None of that is

12  in dispute.  But the code that's been produced is the KICS

13  version of PIMS version 2, which conglomerates the website

14  code which was developed for the KICS Contract with some

15  PIMS modules as they existed in 2011 when the code was

16  produced to us.

17    One of the things you will notice is that it has -- and

18  it has over -- well over 5,000 hits of federal contracts and

19  federal locations, like Kennedy Space Center or Army post

20  bases or other contracts, federal contracts.  This clearly

21  is a conglomeration of who knows where it came from and who

22  knows where it was paid for.

23    We believe we have made a very strong showing, Your

24  Honor, that much of the code was paid for by NASA, and that

25  under the controlling case law that means all code has to be

1    filtered out, because Abacus had the right to use it for

2    federal -- for NASA's benefit, and that's all it did.

3        And then under the case law, the copyright arena, you

4    have to have a bona fide copy.

5        And on the issue of intent, Your Honor, I believe

6    there's plenty of evidence of intent.  There's no intent --

7    there's no evidence that anything was an accident here.

8    Mr. Fuji Nguyen, the CTO of InDyne, did all of this.  He's

9    in charge of the code.  He knows full well he didn't have

10   copies of anything.  He knows full well he has a

11   conglomeration of code.  He knows full well he didn't have

12   the first 25 or last 25 pages to register with the copyright

13   office, as he represented he was doing.  He just plucked it

14   from two different active servers and represented that it

15   was a first and last 25 pages, and it's not.

16       And when you look at that code, it's clear that it's

17   not because it has modification dates in it way, way after

18   2003, the PIMS version 2 date, Your Honor.

19       So we believe, Your Honor, and I think that the

20   evidence is very clear, and especially the unrebutted

21   evidence, number one, and the undisputed evidence to which

22   the parties agree there is sufficient basis to grant both

23   motions for summary judgment on Abacus's behalf.

24       Thank you, Your Honor.

25           THE COURT:  Thank you.

 1      Mr. Dyess, how much of this 66 percent of the code is

 2  in version 1?

 3          MR. DYESS:  Your Honor, based on the evidence, and

 4  I apologize for the belabored answer, the declaration we put

 5  forth shows that version 1 was in place prior to 2000.

 6      Mr. Nguyen's declaration that we put in place was that

 7  version 2, the new modules, were created between

 8  January 2000 and August of 2003.

 9      It's -- the 8,000 files I referenced were created

10  during that time.  So for those 8,000 files, we don't

11  believe any of version 1 is in those files, because contrary

12  to what Ms. Van Over stated, the metadata does show when

13  those files were created, and that was after InDyne was

14  using this PIMS version 1 prior to 2000.

15          THE COURT:  All right.  Okay, I'll get an order

16  out as soon as I can.

17      You should be prepared to -- you're the only case --

18  civil case on the July docket, but the criminal cases trump

19  you.  So you should be prepared to start June 25th.  My --

20      When is my criminal status date?  Does anybody know?

21  The 19th?  All right.  June 19th I'll know whether there's

22  any criminal cases with a speedy trial problem.

23          MR. DYESS:  June 25?

24          THE COURT:  June 25th.

25      And we have to be finished by July 12th, so keep that

1  in mind.

2              (hearing concluded at 11:14 a.m.)

3              C E R T I F I C A T E

4         I certify that the foregoing is a correct

5  transcript from the record of proceedings in the

6  above-entitled matter.

7

8  s\Sandra K. Tremel   May 15, 2012

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25