# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**INDYNE, INC.,**

       **Plaintiff,**

**v.**                                             **Case No:  6:11-cv-137-Orl-22DAB**

**ABACUS TECHNOLOGY
CORPORATION, JERRY RENINGER
and MATTHEW BOYLAN,**

       **Defendants.**

_____

## ORDER

    This cause comes before the Court for consideration of the following motions and responses:

1. Defendant Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan's ("Abacus") Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim Based on the Government's Unlimited Rights & Supporting Memorandum of Legal Authority (Doc. No. 53), filed on March 5, 2012;

2. Plaintiff InDyne, Inc.'s ("InDyne") Opposition to Defendants' Government Contracts Motion for Summary Judgment (Doc. No. 76), filed on April 9, 2012;

3. Abacus' Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim & Supporting Memorandum of Legal Authority (Doc. No. 54), filed on March 5, 2012;

4. InDyne's Opposition to Defendants' Copyright Motion for Summary Judgment (Doc. No. 74), filed on April 9, 2012.

5. Defendants' Reply in Support of their Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim Based on the Government's Unlimited Rights (Doc. No. 87), filed on April 24, 2012; and

6. Defendants' Reply in Support of Defendants' Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim (Doc. No. 89), filed on April 24, 2012.

Because the Court finds dispositive Abacus' motion for summary judgment based on InDyne's copyright infringement claim (Doc. No. 54), it will not reach the other arguments raised in Abacus' motion for summary judgment based on the government's contracts argument (Doc. No. 53).

## I.  BACKGROUND

From 2003 to 2008, InDyne contracted with NASA to "deliver communications and information technology services at NASA's Kennedy Space Center (KSC)."  (Doc. No. 1 at ¶ 11). This contract was known as the Kennedy Integrated Communications Services ("KICS") contract.  As a part of the KICS contract, InDyne utilized its Program Information Management System ("PIMS"), an umbrella system of modules for a contract environment that functions to allow program management staff and customers to see and use data in areas such as work management, work procurement, logistics, safety, and timesheets.  (Lawrence Marcoullier Dep., Doc. No. 86-4 at 36:14-37:4); (Thomas Albert Niemeyer Dep., Doc. No. 86-5 at 49:15-19). Prior to the KICS contract, InDyne had utilized PIMS on at least five government contracts at NASA since 1996.  (*See* Doc. No. 86-3 a p. 4).

InDyne wrote the source code[1] for the PIMS modules in ColdFusion, code language, and the PIMS software suite changed over time as InDyne developed new features for its suite of modules.  (Niemeyer Dep. at 54:20-55:3).  The first version of PIMS ("PIMS V.1") was written in June 1997.  (Doc. No. 1 at ¶ 9).  InDyne never registered with the United States Copyright Office PIMS V.1. (*Cf.* Doc. No. 75-1 at p. 24).  In fact, InDyne did not maintain a copy of PIMS V.1.  The alleged second version of PIMS ("PIMS V.2"), of which some variation was used during the KICS contract, was registered with United States Copyright Office on November 17, 2008 (Registration No.: TX 6-879-047), and InDyne claimed on the registration form that the date of first publication was August 29, 2003.  (Doc.  No. 75-1 at p. 24).  As well, on its copyright registration form, InDyne listed PIMS V.1 as a previous version that should be excluded from copyright protection.  (Doc. No. 86-44 at p. 6).[2]

As stated previously, InDyne relied heavily on PIMS to perform its KICS contract and constantly customized the PIMS modules to conform to the KICS contract as it did with all of its government contracts that employed PIMS.  (D. Fuji Nguyen Dep., Doc. No. 86-15 at112:14-113:12 (noting that there is a version of PIMS V.2 for KICS contract that was result of customization to the contract)).  Thus, the PIMS modules were chameleon-like in nature, i.e. were constantly morphing over the years.  (Thomas Albert Niemeyer Dep., Doc. No. 86-5 at 54:20-55:3).

---

[1] Source code "is a symbolic language, often using English words and common mathematical symbols, that humans can read.  The source code is then translated, through a mechanical process known as compilation or assembly, into 'object code,' which is a concatenation of 1s and 0s readable by computer." 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §13.03[F] n. 271 (Matthew Bender, Rev. ed. 2011).

[2] InDyne has also registered a copyright in the third version of PIMS ("PIMS V.3").  For purposes of this action, the Court's focuses on only PIMS V.2.

Unfortunately, for InDyne, it failed to keep a copy of the PIMS V.2 code as it existed on the date of publication. (Decl. of Duc Fuji Nguyen, Doc. No. 75-1 at ¶ 16). Instead, by the time of its registration in 2008, InDyne only had some version adulterated by years of government contracts and customizations and no clear roadmap[3] by which to decipher what portions were paid for by which parties and what alterations were made. (D. Fuji Nguyen Dep. at 41:10-42:9, 49:21-50:12); (*see* Expert Rpt. of Jeff C. Parmet, Doc. No. 86-46 (noting how the alleged copyrighted code references KICS over ninety-five times despite its supposed first publication occurring prior to the beginning of the KICS contract in 2003)). In fact, thirty-six percent of the alleged copyrighted PIMS V.2 code files produced in discovery have "last modified" dates after the publication date. (Expert Rpt. of Jeff Parmet at p. 20). With this information as a backdrop, the present dispute took shape between InDyne and Abacus.

At the end of the KICS contract period, NASA retained Abacus, instead of InDyne, to perform InDyne's previous functions along with additional duties under the new Information Management and Communications Service (IMCS) contract. In July 2008, during the ninety-day transition period between the contracts, NASA requested Abacus to implement an integrated portal management system similar to the one InDyne had used during the KICS contract because an imminent launch was to occur in October 2008 soon after Abacus' contract period was to begin officially. (Jose Rivera Dep., Doc. No. 86-39 at 26:17-31:9); (Richard Petcol Dep., Doc. No. 86-40 at 34:16-35:9 (noting NASA's concern about having a similarly functioning website

---

[3] The Issue Tracker, InDyne's intranet application used by corporate IT to log software request, did not provide a system during code development of the KICS contract that would track the checking in and checking out of code. (D. Fuji Nguyen Dep., Doc. No. 86-15, at 23:4-12, 47:9-50:12). Moreover, Issue Tracker was not active during the first 15 months of the KICS contract. (Doc. No. 54 at p. 20 at n.9).

for a launch in the first month of the contract)).  Eventually, the launch was delayed and NASA requested that Abacus make a new webpage, specifically making it compliant with the Americans with Disabilities Act.  (Rivera Dep. at 76:21-78:4).

During the ninety-day period when Abacus was attempting to replicate InDyne's website for the fast-approaching launch, Richard Petcol, Abacus' supervisor over the initial website creation, informed others in an email titled "KICS replacement webpage" that an InDyne's transition person, Jerry Reninger[4] ("Reninger") offered to give Abacus all of the non-proprietary source code so Abacus could "stand up" the website as quickly as possible.  (Doc. No. 86-42). At that time, Reninger was working for InDyne, aiding in the transition of software to Abacus.[5] (Jerry Dale Reninger Dep., Doc. No. 86-7 at 24:21-25:5).  On September 8, 2008, Matt Boylan ("Boylan"), an Abacus expert in ColdFusion, met with Reninger because he was told that Reninger would give him access to the InDyne files needed to "stand up" the IMCS website. (Matthew Boylan Dep., Doc. No. 76-10 at 79:12-16).  While in Reninger's office, Boylan stated that Reninger directed him to the directories of files that Boylan needed to copy to a thumb drive. (*Id.* at 81:2-82:19).  After transferring the files from the thumb drive to his laptop, Boylan, through global changes rather than opening up each file, began rebranding the website with the IMCS logo, replacing the KICS logo.  (*Id.* at 95:2-18).  On September 18, 2008, because Boylan

---

[4] During the transition period, Jerry Reninger accepted a position with Abacus under the IMCS contract.  (Jerry Reninger Dep., Doc. No. 76-7 at 15:2-20:20).  Multiple deponents testified that switching to different companies because of new contracts was not uncommon at NASA.

[5] As a part of the transition from InDyne to Abacus, InDyne was contractually obligated to provide Abacus all software and data NASA had the right to use or owned, and InDyne was to provide Abacus a list of software packages used by KICS personnel.  (Decl. of Douglas A. England, Doc. No. 86-57 at ¶ 7); (Doc. No. 86-36 at p. 8 (Transition/Phase Out Plan: KCIS to IMCS, Original Release Date: May 15, 2008)).

did not retrieve a complete set of the files during his first trip to Reninger's office, Boylan returned to Reninger's office to download the remaining files.  (*Id.* at 87:1-4, 105:9-106:4); (*see also* Michael Helmick Dep., Doc. No. 86-33 at 46:19-48:10 (noting that rebranding is "pretty standard business")).  Boylan explained that when he was copying the directories, *in toto*, he did not make a distinction between the directories nor did he know the specifics of each directory. (Boylan Dep. at 176:2-9).

During this mass copying of the directories, Boylan and Reninger[6] inadvertently[7] copied onto the thumb drive some of InDyne PIMS software, as it existed in September 2008. (Reninger Dep. at 104:10-13).  At the time, Reninger believed InDyne's PIMS software was proprietary.  (*Id.* at 12:8-12).  Soon after Abacus commenced its contract with NASA in October 2008, InDyne became aware of Abacus' temporary website and the copying of certain PIMS-related files.

Then, on November 17, 2008, InDyne sent to the United States Copyright Office a Request for Special Handling of its copyright request for PIMS V.2 because the work was "the subject of prospective litigation" and InDyne was "in a dispute with another party concerning unauthorized reproduction and use of the work."  (Doc. No. 86-44 at p. 2).  As a part of its application, InDyne's Chief Technology Officer, D. Fuji Nguyen, utilized for the first twenty-five pages of code filed with the United States Copyright Office a copy of the KICS PIMS V.2, as it existed at the end of the KICS contract.  This copy of the KICS PIMS V.2 was saved to a

---

[6] It is unclear whether Boylan or Reninger was in control of the computer at the time of file transfer.  It is unnecessary to resolve this issue in order to decide the present motions.
[7] Both parties debate whether the copying was inadvertent.  Whether the copying was inadvertent is irrelevant to the Court's determination in this case.

server for InDyne's new contract at Cape Canaveral Air Force Station. (Nguyen Decl. at ¶ 19).[8]
Nguyen also pulled the last twenty-five pages for the registration from a corporate development
server. (*Id.*); *see* 37 C.F.R. § 202.20(c)(2)(vii)(A)(1) (2008) (setting forth the particular pages of
code to file with copyright office).[9] Interestingly, when Nguyen provided a copy of the PIMS
code during discovery from the same two servers, suddenly nineteen files contained metadata
reflecting a date last modified after the November 2008 copyright registration date. (Nguyen
Dec. at ¶ 21). Nguyen was only able to determine that fifteen of these nineteen files were last
modified prior to November 2008. (*Id.* at ¶ 22). There is no explanation for the other four files.

After registering its copyright, InDyne filed the present action against Abacus for
copyright infringement, pursuant to 17 U.S.C. §§ 501 et seq. (Doc. No. 1 at ¶¶ 20-26).[10] In
Abacus' motion for summary judgment based on copyright infringement (Doc. No. 54), Abacus
asserts two alternative arguments: (1) InDyne failed to register a valid copyright and (2) InDyne
is incapable of producing an intact and original version of the August 29, 2003 PIMS V.2 for
purposes of proving substantial similarity between its allegedly copyrighted work and the code
allegedly copied by Abacus. The Court's analysis focuses on the latter argument, which it finds
to be dispositive.[11]

---

[8] Nguyen admitted that others had access to these files during this time but could not
explain why anyone would access these files. (D. Fuji Nguyen Dep. at 194:1-201:16); (Nguyen
Decl. at ¶¶ 21-22).

[9] Even though InDyne did not have the code as it existed on its publication date in August
2003, there is no evidence that InDyne sought special relief from the Register of Copyrights. *See*
37 C.F.R. § 202.20(d) (2008) (setting forth the requirements of special relief).

[10] In its Complaint, InDyne also asserted various state law claims, which the Court has
since dismissed. (Doc. No. 31 (declining to exercise jurisdiction over state law claims)).

[11] Although the Court does not analyze in detail whether InDyne failed to register a valid
copyright, the Court does note that Abacus incorrectly states that an invalid registration is a
jurisdictional question. *See Reed Elsevier, Inc. v. Muchnick*, 130 S.Ct. 1237, 1248 (2010)

## II.  SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is the movant who bears the initial burden of "identifying for the district court those portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)).  In the case in which the non-movant bears the burden of proof at trial, the movant may carry its initial burden by either negating an essential element of the non-movant's case or by demonstrating the absence of evidence to prove a fact necessary to the non-movant's case.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (citation omitted).  Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact.  *Id.* at 1116.  If the movant demonstrates the absence of evidence on a material fact for which the non-movant bears the burden of proof, then the non-movant must either show that the record contains evidence that the movant "overlooked or ignored" or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  *Id.* at 1116-17 (citation omitted).  The non-movant must provide more than a "mere scintilla of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

---

(clarifying that 17 U.S.C. § 411's registration requirement for bringing a copyright infringement action is not a jurisdictional factor).

Further, when analyzing a motion for summary judgment, a court draws all inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). Notwithstanding this inference, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349.

### III. LEGAL STANDARD AND ANALYSIS[12]

#### A.  *The Two-Prong Test for Copyright Infringement*

To state a claim for copyright infringement, InDyne must prove: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

To satisfy the first prong, InDyne must show that the code as a whole is original and that it complied with the applicable statutory formalities.  *MiTek Holdings, Inc. v. ARCE Eng'g Co.*, 89 F.3d 1548, 1553-54 (11th Cir. 1996).  Concerning the second prong, the Court must engage in

---

[12] In Abacus' Reply in Support of Defendants' Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim (Doc. No. 89), Abacus argues that D. Fuji Nguyen cannot create an issue of fact by creating a factual dispute with himself through an affidavit inconsistent with prior testimony.  The Court found that it need not reach this sham affidavit argument in light of its holding in this Order.

As well, Indyne, in its Opposition to Defendants' Copyright Motion for Summary Judgment (Doc. No. 74), requests the Court to strike the March 5, 2012 Declaration of Jeff C. Parmet (Doc. No. 86-58).  Because the Court did not rely on this exhibit in its analysis, the Court denies the objection as moot. As well, InDyne argues that the excerpt from the February 14, 2012 revised report of expert Jeff Parmet (Doc. No. 86-46) should be stricken because it was an unattested expert report.  (Doc. No. 74 at p. 3). Abacus replied that the excerpts are from the Parmet Report included in Abacus' exhibits 91 and 92 (Doc. No. 88-29 & Doc. No. 88-30), which are properly authenticated.  (Doc. No. 89 at p. 4 n.3).  InDyne moved to strike the introduction of these exhibits, which the Court denied.  (Doc. Nos.  91 & 100).  InDyne did not raise again this argument regarding the exhibits at the hearing.  (*See* Doc. Nos. 100 & 106).

two distinct inquiries.  First, the Court must determine whether Abacus, as a factual matter, copied portions of InDyne's PIMS software.  *Id.* at 1554.  Second, the Court must determine, as a mixed issue of fact and law, whether the elements of the PIMS software copied are protected expression and "of such importance to the copied work that the appropriation is actionable."  *Id.* (citation omitted).

With respect to the first inquiry, proof of actual copying may be shown by direct evidence or by inferences drawn from indirect evidence demonstrating that Abacus had access to the copyrighted work and that probative similarities exist between the allegedly infringing work and copyrighted work.  *Id.*  (citations omitted).  Nevertheless, factual proof of copying is merely a single element in satisfying *Feist*'s second prong.  *See Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996).

Importantly, with regards to the second inquiry, copyright infringement only occurs when the defendant copies protected elements of a copyrighted work, those portions satisfying the constitutional requirement of originality.  *MiTek*, 89 F.3d at 1554.  Therefore, InDyne must show "that it is able to prove evidence sufficient for a jury to return a verdict in its favor" as to whether the copying was so extensive that the offending and copyrighted works are substantially similar. *Id.* (citation omitted); *Cohen*, 83 F.3d at 1349.  In other words, "the mere fact that a work is copyrighted does not mean that every element of the work may be protected" because not all copying is actionable.  *MiTek*, 89 F.3d at 1554 (citation omitted); *see also* 4 Nimmer & Nimmer, Nimmer on Copyright § 13.03[F] ("Infringement is shown by a substantial similarity of *protectable expression*, not just an overall similarity between the works.").

As the Court previously stated, it finds the second *Feist* prong to be dispositve in the present case. As well, the factual copying of the PIMS modules is not in question. Therefore, for analytical purposes, the Court will assume that InDyne complied with applicable statutory formalities for ownership of a valid copyright and that there was factual copying. Therefore, the question to be determined is whether InDyne has come forward with sufficient evidence to rebut Abacus' contention that there is an absence of evidence to prove substantial similarity between the allegedly offending work and the protectable, original elements of the copyrighted work. *See Fitzpatrick*, 2 F.3d at 1115-16; *Bateman*, 79 F.3d at 1542.

### B. Altai *Abstraction-Filtration Test Standard*

The Court finds that InDyne is incapable of rebutting Abacus' contention because InDyne has failed to "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *See Fitzpatrick*, 2 F.3d at 1116-17. In the present case, the alleged evidentiary deficiency is that InDyne failed to produce a copy of PIMS V.2, as it existed on August 29, 2003, or a copy of PIMS V.1 for comparison purposes. Without these versions of the PIMS software, a jury cannot conduct the necessary substantial similarity test used to determine a copyright infringement. Thus, there is no basis upon which a jury could reasonably find for InDyne. *See Walker*, 911 F.2d at 1577; *see also* 4 Nimmer & Nimmer, Nimmer on Copyright § 13.03[F] ("[B]efore evaluating substantial similarity, it is necessary to eliminate from consideration those elements of a program that are not protected by copyright.").

In *Bateman*, the Eleventh Circuit Court of Appeals adopted the Second Circuit Court of Appeals' *Altai* test, a three-part test employed to determine the scope of copyright protection that

extends to a computer program's nonliteral structure.  *See Bateman*, 79 F.3d at 1545 (citing

*Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992)).  Although the *Altai* test was

originally formulated to address nonliteral copying of computer code, the Eleven Circuit has held

that "a parallel type of analysis must be undertaken in examining alleged instances of literal

copying of computer code or screen displays."  *Bateman*, 79 F.3d at 1545; *see* Michael D. Scott,

Scott on Information Technology Law § 2.51[B][5] (Aspen Publishers Inc. 2012) (noting that the

Eleventh Circuit in *Bateman* extended the *Altai*'s nonliteral infringement analysis to literal

infringement).[13]  The *Altai* test is critical to the determination of substantial similarity between

the allegedly copyrighted code and the offending use and thus also to the determination of

infringement.  *See* 4 Nimmer & Nimmer, Nimmer on Copyright § 13.03[F] ("In many software

infringement cases, access is either conceded or easily proved, or perhaps even copying itself is

conceded, so that a finding of infringement turns entirely on whether works are substantially

(*i.e.*, 'actionably' ) similar.").  As well, a pertinent consideration is that "copyright law protects

only an author's original expression, not ideas or elements taken from pre-existing works."  *Id.*

The *Altai* test involves three stages: the abstraction stage, the filtration stage, and the

comparison stage.  At the abstraction stage, the court dissects the allegedly copied program's

structure and isolates each level of abstraction contained within it.  This process begins with the

code and ends with an articulation of the program's ultimate function.  *Computer Assocs. Int'l,*

---

[13] In *Mitek*, the Eleventh Circuit explained that "[t]he 'literal elements' of a computer program are its source code and object code" while the "nonliteral elements" "are the products that are generated by the code's interaction with the computer hardware and operating program(s). Examples of nonliteral elements of a computer program include its screen displays and the main menu and submenu command tree structure contained thereon."  *Mitek*, 89 F.3d at 1555 n.15.  For a detailed explanation of source code, see *supra* note 1.

- 12 -

*Inc. v. Altai, Inc.*, 982 F.2d 693, 706-07 (2d Cir. 1992).[14]  Elaborating on the abstraction stage, the Eleventh Circuit has stated,

> Perhaps, the best approach for a district court in any computer program infringement case, whether involving literal or nonliteral elements, is for it to require the copyright owner to inform the court as to what aspects or elements of its computer program it considers to be protectable.  This will serve as the starting point for the court's copyright infringement analysis.

*MiTek*, 89 F.3d at 1555.  Thus, "[t]he purpose of the abstraction portion of the *Altai* test is to enable courts to separate protectable expression from unprotected ideas."  *Id.*

At the filtration stage, the court, successively at each level of abstraction, separates protectable expression from non-protectable material, considering whether the abstraction was an idea, was required by factors external to the program,[15] or taken from the public domain and hence not protectable.  *Altai*, 982 F.2d at 707.  This filtration defines the scope of the plaintiff's copyright.  *Id.*

Finally, at the comparison stage, the court focuses on whether the defendant copied any aspect of the protected expression and assesses the copied portion's relative importance with respect to the plaintiff's overall program.  *Id.*  at 710.  According to the *Altai* court,  after "a court

---

[14] One circuit court stated that "a computer program can often be parsed into at least six levels of generally declining abstraction: (1) the main purpose, (2) the program structure or architecture, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi) object code."  Michael D. Scott, <u>Scott on Information Technology Law</u> § 2.51[B][5] (Aspen Publishers Inc. 2012) (citing *Gates Rubber Co. v Bando Chem. Indus.*, 9 F.3d 823, 835 (10th Cir. 1993)).  In the present case, the Court's analysis is focused on the source code.

[15] Possible extrinsic considerations circumscribing a programmer's freedom of design are: "(1) the mechanical specifications of the computer on which a particular program is intended to run; (2) compatibility requirements of other programs with which a program is designed to operate in conjunction; (3) computer manufacturer's design standards; (4) demands of the industry being serviced; and (5) widely accepted programming practices within computer industry."  *Altai*, 982 F.2d at 709-10 (citation omitted).

has sifted out all the elements of the allegedly infringed program which are 'ideas' or are dictated by efficiency or external factors, or taken from the public domain, there may remain a core protectable expression.  In terms of a work's copyright value, this is the golden nugget." *Id.* at 710 (citation omitted).  However, because there is no copy of PIMS V.1 or PIMS V.2 as it existed on its publication date, the golden nugget is so obscured that not even a famed 49er, with herculean effort, could uncover it.

Abacus argues that no substantial similarity test can be performed because InDyne cannot prove what parts of the PIMS V.2 code presented are protectable due to the fact that the August 2003 PIMS V.2 and PIMS V.1 no longer exist.  As part of this argument, Abacus relies on the Best Evidence Rule because InDyne cannot prove the content of the original code.  Specifically, Abacus emphasizes that InDyne is incapable of separating which parts of the code are from PIMS V.1 and which parts are from third parties.   InDyne did not make any of these specifications when it filed its registration with the Copyright Office as to exactly what particular portions of the submitted code was not copyrightable beyond listing PIMS V.1 as a prior work. (*See* Doc. No. 86-44).   Additionally, Abacus elaborates that in the code produced during discovery, certain files in the code showed last modification dates of April 18, 2011 and other modification dates existing after the November 2008 registration date.[16]

In fact, as previously stated, the PIMS modules were chameleon-like in nature, i.e., were constantly changing over the years.  (Niemeyer Dep. at 54:20-55:3).  By the time of its

[16] Even if the Court were to accept the argument that for certain files, the date of last modification may not be the result of actual modification but rather the mere accessing of the files, (*see* D. Fuji Nyugen Dep. at 198:1-200:4), a jury still could not make the determination as to whether the file existed in 2003 or was originally part of the un-copyrighted PIMS V.1, or was the property of a third party or government entity.

- 14 -

registration in 2008, InDyne was left only with a version adulterated by years of government contracts and customizations and with no clear roadmap to decipher what alterations were made and what parties paid for which portions.  (D. Fuji Nguyen Dep., Doc. No. 86-15 at 41:10-42:9, 49:21-50:12); (*see* Expert Rpt. of Jeff C. Parmet, Doc. No. 86-46 (noting how the copyrighted code references KICS over ninety-five times despite its supposed first publication occurring prior to the beginning of KICS contract in 2003)).  Moreover, thirty-six percent of the code files of the alleged copyrighted PIMS V.2 produced in discovery have last modified dates later than the publication date.  (Expert Rpt. of Jeff Parmet at p. 20).  Because InDyne cannot produce PIMS V.1 or the August 2003 PIMS V.2, InDyne is unable to proffer evidence sufficient for a jury to return a verdict in its favor.  *See Cohen*, 83 F.3d at 1349.

### C.  *Burden of Proof for* Altai *Test*

InDyne, based on an unpublished Eleventh Circuit opinion, claims that it does not bear the burden of showing what is protectable in order to establish a copyright infringement case but may defeat summary judgment by showing sufficient proof that will allow a jury to do so.  (Doc. No. 74 at p. 26); *see Crosspointe, LLC v. Integrated Computing, Inc.*, 199 F. App'x 852 (11th Cir. 2006) (per curiam).[17]  In *Crosspointe*, one of the issues presented on appeal was whether a district court erred by not instructing a jury that it was the plaintiff's burden to show what should be abstracted-filtrated.  Appellant's Initial Brief at 45-59, *Crosspointe, LLC v. Integrated Computing, Inc.*, 199 F. App'x 852 (11th Cir. 2006) (per curiam) (No. 05-13449-FF).  In its unpublished opinion, the Eleventh Circuit panel repeated the issues presented and succinctly stated, without analysis, "After careful review of the briefs and record, and after having the

---

[17] The Court notes that this Eleventh Circuit opinion is unpublished and therefore is not binding but rather only persuasive.

benefit of oral argument, we find no merit in any of these issues." *Id.* at 853.  Because of the lack of analysis, the Court does not find this case to be persuasive, particularly in light of *MiTek*.

Moreover, InDyne ignores the Eleventh Circuit's published opinions when making this argument.  In *MiTek*, the Eleventh Circuit clearly stated that "the ultimate burden is on the copyright holder to prove infringement.  Therefore, if the copyright holder presents the court with a list of features that it believes to be protectable (*i.e.*, original and outside of 17 U.S.C. § 102(b)), the court need not abstract further such features." *MiTek*, 89 F.3d at 1555.  Moreover, before its conclusion, the Eleventh Circuit reiterated that "[t]he burden is on the copyright owner to demonstrate the significance of the copied features." *Id.* at 1560; *see also Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 143 n.26 (5th Cir. 2004) (per curiam) (noting, without reaching the issue of who carries the burden of proof, that the Eleventh Circuit in *MiTek* held that the plaintiff carries the burden when applying the *Altai* test); *Liberty Am. Ins. Grp., Inc. v. Westpoint Underwriters, LLC*, 199 F. Supp. 2d 1271, 1290 (M.D. Fla. 2001) (noting that plaintiff failed to provide any case law supporting the contention that filtration analysis was bore by the defendant as an affirmative defense when plaintiff is seeking an injunction); Scott, Scott on Information Technology Law § 2.51[B][5] ("The burden is on the plaintiff to provide a complete *Altai* analysis.").

Assuming it is InDyne's burden to produce evidence with which to apply the *Altai* test, InDyne has failed to do so.  InDyne makes a veiled attempt at satisfying the abstraction step by claiming, "its copyright extends at least to all of these ColdFusion markup and cascading style sheet files for the PIMSv2 modules located with these directories and subdirectories located on its two copyright CDs, the 'literal elements' of its PIMSv2 software." (Doc. No. 74 at pp. 26-

27).   However, this description fails to separate or even begin to identify which of these ColdFusion files, in their current form, were part of the August 2003 PIMS V.2; which files, if any, were part of PIMS V.1 in some form; and which files, if any, were owned by third parties or government entities.   The reason this cannot be done is simple: InDyne no longer has a copy of the August 2003 PIMS V.2 or PIMS V.1.   Thus, regardless of who must carry the burden as to the *Altai* test, due to insufficient evidence in the record, no reasonable juror will be able to conduct the abstraction-filtration test as there is no way of proving the copyrightable code in the absence of any comparable original code.   Therefore, no reasonable jury could find in InDyne's favor.

### D. *The Sixty-Six Percent Argument*[18]

Notwithstanding, InDyne argues that sixty-six percent, or 8,002 of the 12,631, files on the CDs produced during discovery have "File Created" and "Last Written" dates between January 10, 2000 and August 29, 2003, and thus must be part of the copyrighted August 2003 PIMS V.2 because the proffered version of PIMS V.2 would not operate without this code.   (Doc. No. 74 at

---

[18] While the Court was composing this opinion, InDyne filed on May 25, 2012 Plaintiff's Motion to Correct Oral Argument Statement (Doc. No. 109).   InDyne corrected a misstatement on page 43 of the hearing transcript in which InDyne's counsel refers to Abacus' counsel's contention.   (*See* Hr'g Trans., Doc. No. 106 at 43:1-14).   The Court notes this correction, but as to the remaining arguments in InDyne's motion, the Court finds them moot.   InDyne concedes in the motion that "the 'File Created' metadata cannot be relied upon to determine when the files were created" and instead relies on D. Fuji Nguyen's declaration that states PIMS V.2 was created between 2000 and August 29, 2003.   (Doc. 109 at p. 2).   As discussed in Part III.D of this Order, even taking all reasonable inferences in favor of InDyne and finding that D. Fuji Nguyen's declaration does state that PIMS V.2 was created between 2000 and August 29, 2003, the Court still finds that there is insufficient evidence by a which a jury can make the determination of substantial similarity.   When the Court reads D. Fuji Nguyen's declaration, the Court notes that D. Fuji Nguyen's use of the word "create" relates not only to new modules but also to the enhancement of existing modules.   (D. Fuji Nguyen Decl.  at ¶ 5); *see* Part III.D of this Order.

p. 10 (citing Decl. of Jonathan Luke Tenery, Doc. No. 83-1 at ¶ 19)); (*see also* Transcript of Summary Judgment Hrg., Doc. No. 106, at 30:1-16). However, InDyne fails to consider how its expert defines "File Created" and "Last Written".

According to the Kroll Report, "File Created" "[i]ndicates the date and time a file was initially created. Created can mean actually created, installed, or copied/moved to this media." (Doc. No. 83-4 at p. 4). "Last Written" "[i]ndicates the date and time a files [sic] contents were saved or changed. This date and time would change if you opened a file, changed some information in it and saved the file." (*Id.*). Therefore, based on these definitions, these files may still be from PIMS V.1 or elsewhere but copied or moved to this new media during the 2000 to 2003 timeframe or were opened and resaved during this same timeframe. Moreover, InDyne recently conceded that "the 'File Created' metadata cannot be relied upon to determine when the files were created." (Doc. No. 109 at p. 2). Because there are no copies of PIMS V.1 or the August 2003 PIMS V.2, no reasonable juror could make this determination. There is no way of knowing if these files originated from or were sufficiently different from PIMS V.1 or originated from a prior contract, or were created from scratch[19] other than InDyne's Chief Technology Officer's declaration stating that new code was written. (Decl. of Duc Fuji Nguyen at ¶ 5). Yet, this new code was also developed to enhance existing modules; in other words, modules that predated PIMS V.2. Without PIMS V.1, it is unclear whether these enhanced modules were sufficiently original.[20] *Cf. Montgomery v. Noga*, 168 F.3d 1282, 1289-90 (11th Cir. 1999). In

---

[19] As well, the CD report shows files "created" or "last written" in 1997, 1998, 1999, 2004, 2005, 2006, 2007, 2008, 2009, and 2011. (Doc. No. 83-18).

[20] In fact, two of the enhanced modules, which became known as eServiceTitan and eTimeTitan, are linked to files with File Created dates and Last Written dates as early as 1997 and 1998, respectively. (Doc. No. 83-18 at p. 2).

laymen terms, the PIMS code produced by InDyne in the present case is like a secret code without the secret decoder ring.

### E.  *Why* Montgomery v. Noga *Is Inapplicable*

In its final analysis, InDyne relies heavily on *Montgomery v. Noga* to support its argument that it can prove violation of the copyrighted August 2003 PIMS V.2.  Specifically, InDyne argues that allegedly "some 64% of the code on InDyne's copyright CDs [, the CDs produced in discovery,] was created before the August 29, 2003 publication date" and "that PIMSv2 would not operate without this code" and "that all but four of the 12,000 files on the copyright CDs were created or last modified before the November 17, 2008 registration date." (Doc. No. 74 at p. 29).  However, the Court has previously addressed this sixty-four percent[21] argument as set out above.  Additionally, InDyne, massaging the math in its favor, ignores the obvious counterpoint that at least thirty-six percent of the files were created after August 2003. Finally, *Montgomery* is factually distinguishable from the present case.

In *Montgomery*, the plaintiff Robert Montgomery was the author of a computer software program enabling users to view pictures on the computer screen.  *Montgomery*, 168 F.3d at 1286. Montgomery failed to register a copyright for earlier versions of his software when marketing it, yet he finally did so with version 2.9a in August 1990 and did include a copyright notice on subsequent versions when he marketed the software on computer bulletin boards.  *Id.*  In 1992, the defendants Rebecca Noga and Florida Lion's Den, Inc. downloaded version 4.3, which was not registered until after Montgomery filed his suit against the defendants for copyright

---

[21] InDyne uses sixty-four percent and sixty-six percent interchangeably in its filings and at the summary judgment hearing. *Compare* (Doc. No. 74 at p. 29)*, with* (Doc. No. 106 at 30:10-16)

infringement of version 4.3.  *Id.*  at 1287.  As well, Montgomery's copyright notice did not appear on the version activated by the defendants because the defendants activated a certain feature of the software.  *Id.*

After the jury found that the defendants infringed Montgomery's copyright, the defendants appealed, arguing that Montgomery's copyright in version 2.9a was invalid because earlier versions of the software were injected into the public domain and that scope of version 2.9a, even if valid, did not extend to protect the then, un-copyrighted derivative version 4.3.  *Id.* at 1288.

Regarding the first argument, the Eleventh Circuit found that although version 1.3 and its predecessors were released into the public domain without containing copyright notices, versions 1.4 through 2.9a were sufficiently original to support a valid copyright in version 2.9a as a derivative work.  *Id.* at 1289-90.  In *Montgomery*, the Eleventh Circuit was able to find that version 2.9a "contained several additions and corrections that were not present in version 1.3" and was able to cite a clear revision history for support.  *Id.*  at 1290-91.  However, in the case at bar, there is no copy of PIMS V.1 or a clear revision history or even the August 2003 PIMS V.2 from which to compare the alleged differences in the CDs produced during discovery.  Unlike the *Montgomery* court, this Court has no basis to find that the additions and corrections from PIMS V.1 were sufficiently original.

Regarding the second argument, the Eleventh Circuit affirmed the district court's act of permitting Montgomery to prove infringement of the unregistered version 4.3 by showing that the defendants violated the copyrighted version 2.9a because version 4.3 incorporated over seventy percent of the original source code from the registered version 2.9a.  *Id.*  at 1292.  As

well, the court noted that version 4.3 would not function if the code for version 2.9a was removed. *Id.* (citing the legislative history that stated "under section 106(1), 'a copyright work would be infringed by reproducing it in whole or *in any substantial part*, and by duplicating it exactly or by imitation or simulation' (emphasis added)").

In the present case, InDyne claims that sixty-four percent of the code on the CDs produced during discovery was created on or before the August 29, 2003 publication date and that the PIMS system would not operate without this part of the code.  (Doc. No. 74 at p. 29). Therefore, InDyne concludes that even if the copies provided were a derivative of the code existing in 2003, under *Montgomery*, InDyne still could establish that Abacus infringed the registered code.  *Id.*  This conclusion neglects the fact that in *Montgomery*, the court was presented with the original registered code as of the date of publication and that the plaintiff was able to identify the changes made from earlier unregistered codes.  Further, the facts of this case present the reverse scenario.  InDyne is attempting to use the code in the CDs produced during discovery of which thirty-six percent, at the very least, is dated after August 2003 to prove the contents of another code, the 2003 PIMS V.2, which no longer exists.  All the while, InDyne ignores the fact that it cannot show how the code in the CDs is different from PIMS V.1, which also no longer exists.  In reality, InDyne has a version of the code that does not completely match what it claims it registered in 2008 and that includes the various revisions of changes that occurred during the course of the KICS contract from 2004 to 2008.

To support its argument that *Montgomery* is inapplicable, Abacus also cites a recent First Circuit opinion, *Airframe Systems, Inc. v. L-3 Communications Corporation*, 658 F.3d 100 (1st Cir. 2011).  In *Airframe Systems*, an aircraft maintenance software developer brought a copyright

infringement action against a licensee.  *Id.* at 102-03.  Although the plaintiff had copyrighted

versions of its software, the plaintiff only produced an updated 2009 version of the source code

that was not registered and was insufficient to establish the content of the prior source code

versions covered by the copyright registrations.  *Id.* at 104.  Based on this failure to produce, the

defendant argued that the plaintiff could not prove substantial similarity between the source code

in the alleged infringing work and the registered source code that was allegedly infringed.  The

district court agreed, granting the defendant's motion for summary judgment despite the

declaration produced by the plaintiff's president and designer that after comparing the alleged

infringing work to the 2009 version, the works "shared almost complete identicality" down to

misspelled words.  *Id.*

　　　In affirming the lower court, the First Circuit reiterated that the district court concluded

that the plaintiff, whose burden it was to prove the allegedly infringed source code in its original

form, had failed to produce the relevant source code.  *Id.* at 104, 105.  Elaborating further, the

First Circuit stated that by

> [h]aving presented no evidence sufficient to prove the content of
> its registered source code versions, Airframe cannot show that
> any of its registered works is substantially similar to the allegedly
> infringing M3 program, and Airframe has failed to create a
> genuine issue of material fact as to its claim of copyright
> infringement.

*Id.* at 107.  Therefore, the First Circuit concluded that the plaintiff failed to establish a prima

facie case of copyright infringement.  *Id.* at 105; *see also id.* at 106, 107 (noting that before a

"comparison can take place, the plaintiff must necessarily establish the content of the

copyrighted work that it contends was infringed" even if there is evidence of direct copying).

Similarly, in the present case, InDyne has failed to present a copyrighted version of the code and cannot prove the contents of the original code because neither PIMS V.1 nor the August 2003 PIMS V.2 exists.

F.   *The Best Evidence Rules Argument*

A lingering issue is the Best Evidence Rule, under which "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith . . . ."  Fed. R. Evid. 1004 (2012).  InDyne argues that it has satisfied the Best Evidence Rules with the CDs it produced during discovery because: (1) the CDs were duplicates of the code registered in 2008 as they were copied directly from the same sources as in 2008  or in the alternative, (2)  the August 2003 original code was not destroyed in bad faith and thus the CDs, as secondary evidence, may be used to prove the content of the original.  (Doc. No. 74 at pp. 21-22); *see* Fed. R. Evid. 1003 (2012) ("A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."); *cf. Airframe Sys., Inc.*, 658 F.3d at 107 n.9 ("We note that, if the Best Evidence Rule is satisfied, evidence other than the original may be sufficient to establish the content of a copyrighted work. . . . Airframe has made no effort to satisfy the requirements of the Best Evidence Rule here."  (citations omitted)).

Assuming *arguendo* that InDyne did not destroy in bad faith the August 2003 PIMS V.2, the CDs produced during discovery still, even if admitted as secondary evidence, do not allow a jury to determine which portions of the CDs are PIMS V.1 or from other sources, which may not even be copyrightable.  Moreover, with respect to the duplicate argument, the CDs still include at

least four files that were produced or modified after the November 2008 registration date and at least thirty-six percent of the files on the CDs were created or modified after August 2003, raising a question as to the duplicate's accuracy.  (*See* Doc. No. 74 at pp. 22, 29); *see also* Fed. R. Evid. 1001(e) ("A 'duplicate' means a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original.").  This fact alone raises an issue as to whether these files are reliable considering the ability to change them throughout the KICS contract and beyond.  As well, Abacus has raised a genuine question as to the authenticity of the original, the August 2003 PIMS V.2, and a fairness question based on the fact that InDyne cannot even prove what parts of the August 2003 code are from PIMS V.1, third parties, or government contracts as no copy of PIMS V.1 exists.  *See* Fed. R. Evid. 1003 (2012).[22]   Finally, in the present case, not only is there serious issue as to the accuracy of the duplicate, there is also serious issue as to the accuracy of the alleged original registered in 2008 with respect to whether portions of it were even copyrightable.[23]

---

[22] In fact, during his deposition, D. Fuji Nguyen, who prepared the CDs and the 2008 copyright registration, was uncertain what type of server he used to pull the files for the CDs. (D. Fuji Nguyen Dep. at 196:2-197:19).

[23] As part of its argument, Abacus cites multiple cases invalidating registrations when the plaintiff attempted to reconstruct a deposit from memory rather than referring to the original. *See, e.g., Coles v. Wonder*, 283 F.3d 798 (6th Cir. 2002) (finding invalid registration when copy made for deposit was based off of memory rather than being virtually identical to the original and made by referring to the original); *Geoscan, Inc. v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir. 2000) (finding incomplete registration when plaintiff filed later versions of source code rather than the original source codes for its software); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209 (9th Cir. 1998) (holding a copyright registration invalid when the plaintiff sketched the cartoon characters from his memory rather than referring to the original); *Shroats v. Customized Tech., Inc.*, No. 08-C-5565, 2011 U.S. Dist LEXIS 68142 (N.D. Ill.  June 22, 2011) (finding registration invalid when plaintiff, lacking an original copy of the software, filed a different version that underwent frequent changes since the alleged publication date ten years prior and attempted to reconstruct the submitted version from memory); *Tavory v. NTP, Inc.*, 495 F. Supp. 2d 531, 536 (E.D. Va. 2007) (finding registration invalid when plaintiff, lacking a copy of the

### G.  *Attorney's Fees*

Abacus argues that InDyne's request for attorney's fees in its Complaint is impermissible because the alleged infringement occurred prior to the registration and because the registration application was made more than three months after the publication date.  (Doc. No. 54 at pp. 24-25).   InDyne concedes that the Court cannot award it attorney's fees on its copyright infringement claim as the request was related to its state law claims that the Court previously dismissed.  (Doc. No. 74 at p. 29).

## IV. CONCLUSION

In sum, the Court finds that Abacus has identified portions of the record, which demonstrate the absence of a genuine issue of material fact regarding the substantial similarity test component of a copyright infringement claim.  *See Cohen*, 83 F.3d at 1349.  Specifically, Abacus has shown that InDyne cannot produce a code sufficient for a substantial similarity comparison, an essential element of InDyne's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  As well, the Court has determined that InDyne, as the non-movant bearing the burden at trial, neither has shown that the record contains evidence that Abacus "overlooked or ignored" nor has InDyne "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  *Id.* at 1116-17.  Therefore, the Court holds that InDyne has failed to make "enough of a showing that the jury could reasonably find for" it, even drawing all inferences from the evidence in the light most favorable to InDyne.  *Walker*, 911

---

original source code from 1990, attempted to deposit a code by referring to modified versions of the 1990 code and redacting the modification based on recollections of the original and noting unlike other cases upholding registration, a bona fide copy of the original from which to effect reproduction was lacking). Although the code produced may be a conglomeration of prior code, labeling it as a reconstruction is a misnomer.  The Court will not explore this argument further.

F.2d at 1577;  *Porter*, 461 F.3d at 1320.

Therefore, based on the foregoing, it is **ORDERED** as follows:

1. Plaintiff's Motion to Correct Oral Argument Statement (Doc. No. 109), filed on May 25, 2012, is **GRANTED** to the extent it corrects lines 9 through 14 of pages 43 of the Hearing Transcript (Doc. No. 106).  As to the remainder, the motion is **DENIED** as **moot**.

2. Abacus' Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim & Supporting Memorandum of Legal Authority (Doc. No. 54), filed on March 5, 2012, is **GRANTED** in so far as it argues that InDyne cannot prove the copying of the constituent elements of the work such that a jury could determine the substantial similarity between the alleged copyrighted work and the purported infringing work.

3. Abacus' Motion for Summary Judgment on Plaintiff's Copyright Infringement Claim Based on the Government's Unlimited Rights & Supporting Memorandum of Legal Authority (Doc. No. 53), filed on March 5, 2012, is **DENIED as moot**.

4. The Clerk is **DIRECTED TO CLOSE** this case.

5. The Clerk is **SHALL ENTER** a final judgment providing that InDyne shall take nothing on its claims against Defendants and that Defendants shall recover their costs of the action.

**DONE** and **ORDERED** in Orlando, Florida on June 1, 2012.


ANNE C. CONWAY
United States District Judge


Copies furnished to:

Counsel of Record
Unrepresented Parties