# United States District Court
## Middle District of Florida
## Orlando Division

INDYNE, INC.,

     **Plaintiff,**

-vs-             **Case No.  6:11-cv-137-Orl-22DAB**

ABACUS TECHNOLOGY
CORPORATION, JERRY RENINGER and
MATTHEW BOYLAN,

     **Defendants.**
_____/

## Report And Recommendation

**TO THE UNITED STATES DISTRICT COURT**

   This cause came on for consideration without oral argument on the following motions filed

herein:

| | |
|---|---|
| **MOTION:** | **MOTION FOR ATTORNEY'S FEES AND COSTS (Doc. No. 144)** |
| **FILED:** | **May 10, 2013** |
| | |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED** in part.

| | |
|---|---|
| **MOTION:** | **MOTION FOR ATTORNEY'S FEES AND COSTS (Doc. No. 153)** |
| **FILED:** | **June 12, 2013** |
| | |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED** in part.

   Defendants Abacus Technology Corporation, Jerry Reninger and Matthew Boylan, as the

prevailing parties in the district court and on appeal, seek to recover their attorney's fees from Plaintiff

InDyne, Inc. pursuant to the Copyright Act, 17 U.S.C. § 505.  Docs. 144, 153.  The Court finds that

an award of fees is warranted under the Copyright Act for the litigation and the appeal, but in amounts far less than the $1.47 million award sought by Abacus.

# I.  Background Facts[1]

From 2003 to 2008, InDyne contracted with NASA to deliver communications and information technology services at NASA's Kennedy Space Center (KSC) under the Kennedy Integrated Communications Services ("KICS") contract. As a part of the KICS contract, InDyne utilized its Program Information Management System ("PIMS"), an umbrella system of modules for a contract environment that functions to allow program management staff and customers to see and use data in areas such as work management, work procurement, logistics, safety, and timesheets. Prior to the KICS contract, InDyne had utilized PIMS on other government contracts at NASA since 1996.

InDyne wrote the source code[2] for the PIMS modules in ColdFusion, a code language, and the PIMS software suite changed over time as InDyne developed new features for its suite of modules. The first version of PIMS ("PIMS V.1") was written in June 1997, however, InDyne never registered it with the United States Copyright Office. In fact, InDyne did not maintain a copy of PIMS V.1. The alleged second version of PIMS ("PIMS V.2"), of which some variation was used during the KICS contract, was registered with United States Copyright Office on November 17, 2008 (Registration No.: TX 6-879-047), and InDyne claimed on the registration form that the date of first publication was August 29, 2003. Additionally, on its copyright registration form, InDyne listed PIMS V.1 as a previous version that should be excluded from copyright protection.  InDyne relied heavily on PIMS to perform its KICS contract and constantly customized the PIMS modules to conform to the KICS

---

[1]The Background is taken from Judge Conway's summary judgment order.  Doc. 113  (internal citations omitted); decision published as *InDyne, Inc. v. Abacus Tech. Corp.*, 876 F. Supp.2d 1278 (M.D. Fla. 2012).

[2]Source code "is a symbolic language, often using English words and common mathematical symbols, that humans can read. The source code is then translated, through a mechanical process known as compilation or assembly, into 'object code,' which is a concatenation of 1s and 0s readable by computer." 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §13.03[F] n. 271 (Matthew Bender, Rev. ed. 2011).

contract as it did with all of its government contracts that employed PIMS. Thus, the PIMS modules were chameleon-like in nature and were frequently morphing over the years.

Unfortunately for InDyne, it failed to keep a copy of the PIMS V.2 code as it existed on the date of publication.  Instead, by the time of its registration in 2008, InDyne only had some version adulterated by years of government contracts and customizations and no clear roadmap by which to decipher what portions were paid for by which parties and what alterations were made. In fact, thirty-six percent of the alleged copyrighted PIMS V.2 code files produced in discovery had "last modified" dates *after* the publication date. With this information as a backdrop, the lawsuit took shape between InDyne and Abacus.

At the end of the KICS contract period, NASA retained Abacus, instead of InDyne, to perform InDyne's previous functions along with additional duties under the new Information Management and Communications Service (IMCS) contract. In July 2008, during the ninety-day transition period between the contracts, NASA requested Abacus to implement an integrated portal management system similar to the one InDyne had used during the KICS contract because an imminent launch was to occur in October 2008, soon after Abacus' contract period was to begin officially. Eventually, the launch was delayed and NASA requested that Abacus make a new webpage, specifically making it compliant with the Americans with Disabilities Act.

During the ninety-day period when Abacus was attempting to replicate InDyne's website for the fast-approaching launch, Richard Petcol, Abacus' supervisor over the initial website creation, informed others in an email titled "KICS replacement webpage" that InDyne's transition person, Jerry Reninger[3] ("Reninger") offered to give Abacus all of the non-proprietary source code so Abacus could "stand up" the website as quickly as possible. At that time, Reninger was working for InDyne, aiding

---

[3]During the transition period, Jerry Reninger accepted a position with Abacus under the IMCS contract. Multiple deponents testified that switching to different companies because of new contracts was not uncommon at NASA.

in the transition of software to Abacus.[4] On September 8, 2008, Matt Boylan ("Boylan"), an Abacus expert in ColdFusion, met with Reninger because he was told that Reninger would give him access to the InDyne files needed to "stand up" the IMCS website. While in Reninger's office, Boylan stated that Reninger directed him to the directories of files that Boylan needed to copy to a thumb drive. After transferring the files from the thumb drive to his laptop, Boylan, through global changes rather than opening up each file, began rebranding the website with the IMCS logo, replacing the KICS logo. On September 18, 2008, because Boylan did not retrieve a complete set of the files during his first trip to Reninger's office, Boylan returned to Reninger's office to download the remaining files. Boylan explained that when he was copying the directories, in toto, he did not make a distinction between the directories nor did he know the specifics of each directory.

During this mass copying of the directories, Boylan and Reninger inadvertently copied onto the thumb drive some of InDyne PIMS software, as it existed in September 2008. At the time, Reninger believed InDyne's PIMS software was proprietary. Soon after Abacus commenced its contract with NASA in October 2008, InDyne became aware of Abacus' temporary website and the copying of certain PIMS-related files.

Then, on November 17, 2008, InDyne sent to the United States Copyright Office a Request for Special Handling of its copyright request for PIMS V.2 because the work was "the subject of prospective litigation" and InDyne was "in a dispute with another party concerning unauthorized reproduction and use of the work." As a part of its application, InDyne's Chief Technology Officer, D. Fuji Nguyen, utilized for the first twenty-five pages of code filed with the United States Copyright Office a copy of the KICS PIMS V.2, as it existed at the end of the KICS contract. This copy of the KICS PIMS V.2 was saved to a server for InDyne's new contract at Cape Canaveral Air Force

---

[4]As a part of the transition from InDyne to Abacus, InDyne was contractually obligated to provide Abacus all software and data NASA had the right to use or owned, and InDyne was to provide Abacus a list of software packages used by KICS personnel.

Station. Nguyen also pulled the last twenty-five pages for the registration from a corporate development server. Interestingly, when Nguyen provided a copy of the PIMS code during discovery from the same two servers, suddenly nineteen files contained metadata reflecting a date last modified after the November 2008 copyright registration date. Nguyen was only able to determine that fifteen of these nineteen files were last modified prior to November 2008. There is no explanation for the other four files.

After registering its copyright, InDyne filed the present action against Abacus for copyright infringement, pursuant to 17 U.S.C. §§ 501 et seq.  In Abacus' motion for summary judgment based on copyright infringement, Abacus asserted two alternative arguments: (1) InDyne failed to register a valid copyright and (2) InDyne is incapable of producing an intact and original version of the August 29, 2003 PIMS V.2 for purposes of proving substantial similarity between its allegedly copyrighted work and the code allegedly copied by Abacus. The District Judge granted summary judgment on the latter argument, finding InDyne could not produce an intact and original version of the August 29, 2003 PIMS V.2 for purposes of proving substantial similarity, an issue which was dispositive on the copyright infringement.

## II.  ANALYSIS

### A. Legal Standard for Fees Under the Copyright Act

Defendants seek to recover their attorney's fees as the prevailing parties under the Copyright Act, 17 U.S.C. § 505, from Plaintiff InDyne, arguing they are entitled to attorney's fees because they are the prevailing parties, InDyne's copyright claim was objectively unreasonable and frivolous, improperly motivated, and such an award would have deterrence value. Doc. 144.  Defendants also argue that the proposed amount of its fees and costs are reasonable under the standards of the Act.

InDyne contends that Defendants did not prevail on the merits, but rather on a technical defense and escaped liability for copyright infringement despite their admitted unauthorized, secret

copying of InDyne's PIMS proprietary source code, thus, Defendants should not be rewarded for such misconduct merely for prevailing under what InDyne characterizes as "a new standard of copyright proof." InDyne contends that Judge Conway only granted summary judgment to Defendants because InDyne could not produce certain original versions of PIMS as those versions existed in the past, which it argues was a new evidentiary burden that did not exist in prior case law. Awarding fees to Defendants despite their wrongful conduct, InDyne argues, would be inconsistent with the Copyright Act's purpose and would endorse Defendants' misappropriation with an award of fees.

It is the general rule in this country that, unless Congress provides otherwise, parties are to bear their own attorney's fees. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975) (tracing the origins and development of the American Rule)). Pursuant to 17 U.S.C. § 505, "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Unlike certain other areas of federal law, the Copyright Act neither mandates an award of fees nor favors one party over the other in regard to such an award. The Supreme Court has stated that for purposes of § 505 "[p]revailing plaintiffs and prevailing defendants are to be treated alike, but attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Fogerty*, 510 U.S. at 534 (declining to adopt British Rule by which fees would be awarded as a matter of course to prevailing parties).

In determining whether to award attorney's fees under § 505, the district court "should consider not whether the losing party can afford to pay the fees but whether imposition of fees will further the goals of the Copyright Act," *i.e.*, "by encouraging the raising of objectively reasonable claims and defenses, which may serve not only to deter infringement but also to ensure that the boundaries of copyright law are demarcated as clearly as possible in order to maximize the public

exposure to valuable works." *Mitek Holdings, Inc. v. Arce Engineering Co., Inc.*, 198 F.3d 840, 842 (11th Cir. 1999) (quoting *Fogerty*, 510 U.S. at 526-27).  Nonexclusive factors the court is to consider in determining whether to award prevailing party attorney fees under the Copyright Act include frivolousness, motivation, objective unreasonableness (both in factual and in legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence. *Fogerty*, 510 U.S. at 534; *Mitek Holdings*, 198 F.3d at 842-43.  "When close infringement cases are litigated, copyright law benefits from the resulting clarification of the doctrine's boundaries. But because novel cases require a plaintiff to sue in the first place, the need to encourage meritorious defenses is a factor that a district court may balance against the potentially chilling effect of imposing a large fee award on a plaintiff who, in a particular case, may have advanced a reasonable, albeit unsuccessful, claim." *Lotus Dev. Corp. v. Borland Int'l Inc.,* 140 F.3d 70, 75 (1st Cir. 1998).

The Second Circuit has recognized that "objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted" because "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." *Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 121-22 (2d Cir. 2001); *see also Baker v. Urban Outfitters, Inc.*, 431 F. Supp.2d 351, 357 (S.D. N.Y. 2006), *aff'd*, 2007 WL 2908272 (2nd Cir. 2007). "This is because such attorney fee awards may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law." *Ariel (UK) Ltd. v. Reuters Group PLC*, No. 05 Civ. 9646, 2007 WL 194683, at *1 (S.D. N.Y. Jan. 24, 2007) (citing *Fogerty*, 510 U.S. at 527).

The district court in *Chivalry Film Productions v. NBC Universal, Inc.* discussed the reasoning behind the award of fees to a prevailing defendant in various post-*Fogerty* "objectively unreasonable" cases:

The mere fact that a defendant has prevailed, however, does not necessarily equate with an objectively unreasonable claim. To hold otherwise would establish a *per se* entitlement of attorney's fees whenever issues pertaining to judgment are resolved against a copyright Plaintiff. . . . This is not a correct construction of the law. Similarly, the fact that a defendant has prevailed on a motion to dismiss or on summary judgment does not require the court to award fees. However, if a copyright claim is clearly without merit or otherwise patently devoid of legal or factual basis, that claim ought to be deemed objectively unreasonable, and an award of fees and costs is then proper. . . . Moreover, although the Plaintiff in this case did not engage in a campaign of vexatious litigation, the need for deterrence against objectively unreasonable copyright claims is significant. Just as attorney fee awards may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law, the denial of such awards in objectively unreasonable cases also disserves the purposes of copyright law, by failing to protect the owners of valid copyrights from the cost of frivolous litigation. Furthermore, the denial of fees and costs to a prevailing defendant in an objectively unreasonable copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to chill. Future litigants should be discouraged from comparable behavior.

2007 WL 4190793, *2-3 (S.D. N.Y. 2007) (internal quotation marks and citation omitted) (awarding fees to prevailing defendant granted summary judgment on screenwriter's claims of copyright infringement by two films where "no reasonable trier of fact could find that plaintiff had established substantial similarity of work or alternatively that the films were based on independent prior creations that pre-dated Plaintiff's copyrights"). With these standards in mind, the Court turns to the facts of this case.

### B. Analysis of the Copyright Act Fee Claim

1. *Prevailing Party*

Defendants are clearly the prevailing parties inasmuch as the Eleventh Circuit affirmed summary judgment in favor of Defendants as to InDyne's copyright infringement claim. Doc. 137 (affirming the district court's "on the basis of the thorough and well-reasoned opinion"). InDyne does not dispute that Defendants were the prevailing party "in a technical sense," but argue an award of fees would not further the purposes of the Copyright Act. To determine whether a fee should be

awarded, the Court must also consider the rest of the non-exclusive list of factors suggested by the Supreme Court. *See Mitek Holdings*, 198 F.3d at 842 (citing *Fogerty*, 510 U.S. at 526-27).

    2. *Frivolousness*

    Two elements must be proven for a valid copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). To satisfy the first prong, InDyne was required to show that the code as a whole was original and that it complied with the applicable statutory formalities. Doc. 113 at 9 (citing *MiTek Holdings, Inc. v. ARCE Eng'g Co.*, 89 F.3d 1548, 1553-54 (11th Cir. 1996)). Concerning the second prong, Judge Conway was required to determine, first, whether Abacus, as a factual matter, copied portions of InDyne's PIMS software, and, second, whether the elements of the PIMS software copied were protected expression and "of such importance to the copied work that the appropriation is actionable." Doc. 113 at 9 (citing *Id.*).

    Judge Conway noted that, based on the relevant case law, InDyne had to show "that it is able to prove evidence sufficient for a jury to return a verdict in its favor" as to whether the copying was so extensive that the offending and copyrighted works were substantially similar. Doc. 113 at 9 (citing *id.*); *Cohen*, 83 F.3d at 1349. For analytical purposes, Judge Conway *assumed* that InDyne had complied with applicable statutory formalities for ownership of a valid copyright and that there was factual copying, and concentrated on determining the relevant inquiry of whether InDyne had come forward with sufficient evidence to rebut Abacus' contention that there was an absence of evidence to prove substantial similarity between the allegedly offending work and the protectable, original elements of the copyrighted work. Doc.113 (citations omitted). Given that Judge Conway assumed these foundational elements were present for analytical purposes – rather than found them completely lacking – it does not appear that InDyne's claims can be considered frivolous. Moreover, Defendants

do not argue InDyne's claims were frivolous as a separate element, but instead collapse it into the discussion that they were collectively "objectively unreasonable and frivolous" without making a distinction between the two criteria.  Doc. 144 at 7-8.

   3.  *Objective Unreasonableness of Copyright Claims*

   Cases applying the objectively unreasonable standard predictably run in both directions and are highly dependent on case specific facts and circumstances.  The mere fact that summary judgment was granted, in and of itself, does not speak to whether Plaintiff's claims were "objectively unreasonable."  *See, e.g., FASA Corp. v. Playmates Toys, Inc.*, 1 F.Supp.2d 859, 864 (N.D. Ill.1998) ("Not all unsuccessfully litigated claims are objectively unreasonable."); *Garnier v. Andin Int'l, Inc.*, 884 F.Supp. 58, 62 (D. R.I. 1995) (holding that although plaintiff's suit was "premised on an erroneous view of the law," it was not unreasonable).

   Another Judge of the Middle District previously noted in *CrossPointe, LLC v. Integrated Computing, Inc.,* "[s]ince the *Fogerty* Court reaffirmed the discretion permitted by § 505, several courts have exercised that discretion to deny attorney's fees to prevailing parties in copyright actions."  Case No. 6:03-cv-558, 2005 WL 1677460, *4 (M.D. Fla. Jul. 18, 2005) (citing *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 382-83 (5th Cir. 2004) (affirming district court's denial of fees to prevailing defendant where claims were not "frivolous, objectively unreasonable, or without proper motive" and an award would not deter future meritless lawsuits); *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 74-75 (1st Cir. 1998) (in a case of first impression, denial of fees was within court's discretion where "both parties had important economic interests in the litigation," deterrence was not a factor, and plaintiff's unsuccessful claim was reasonable); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 754 (11th Cir. 1997) (affirming denial of defendant's motion for fees in light of *Fogerty* factors without analysis); *Clark v. Hudson Bay Music, Inc.*, 1996 WL 547186, *2 (2d Cir. 1996) (denial of plaintiff's request for fees affirmed where damages and future royalties made

considerations of deterrence and compensation irrelevant); *Johnson v. Tuff-N-Rumble Mgmt., Inc*., 2000 WL 1145748, *11 (E.D. La. 2000) (denying defendant's request for fees where plaintiff's claims were colorable and not objectively unreasonable and where award would not deter future baseless suits); *Compaq Computer Corp. v. Procom Tech., Inc.*, 908 F.Supp. 1409, 1429 (S.D. Tex. 1995) (declining to award fees to prevailing plaintiff where deterrence was served by injunctive relief and defendant's position was not objectively unreasonable); *Bourne Co. v. Walt Disney Co.*, 1994 WL 263482, *2 (S.D. N.Y. 1994) (denying plaintiff's motion for fees where case involved unsettled issues of law and defense raised by unsuccessful defendant was "fair ground for litigation" even if not accepted by jury), *aff'd*, 68 F.3d 621 2nd Cir. 1995); *see also Donald Frederick Evans & Assoc. v. Continental Homes, Inc*., 785 F.2d 897, 916 (11th Cir. 1986) (in pre-*Fogerty* case, affirming denial of prevailing defendant's fee request where plaintiff's claims were colorable)).

However, there are also a number of cases post-*Fogerty*, that have awarded fees to prevailing defendants for plaintiffs' objectively unreasonable claims. *See, e.g.*, *Amadasun v. Dreamworks*, *LLC*, 359 F.Supp.2d 1367, 1375-76 (N.D. Ga. 2005) (awarding fees for defense of screenwriter-plaintiff's claims against two large film companies which were "objectively unreasonable"); *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 894 (6th Cir. 2004) (awarding fees to prevailing defendant where plaintiffs chose to sue hundreds of defendants all at the same time, regardless of the strength of the individual claims for contributory infringement and negligence based on shaky facts and even shakier legal arguments and inevitably swept up parties against whom they had little or no chance of succeeding and defendants prevailed on a statute of limitations defense).

Defendants argue that InDyne's decision to bring a copyright claim was objectively unreasonable because the "evidentiary deficiency" was known to Plaintiff at the time it filed its November 2008 application for copyright protection of "PIMS V.2" and at the time it filed this lawsuit. Doc. 144.

Judge Conway applied the *Altai* Abstraction-Filtration Test Standard in finding that "InDyne is incapable of rebutting Abacus' contention because InDyne has failed to 'come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" Doc. 113 at 8. Judge Conway discussed at length the "evidentiary deficiency" presented by InDyne's lack of a copy of PIMS V.2:

> In the present case, the alleged evidentiary deficiency is that InDyne failed to produce a copy of PIMS V.2, as it existed on August 29, 2003, or a copy of PIMS V.1 for comparison purposes. Without these versions of the PIMS software, a jury cannot conduct the necessary substantial similarity test used to determine a copyright infringement. Thus, there is no basis upon which a jury could reasonably find for InDyne. *See Walker*, 911 F.2d at 1577; *see also* 4 Nimmer & Nimmer, Nimmer on Copyright § 13.03[F] ("[B]efore evaluating substantial similarity, it is necessary to eliminate from consideration those elements of a program that are not protected by copyright.").

> In *Bateman*, the Eleventh Circuit Court of Appeals adopted the Second Circuit Court of Appeals' *Altai* test, a three-part test employed to determine the scope of copyright protection that extends to a computer program's nonliteral structure. *See Bateman*, 79 F.3d at 1545 (citing *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992)). Although the *Altai* test was originally formulated to address nonliteral copying of computer code, the Eleven Circuit has held that "a parallel type of analysis must be undertaken in examining alleged instances of literal copying of computer code or screen displays." *Bateman*, 79 F.3d at 1545; *see* Michael D. Scott, Scott on Information Technology Law § 2.51[B][5] (Aspen Publishers Inc. 2012) (noting that the Eleventh Circuit in *Bateman* extended the *Altai*'s nonliteral infringement analysis to literal infringement). The *Altai* test is critical to the determination of substantial similarity between the allegedly copyrighted code and the offending use and thus also to the determination of infringement. *See* 4 Nimmer & Nimmer, Nimmer on Copyright § 13.03[F] ("In many software infringement cases, access is either conceded or easily proved, or perhaps even copying itself is conceded, so that a finding of infringement turns entirely on whether works are substantially (*i.e.*, 'actionably' ) similar."). [A] pertinent consideration is that "copyright law protects only an author's original expression, not ideas or elements taken from pre-existing works." *Id.*

> The *Altai* test involves three stages: the abstraction stage, the filtration stage, and the comparison stage. At the abstraction stage, the court dissects the allegedly copied program's structure and isolates each level of abstraction contained within it. This process begins with the code and ends with an articulation of the program's ultimate function. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706-07 (2d Cir. 1992). Elaborating on the abstraction stage, the Eleventh Circuit has stated,

Perhaps, the best approach for a district court in any computer program infringement case, whether involving literal or nonliteral elements, is for it to require the copyright owner to inform the court as to what aspects or elements of its computer program it considers to be protectable. This will serve as the starting point for the court's copyright infringement analysis.

*MiTek*, 89 F.3d at 1555. Thus, "[t]he purpose of the abstraction portion of the *Altai* test is to enable courts to separate protectable expression from unprotected ideas." *Id.*

At the filtration stage, the court, successively at each level of abstraction, separates protectable expression from non-protectable material, considering whether the abstraction was an idea, was required by factors external to the program, or taken from the public domain and hence not protectable. *Altai*, 982 F.2d at 707. This filtration defines the scope of the plaintiff's copyright. *Id.*

Finally, at the comparison stage, the court focuses on whether the defendant copied any aspect of the protected expression and assesses the copied portion's relative importance with respect to the plaintiff's overall program. Id. at 710. According to the *Altai* court, after "a court has sifted out all the elements of the allegedly infringed program which are 'ideas' or are dictated by efficiency or external factors, or taken from the public domain, there may remain a core protectable expression. In terms of a work's copyright value, this is the golden nugget." *Id.* at 710 (citation omitted). However, because there is no copy of PIMS V.1 or PIMS V.2 as it existed on its publication date, the golden nugget is so obscured that not even a famed 49er, with herculean effort, could uncover it.

Abacus argues that no substantial similarity test can be performed because InDyne cannot prove what parts of the PIMS V.2 code presented are protectable due to the fact that the August 2003 PIMS V.2 and PIMS V.1 no longer exist. As part of this argument, Abacus relies on the Best Evidence Rule because InDyne cannot prove the content of the original code. Specifically, Abacus emphasizes that InDyne is incapable of separating which parts of the code are from PIMS V.1 and which parts are from third parties. InDyne did not make any of these specifications when it filed its registration with the Copyright Office as to exactly what particular portions of the submitted code was not copyrightable beyond listing PIMS V.1 as a prior work. Additionally, Abacus elaborates that in the code produced during discovery, certain files in the code showed last modification dates of April 18, 2011 and other modification dates existing after the November 2008 registration date.

In fact, as previously stated, the PIMS modules were chameleon-like in nature, *i.e.*, were constantly changing over the years. By the time of its registration in 2008, InDyne was left only with a version adulterated by years of government contracts and customizations and with no clear roadmap to decipher what alterations were made and what parties paid for which portions. Moreover, thirty-six percent of the code files of the alleged copyrighted PIMS V.2 produced in discovery have last modified dates later than the publication date. Because InDyne cannot produce PIMS V.1 or the August

2003 PIMS V.2, InDyne is unable to proffer evidence sufficient for a jury to return a verdict in its favor. *See Cohen*, 83 F.3d at 1349.

* * *

Because there are no copies of PIMS V.1 or the August 2003 PIMS V.2, no reasonable juror could make this determination. There is no way of knowing if these files originated from or were sufficiently different from PIMS V.1 or originated from a prior contract, or were created from scratch other than InDyne's Chief Technology Officer's declaration stating that new code was written. Yet, this new code was also developed to enhance existing modules; in other words, modules that predated PIMS V.2. Without PIMS V.1, it is unclear whether these enhanced modules were sufficiently original. *Cf. Montgomery v. Noga*, 168 F.3d 1282, 1289-90 (11th Cir. 1999). In laymen terms, the PIMS code produced by InDyne in the present case is like a secret code without the secret decoder ring.

Doc. 113 at 11-15 (internal citations omitted).  Judge Conway very clearly held that InDyne had not and could not possibly proffer evidence of its PIMS V.1 or the August 2003 PIMS V.2, thus InDyne was "unable to proffer evidence sufficient for a jury to return a verdict in its favor."  It was objectively unreasonable for InDyne to file suit for copyright infringement without possessing sufficient evidence of its PIMS V.2 code as it existed on the publication date (August 29, 2003) in order to prove substantial similarity between its allegedly copyrighted work and the code allegedly copied by Defendants.  Doc. 113 at 15.

InDyne argues that it was objectively reasonable in bringing suit because it could have – through a process of elimination – proven the protectable portion of its source code as it existed on the copyright publication date by eliminating all pre-existing code and all subsequently added or modified code, as in the case of *Montgomery v. Noga*, 108 F.3d 1282 (11th Cir. 1999).  Doc. 149 at 14.  InDyne argues that Judge Conway held "in effect" that "if InDyne had ever wanted to bring suit for infringement of its copyright in PIMS V.2, it had to have escrowed a copy of PIMS V.1 and a copy of PIMS V.2, as it existed on August 29, 2003" even though "no prior case had ever required such preservation of copyrighted source code as of its publication date." Doc. 149 at 14.

To the contrary, Judge Conway did not come up with some "heightened" or "new" standard that differed from *Montgomery*, as InDyne argues.  As Judge Conway explained, *Montgomery* is factually distinguishable from InDyne's case,  principally because, in *Montgomery*, the plaintiff did present the original registered code as of the publication date, and InDyne did not – because it does not have its original registered code as of the publication date.  Doc. 113 at 19.  As Judge Conway explained:

> In its final analysis, InDyne relies heavily on *Montgomery v. Noga* to support its argument that it can prove violation of the copyrighted August 2003 PIMS V.2. . . *Montgomery* is factually distinguishable from the present case.  In *Montgomery*, the plaintiff Robert Montgomery was the author of a computer software program enabling users to view pictures on the computer screen. *Montgomery*, 168 F.3d at 1286. Montgomery failed to register a copyright for earlier versions of his software when marketing it, yet he finally did so with version 2.9a in August 1990 and did include a copyright notice on subsequent versions when he marketed the software on computer bulletin boards. *Id.* In 1992, the defendants Rebecca Noga and Florida Lion's Den, Inc. downloaded version 4.3, which was not registered until after Montgomery filed his suit against the defendants for copyright infringement of version 4.3. *Id.* at 1287.
>
> After the jury found that the defendants infringed Montgomery's copyright, the defendants appealed, arguing that Montgomery's copyright in version 2.9a was invalid because earlier versions of the software were injected into the public domain and that scope of version 2.9a, even if valid, did not extend to protect the then, un-copyrighted derivative version 4.3. *Id.* at 1288.
> * * *
> The Eleventh Circuit found that version 2.9a "contained several additions and corrections that were not present in version 1.3" and was able to cite a clear revision history for support. *Id.* at 1290-91. However, in the case at bar, there is no copy of PIMS V.1 or a clear revision history or even the August 2003 PIMS V.2 from which to compare the alleged differences in the CDs produced during discovery. Unlike the *Montgomery* court, this Court has no basis to find that the additions and corrections from PIMS V.1 were sufficiently original.
>
> Regarding the second argument, the Eleventh Circuit affirmed the district court's act of permitting Montgomery to prove infringement of the unregistered version 4.3 by showing that the defendants violated the copyrighted version 2.9a because version 4.3 incorporated over seventy percent of the original source code from the registered version 2.9a. *Id.* at 1292. The court noted that version 4.3 would not function if the code for version 2.9a was removed. *Id.* (citing the legislative history that stated "under section 106(1), 'a copyright work would be infringed by reproducing it in whole or *in any substantial part*, and by duplicating it exactly or by imitation or simulation' (emphasis added)").

In the present case, InDyne claims that sixty-four percent of the code on the CDs produced during discovery was created on or before the August 29, 2003 publication date and that the PIMS system would not operate without this part of the code. (Doc. No. 74 at p. 29). Therefore, InDyne concludes that even if the copies provided were a derivative of the code existing in 2003, under *Montgomery*, InDyne still could establish that Abacus infringed the registered code. *Id.* This conclusion neglects the fact that in *Montgomery*, the court was presented with the original registered code as of the date of publication and that the plaintiff was able to identify the changes made from earlier unregistered codes. Further, the facts of this case present the reverse scenario. InDyne is attempting to use the code in the CDs produced during discovery of which thirty-six percent, at the very least, is dated after August 2003 to prove the contents of another code, the 2003 PIMS V.2, which no longer exists. All the while, InDyne ignores the fact that it cannot show how the code in the CDs is different from PIMS V.1, which also no longer exists. In reality, InDyne has a version of the code that does not completely match what it claims it registered in 2008 and that includes the various revisions of changes that occurred during the course of the KICS contract from 2004 to 2008.

Doc. 113 at 19-21.

Judge Conway also discussed the First Circuit's 2011 opinion in *Airframe Systems, Inc. v. L-3 Communications Corporation*, 658 F.3d 100 (1st Cir. 2011), in which an aircraft maintenance software developer brought a copyright infringement action against a licensee. Doc. 113 at 21 (citing *Id.* at 102-03). Judge Conway's analysis continued:

> Although the plaintiff had copyrighted versions of its software, the plaintiff only produced an updated 2009 version of the source code that was not registered and was insufficient to establish the content of the prior source code versions covered by the copyright registrations. *Id.* at 104. Based on this failure to produce, the defendant argued that the plaintiff could not prove substantial similarity between the source code in the alleged infringing work and the registered source code that was allegedly infringed. The district court agreed, granting the defendant's motion for summary judgment despite the declaration produced by the plaintiff's president and designer that after comparing the alleged infringing work to the 2009 version, the works "shared almost complete identicality" down to misspelled words. *Id.*

> In affirming the lower court, the First Circuit reiterated that the district court concluded that the plaintiff, whose burden it was to prove the allegedly infringed source code in its original form, had failed to produce the relevant source code. *Id.* at 104, 105. Elaborating further, the First Circuit stated that by

>> [h]aving presented no evidence sufficient to prove the content of its registered source code versions, Airframe cannot show that any of its registered works is substantially similar to the allegedly infringing M3

> program, and Airframe has failed to create a genuine issue of material fact as to its claim of copyright infringement.

> *Id.* at 107. Therefore, the First Circuit concluded that the plaintiff failed to establish a prima facie case of copyright infringement. *Id.* at 105; *see also id.* at 106, 107 (noting that before a "comparison can take place, the plaintiff must necessarily establish the content of the copyrighted work that it contends was infringed" even if there is evidence of direct copying).

> Similarly, in the present case, *InDyne has failed to present a copyrighted version of the code and cannot prove the contents of the original code because neither PIMS V.1 nor the August 2003 PIMS V.2 exists.*

Doc. 113 at 21-22 (emphasis added).

In this case, it was objectively unreasonable for InDyne to file suit for copyright infringement even though it did not have a copy of the copyrighted material, PIMS V.1 or a clear revision history of the August 2003 PIMS V.2 to support its basic claims. *See, e.g., Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 894 (6th Cir. 2004) (awarding fees to prevailing defendant where plaintiffs chose to sue hundreds of defendants all at the same time, regardless of the strength of the individual claims for contributory infringement and negligence based on shaky facts and even shakier legal arguments and inevitably swept up parties against whom they had little or no chance of succeeding and defendants prevailed on a statute of limitations defense); *Williams v. Crichton*, 891 F.Supp. 120, 121-22 (S.D. N.Y. 1994) (copyright infringement claim brought by author of children's books, based on allegation that books about visits to a dinosaur zoo were infringed by the novel and movie "Jurassic Park," was not objectively reasonable, entitling prevailing defendants to award of attorney fees; claim was neither novel nor complex, and all similarities between the works flowed from the concededly uncopyrightable concept of a dinosaur zoo); *See also Hermosilla v. Coca-Cola Co.,* 492 Fed. Appx. 73, 75 (11th Cir. 2012) (affirming award of attorney's fees to defendant following the district court's entry of summary judgment).

4. *Motivation*

Defendants contend that the context in which InDyne filed and pursued this claim suggests that InDyne's motivation was substantially an attempt to overwhelm a smaller competitor for Government contracts providing IT and management services to the Government, including for NASA.  Doc. 144 at 10.  NASA selected Abacus to succeed InDyne to perform follow-on services, and Defendants argue that despite the lack of evidence that Defendants used any software code for any commercial purpose (just a limited amount of code to stand-up a temporary website for NASA), InDyne aggressively pursued the case. Defendants point out that they voluntarily returned the code, and even assuming liability, the total reasonable royalty would only be $420,000, which is less than the attorney's and expert fees that Defendants incurred. They also point to InDyne's efforts to spur criminal and civil investigations of Defendants by the FBI and NASA Office of Inspector General and U.S. Attorney (none of these entities took action against Defendants), which drove up their defense costs significantly. *See* Doc. 158 (Defendants' Reply).

InDyne argues that this factor weighs against an award of fees because its primary motive in filing suit was to stop any further spread of its source code and bringing suit was truly its last recourse. Prior to bringing suit, InDyne contends that it endeavored to resolve the dispute with Abacus and only brought suit after Abacus misled InDyne about the copying of the PIMS source code; a forensic analysis proved Abacus *may have* copied the PIMS source code onto media other than the thumb drive and laptop, in direct contradiction of Abacus' representations; and after Abacus refused multiple offers to take a license for PIMS. Doc. 149 at 16.

InDyne also argues that it was not a "competitor" in the regular sense because it was eliminated from the competition for the ICMS contract at an early stage.  Because InDyne had no chance of winning the contract, InDyne's President and Chief Executive Officer, C. Donald Bishop, encouraged several InDyne consultants and senior staff (on their own time) to assist Abacus in preparing its best

and final offer to NASA on the ICMS contract, which, it argues, is hardly the conduct of a company trying "to overwhelm a small competitor."

The Court finds that InDyne may have begun the process with altruistic intentions toward Abacus, but by the time InDyne filed suit three years later, it was interested in the $420,000 license that  it was seeking based on the theory that InDyne *may* have copied the code to additional media. Thus, the motivation factor weighs in favor of an award of fees.

### 5. *Need to Advance Considerations of Compensation and Deterrence*

In certain cases, it does not promote the purposes of the Copyright Act to award attorney fees to a prevailing defendant when the plaintiff has advanced a reasonable, yet unsuccessful claim. *See Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 122 (2d Cir. 2001); *see also Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 75 (1st Cir. 1998) (in close infringement cases, "the need to encourage meritorious defenses is a factor that a district court may balance against the potentially chilling effect of imposing a large fee award on a plaintiff who . . . may have advanced a reasonable, albeit unsuccessful, claim").

At the same time, courts have recognized that a prevailing defendant's successful defense against a copyright claim aids in establishing the boundaries of infringement and furthers the purpose of "enriching the general public through access to creative works." *Amadasun*, 359 F. Supp.2d at 1376 (citing *Fogerty*, 510 U.S. at 527). "[D]efendants have an interest in being compensated for their successful defense of this action. In addition, potential plaintiffs must be deterred from bringing frivolous and baseless suits." *Id.*

Some courts have commented on the importance of making sure that prevailing defendants receive their fees because that is the only means they have of recovering their fees. "When the prevailing party is the defendant, who by definition receives not a small award but no award, the presumption in favor of awarding fees is very strong.  Without the prospect of such an award, the party

might be forced into a nuisance settlement or deterred altogether from exercising his rights." *Diamond Star Building Corp. v. Freed*, 30 F.3d 503, 506 (4th Cir. 1994).  As the Seventh Circuit explained in *Assessment Technologies of WI, LLC v. WIREdata, Inc.*:

> [W]hen a meritorious claim or defense is not lucrative, an award of attorneys' fees may be necessary to enable the party possessing the meritorious claim or defense to press it to a successful conclusion rather than surrender it because the cost of vindication exceeds the private benefit to the party. The best illustration is . . . where the party awarded the fees, being the defendant, could not obtain an award of damages from which to pay his lawyer no matter how costly it was for him to defend against the suit.

361 F.3d 434, 437 (7th Cir. 2004) (distinguished in *CrossPointe, LLC v. Integrated Computing, Inc.*, Case No. 6:03-cv-1860-Orl-19KRS, 2005 WL 1677460, *5 (M.D. Fla. Jul. 18, 2005)).  The Court is also mindful that "the denial of fees and costs to a prevailing defendant in an objectively unreasonable copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to chill.  Future litigants should be discouraged from comparable behavior." *See Chivalry Film Productions v. NBC Universal, Inc.*, 2007 WL 4190793, *2-3 (S.D. N.Y. 2007).

Simply put, future litigants who are copyright holders without the producible evidence of their copyrighted computer source code should be deterred from choosing to sue for copyright infringement despite the lack of this fundamental evidence.

6. *Final Balancing*

A plaintiff's good faith or the complexity of the issues is not determinative of the issue of attorney's fees.  *See Mitek Holdings*, 198 F.3d at 842.  When the circumstances of the overall case are taken into consideration here, the Court finds that imposing the fees will further the goals of the Copyright Act.  *Id*. at 842-43. It was objectively unreasonable for InDyne to file suit for copyright infringement without possessing sufficient evidence of its PIMS V.2 code as it existed on the publication date (August 29, 2003) in order to prove substantial similarity between its allegedly copyrighted work and the code allegedly copied by Defendants.  Doc. 113 at 15; 876 F.Supp.2d at

1288.   Compelling or assuring that plaintiffs asserting copyright claims have producible evidence of their copyrighted material before asserting their copyright claims furthers the purposes of the Copyright Act.  InDyne's expert, Michael Crosbie, Esq., an equity partner at the Orlando office of Shutts & Bowen and a practitioner of intellectual property law, concedes that Defendants are prevailing parties for purposes of Section 505 of the Copyright Act. Doc. 149-4 at 12. Imposing fees on Plaintiff InDyne in this case would discourage the filing of suits containing objectively unreasonable claims in which the copyright holder does not have producible evidence of the copyrighted material to prove its claim. Accordingly, it is respectfully **RECOMMENDED** that Defendants recover from InDyne their reasonable attorney's fees under the Copyright Act.

## V. Amount of Fees in District Court

In awarding fees under the Copyright Act, the amount of the fees must be reasonable.  The total amount of fees sought for work in the District Court in this case (which did not go to trial) is approximately $1,470,832.31. Defendants were represented by the Washington, D.C. offices of Pillsbury law firm ($957,427.71), the Kong law firm ($349,327.52), and two Orlando firms[5], Lowndes ($13,708.67), and Akerman ($80,856.63); they also seek recoupment for Forensic Analysis costs ($66,228) and other costs ($3,283.78).  Doc. 144.  InDyne suggests a total fee closer to $500,000, after adjustments for more reasonable hourly rates and redundant and problematic billing. Doc. 149.

In addition, Defendants seek fees for the appeal for the work of both law firms of $228,229.27 plus $8,715.92 in costs.  Doc. 153. InDyne argues that an award of $75,000 is reasonable, based exclusively on time billed by Pillsbury lawyers, with suggested reductions. Doc. 159.

### A.  Standards for Calculating the Lodestar

---

[5]Mr. Pittenger changed firms during the course of the litigation, so the work by two different firms was performed consecutively, not simultaneously.

The fee applicant bears the burden of "establishing entitlement and documenting the appropriate hours and hourly rates." *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1303 (11th Cir. 1988). This burden includes supplying the court with specific and detailed evidence from which it can determine the reasonable hourly rate; maintaining records to show the time spent on the different claims; and setting out with sufficient particularity the general subject matter of the time expenditures so that the district court can assess the time claimed for each activity. *ACLU v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999).

"A well-prepared fee petition also would include a summary, grouping time entries by the nature of the activity or state of the case." *Id.* While the District Court may benefit from evidence of prevailing views among practitioners on the reasonableness of such fees, generalized statements that time spent was reasonable or unreasonable are not particularly helpful and are not entitled to much weight. *Norman*, 836 F.3d at 1301. Proof from fee opponents should be precise. *Id.* at 1303.

In formulating a fee that is reasonable, federal courts employ the familiar lodestar approach. *See Nick-O-Val Music Co., Inc. v. P.O.S. Radio, Inc.*, 656 F. Supp. 826 (M.D. Fla. 1987) (awarding fees in copyright case using the lodestar). "The starting point in fashioning an award of attorney's fees is to multiply the number of hours reasonably expended by a reasonable hourly rate." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (per curiam); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Factors to be considered when setting a fee include: 1) the time and labor required; 2) the novelty and difficulty of the issues; 3) the skill required to perform the legal services properly; 4) preclusion of other employment; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorneys; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated*

*on other grounds, Blanchard v. Bergeron*, 489 U.S. 87 (1989); *see Cable/Home Communication Corp. v. Network Production*, 902 F.2d 829, 853 n.37 (11th Cir. 1990).

Although the district court must examine each of the *Johnson* factors, it is not obligated to adjust a fee upward or downward in every instance where one or another of the factors is found to be present. *Marion v. Barrier*, 694 F.2d 229, 231 (11th Cir. 1982). Rather, *Johnson* suggests a balancing process, with the trial judge remaining responsible for the discretionary functions of assessing the weight to be given to each factor and the appropriate adjustments to make in the fee. *Id.*

A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience and reputation. *Gaines v. Dougherty County Board of Education*, 775 F.2d 1565, 1571 (11th Cir. 1985). The reasonableness of the rate charged is determined by its congruity with "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. 886, 896 n.11 (1984).  In fact, the going rate in the community is the most critical factor in setting the fee rate.  *Martin v. University of South Alabama*, 911 F.2d 604, 610 (11th Cir. 1990); *see Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers,* 34 F.3d 1148 (2d Cir. 1994) (prevailing community court should use in setting the lodestar is the district in which the court sits).

An applicant may meet this burden to show the reasonable rate by producing either direct evidence of rates charged under similar circumstances, or opinion evidence of reasonable rates. *Norman,* 836 F.2d at 1299.  The court may also use its own expertise and judgment to make an appropriate independent assessment of the value of an attorney's services. *Id.* at 1303; *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County,* 278 F.Supp.2d 1301, 1310 (M.D. Fla. 2003); *Scelta v. Delicatessen Support Services,* 203 F.Supp.2d 1328, 1331 (M.D. Fla. 2002).  In exercising its discretion, this Court must consider "the prevailing marketplace rates for the type of work and the experience of the attorneys." *Cabrera v. Jakabovitz,* 24 F.3d 372, 392 (2d Cir.

1994). Services of paralegals and law clerks are also compensable at market rates. *Missouri v. Jenkins by Agyei,* 491 U.S. 274, 288-89 (1989); *Duckworth v. Whisenant*, 97 F.3d 1393 (11th Cir. 1996); *American Charities,* 278 F.Supp.2d at 1310.

In cases in which the documentation is inadequate, the "district court is not relieved of its obligation to award a reasonable fee, but the district court traditionally has had the power to make such an award without the need of further pleadings or an evidentiary hearing." *Norman*, 836 F.2d at 1303. Because the Court is itself an expert on attorney's fees, it may consider its own knowledge and experience and award attorney's fees based solely on affidavits in the record. *Id.*  Excessive, redundant, and unnecessary hours should be excluded from a fee award. *Id.* at 1301 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). The Supreme Court requires fee applicants to exercise billing judgment which means that the applicant should "exclude from his fee applications 'excessive, redundant, or otherwise unnecessary [hours],' which are hours that would be "unreasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation or experience of counsel." *Norman*, 836 F.3d at 1301; *ACLU v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).  Excluding excessive hours means that a lawyer may not be compensated for activities which would not be billed to a client intent on vindicating its rights.  *Id.* Exclusions for excessive hours are ultimately left to the discretion of the District Court. *Id.*

Having set forth these standards, the United States Supreme Court, however, expects that a request for attorney's fees will not result in a second major litigation, and that ideally the litigants will settle the amount of the fee. *Hensley v. Eckerhart*, 461 U.S. 434, 437 (1983); *Thompson v. Pharmacy Corp. of America, Inc.*,  334 F.3d 1242, 1245 (11th Cir. 2003)(Lawyers should not be compensated for turning the litigation about attorney's fees into a "second major litigation.").  Justices Brennan, Marshall, Blackmun, and Stevens characterized post-judgment litigation over attorneys fees and related appeals as "one of the least socially productive types of litigation imaginable." *Id.* at 442, 103

S.Ct. 1933 (concurring in part and dissenting in part); *Association for Disabled Americans, Inc. v. Integra Resort Management, Inc.*, 385 F.Supp.2d 1272, 1286 (M.D. Fla. 2005). The Court now turns to the calculation of a reasonable fee.

### B. Reasonable Rates of Counsel for Litigation and Appeal

In this case, Defendants argue that they are entitled to recover fees at far above Orlando rates because the case called for counsel with special expertise in copyright and government contracts, whom Defendants hired from Washington, D.C., and local counsel from Orlando. Defendants argue their lead counsel have impressive experience, reputations, and abilities that allowed them to effectively and efficiently conduct the defense: Joël Van Over has more than 25 years of Government contracts experience, an L.L.M. in intellectual property, and substantial experience litigating IP cases. Ms. Van Over has also been nationally ranked in Chambers for Government Contracts; Todd Pittenger has more than 20 years of experience in Federal court litigation, including several IP cases, and is Board Certified by The Florida Bar in Business Litigation; Stephen Kong has extensive public and private legal experience, including having been the Deputy General Counsel and former Acting General Counsel of the U.S. Small Business Administration; and the other attorneys who worked on the case are experienced in Government contracts and IP law and Federal court litigation. Doc. 144 at 18. Defendants seek to recover attorney's fees at Washington, D.C. rates of $645/hour for partner work and $435/hour for associate work as consistent with fees charged by peer firms with "similar government contracts and IP expertise." Doc. 144 at 18 (citing rate sources).

Defendants propose an award applying a "blended rate" as an exercise in reasonable billing judgment. They contend Ms. Van Over, lead counsel, was responsible for managing the case, overseeing the work of all other attorneys, and coordinating with opposing counsel and Defendants' expert witnesses, and she also took or defended most depositions; thus, she billed significantly more time than any other Pillsbury attorney. By utilizing a blended rate structure, Defendants argue that they

received a $120/hour discount (October 2011-December 2011) and $110/hour discount (January 2012-May 2012) off of Ms. Van Over's standard rates, and while associates were also billed at the blended rates (which were above their normal billing rates), the relative number of hours performed by Ms. Van Over demonstrates that the blended rate approach was reasonable; Ms. Van Over billed 821 hours under the blended rate structure (claiming only 711 are claimed here) versus 969 hours billed by all Pillsbury associates under the blended rate structure (of which only 718 are claimed here). Doc. 144 at 19-20.

Defendants' expert on fees, Mayanne Downs, Esq., former president of the Florida Bar who has practiced in Orlando for more than 20 years, opines that Pillsbury's lead counsel, Ms. Van Over, has a particular expertise that provided value and efficient handling of this computer copyright infringement/government contracting case because the theories of recovery and factual foundation of the case demonstrate that both the computer copyright infringement and the government-contracting part of this case was important to be understood, technically and legally analyzed, and presented properly, and Joel Van Over's participation as lead counsel allowed an efficient and persuasive development of Defendants' positions which led to a successful result. Doc. 144-10 at 7. Ms. Downs also opines that the blended hourly rate charged by Pillsbury was reasonable because it resulted in a net decrease in the amount charged for Pillsbury's services; and the parties received the benefit of Mr. Kong's reduced rates by virtue of his close relationship to the client's senior management, with the value of those services being significant because he had a deep understanding of the client, the client's business and the government contracts and relationships that were a feature of this action; and the interplay and complexity of the issues decided on summary judgment and at the 11th Circuit were significant. Doc. 144-10 at 6.

Defendants also argue that the rates for local counsel, (1) $440 for partners and $245-320 for senior associates for Lowndes, and (2) $385-400 for partners and $225 for associates at Akerman, are

consistent with the prevailing market rates in Florida for comparable legal services.  Doc. 144 at 20 (citing cases awarding partner rates up to $500/hour and associate rates up to $285/hour as reasonable). Defendants also contend that Mr. Kong's rates of $200 to $250 were reasonable in light of prevailing market rates in the Middle District of Florida.

InDyne argues that Defendants' proposed rates are not reasonable because they are not the prevailing rates in Central Florida, and InDyne suggests rates more in line with local rates.  Doc. 149 at 17.  InDyne's expert, Michael Crosbie, Esq., an equity partner at the Orlando office of Shutts & Bowen and a practitioner of intellectual property law, opines that there are ample attorneys with similar levels of skill and expertise in the Central Florida legal marketplace who could have ably represented defendants in this matter. Doc. 149-4 at 11.  He also opines that the rates charged by Defendants' counsel "far exceed" the reasonable and customary rates charged for similar services in this area, *i.e.*, the Pillsbury lawyers practice in larger, more expensive markets, where hourly rates (even the proposed blended rates) are considerably higher, and their rates are excessive for the applicable market of Central Florida. *Id*.  Mr. Crosbie opines that a reasonable rate for an experienced Central Florida partner would be no more than from $400 to $475; a reasonable hourly rate for a senior associate would be $225 to $275; and the rate for very junior associates would be $175 to $200 per hour; he also suggests that   the Lowndes/Akerman hourly rates are indicative of the range of rates charged by peer attorneys in the relevant market for legal work of this nature.   Doc. 149-4 at 12[6].

InDyne also cites other cases in the Middle District awarding fees below this range.  Doc. 149 at 19 n.8.  (*Dream Custom Homes, Inc. v. Modern Day Const., Inc.*, 2013 WL 393916, at *3 (M.D. Fla. Jan. 8, 2013) (maximum hourly rate of $250 in copyright dispute); *Sanchez v. Ocwen Loan Servicing, LLC*, 2009 WL 464266, at *4 (M.D. Fla. Feb. 24, 2009) (citing cases awarding hourly rates of $300-$325 for partners and $175-$200 for associates).

---

[6]Mr. Crosbie opines that no adjustment is necessary to the hourly rates of Mr. Kong.

The Court finds Defendants' proposed rates to be excessive compared for commercial litigation in Orlando. The rates claimed for the out of state lawyers may well be reasonable for copyright actions (or, as Defendants argue, "government contract cases") in Washington, D.C. or other larger cities, but they are not in keeping with rates in the relevant community of Orlando. The general rule is that the "relevant market" for purposes of determining the reasonable hourly rate for an attorney's services is "the place where the case is filed." *Barnes*, 168 F.3d at 437; *Cullens v. Georgia Dep't of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994). If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims. *Barnes*, 168 F.3d at 437; *Brooks v. Georgia State Board of Elections*, 997 F.2d 857, 869 (11th Cir. 1993) (upholding decision to award non-local rates based on the district court's finding that there were no local attorneys who could have handled the case); *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 278 F.Supp.2d 1301, 1310 n.4 (M.D. Fla. 2003). Defendants have not made that showing and instead argue in their Reply that InDyne's position is disingenuous since InDyne also retained attorneys from the Washington, D.C. market.

The Court may decide a reasonable rate based on its own expertise and judgment. *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1303-04 (11th Cir. 1988). In the Court's view, nothing in circumstances of this case really required resort to multiple lawyers from outside Central Florida. Neither the facts nor controlling law is so arcane as to require highly specialized expertise that is unavailable here. The relevant rate in this copyright case that happened to involve parties providing services to the government – as opposed to a true "government contract case" – are the prevailing rates in Central Florida where this case was filed, and not the rates in the Washington, D.C. legal market. The prevailing rates in Central Florida for "similar services by lawyers of

reasonably comparable skills, experience and reputation" are Orlando rates for all of counsel's services.  InDyne's expert suggests using the rates applied by Defendants' local counsel.

For litigation related work performed in 2011, rates ranging up to $400 per hour for senior counsel or partner level work and $175 to $225 for junior attorneys were prevailing in the Middle District.  For purposes of arriving at an appropriate fee award in this case, the Court will assign rates of $400 for senior level work,[7] $300 for mid-level attorneys' work and $200 for junior attorneys' work.

### C.  Reasonable Hours in This Court

Defendants' counsel litigated the case from January 2011 to June 2012, and Pillsbury (alone) expended 1,688 hours; the total fees incurred and billed by Pillsbury are $927,576.25.  *See* Doc. 144-10 at 5 (summary).  Mr. Kong billed $319,356.68 for 1,717 hours, and local counsel billed $83,926.90 for 213 hours.  Doc. 144-10 at 5-6.  The fee applicant is charged with the burden of showing the reasonableness of the hours that were billed and, accordingly, is charged with proving that they exercised billing judgment. *See Leroy v. City of Houston*, 831 F.2d 576, 586 (5th Cir. 1987).

Defendants argue that the hours sought to be reimbursed are reasonable and counsel has already used billing judgment to deduct $260,000 in fees for time where co-counsel attended depositions taken/defended by lead counsel; time where multiple lawyers participated in calls with Defendants' expert witnesses (unless such attendance was absolutely necessary); time for work performed by more junior attorneys; the time of paralegals and other support staff; time for preparing the fee application; and (the minimal) time related to staying Plaintiff's state law case after the Court dismissed the state law claims.  Doc.  144 at 15.  Defendants' expert, Ms. Downs, opines that the number of hours billed is reasonable because Defendants have chosen to discount over 500 hours of services from their total fee reimbursement claim, even though she does not consider the hours

---

[7]As noted below, some of the work performed by senior attorneys was not senior level work, and an adjustment is made for that fact.

incurred and time claimed for the various firms' work to be duplicative, and counsel eliminated any request for time incurred by additional associates, paralegals, and support staff in an effort to keep the time claimed limited to the core group of attorneys; the parties received the benefit of Mr. Kong's reduced rates by virtue of his close relationship to the client's senior management and knowledge of their business and the issues.  Doc. 144.

InDyne argues Pillsbury's invoices are replete with instances of multiple attorneys performing the same tasks, excessive coordination among the three law firms Defendants retained, inefficient staffing, time spent on issues unrelated to the litigation, and improper block-billed and vague time descriptions.  Doc. 149.  InDyne's expert, Mr. Crosbie, opines, as to Pillsbury, that because the invoices show multiple redactions, it is impossible to assess whether the time recorded with redacted descriptions was reasonable or, for that matter, even related to the lawsuit at issue.  Doc. 149-4.  He also contends that Pillsbury lawyers used block billing to record all tasks for each day within one entry making it difficult to analyze the individual entries to determine whether the tasks described in the blocks of narrative were appropriate or handled with reasonable dispatch. He also opines that the Pillsbury billing records reflect unnecessary duplication of effort, such as depositions attended by both Ms. Van Over and Mr. Kong, who also seek to recover fees for the same depositions; Pillsbury attorneys billed significant time preparing for such depositions, which was also duplicative of Mr. Kong's work.  He also opines the 25% reduction would account for duplicative time preparing for and attending oral argument, reviewing documents, and work related to a motion for reconsideration.

InDyne argues that the Court should employ an across-the-board reduction of the number of hours to account for the difficulties created by Pillsbury's block billing, redundant billing and vague time descriptions; the Court should reduce the Pillsbury hours by at least 25%, similar to other courts in Florida and elsewhere that have imposed a reduction of 20% to 30% for block billing.  Doc. 149 at 18 (citing *Lil' Joe Wein Music, Inc. v. Jackson*, 2008 WL 268817, *13 (S.D. Fla. July 1, 2008)

(discounting the fees sought by 20% because "the use of multiple attorneys to work on the same tasks, combined with frequent conferences and the use of block billing, leads to the inescapable conclusion that there was at least some duplication of effort by Defendants' various counsel in this case.")); *Oravec v. Sunny Isles Luxury Ventures L.C.*, No. 04-22780-CIV, 2010 WL 1302914, at *12-13 (S.D. Fla. Mar. 31, 2010) (25%-35% reduction); *St. Fleur v. City of Fort Lauderdale*, 149 F. App'x 849, 853 (11th Cir. 2005) (30% discount for "duplicated efforts, excessive meetings between attorneys, billing for administrative tasks, senior counsel's billing for legal research that could have been assigned to an associate or paralegal, and billing for non-legal tasks like travel and clerical functions.").

Mr. Crosbie also identifies, as excessive billing, the nearly daily office conferences among lawyers within Pillsbury, and between Pillsbury and Mr. Kong– entries which lack any information about the nature of the matters discussed; he opines that in his experience, the large number of hours spent on such conferences indicates an unreasonable expenditure of time. He further identifies Pillsbury's top-heavy staffing of the matter – he points to the fact that Ms. Van Over's time represents more than 50% of the time Pillsbury billed and opines in his experience, this high level of partner involvement indicates excessive use of senior attorneys. However, even the use of associates was not efficient, in his opinion, because Pillsbury tasked associates to research topics with which they had no experience, such as Mr. Wesser who spent considerable time researching copyright issues even though his purported specialty is in government contracts, and use of an experienced intellectual property associate would have necessitated fewer hours researching the copyright issues in his opinion.

InDyne complains that the billing records contain dozens of vague, generic time entries that lack the meaningful narrative to support such time, and the amounts requested in such vague entries should not be awarded. Mr. Crosbie cites examples by Mr. Wesser that state "Review and flag documents for J. VanOver," which comprises 16.6 hours of time but does not cite any meaningful

issue in the case.  Doc. 149-4 (citing entries for October 11, 12, 13, 14, 17, 2011).  He also cites entries by Ms. Baker, at $525 to $545 per hour, to "review documents" "or "review documents for depositions," for four, six, or even nine hours per day on such a generic task.  InDyne also contends that the Defendants should not be reimbursed for attorney time at more than $500 per hour for doing clerical work, such as "coordinate with litigation support to prepare and print documents" and "supplement and organize case issues folders containing 'hot' documents." Doc. 149-4. *Am. Charities for Reasonable Fundraising*, 278 F. Supp. 2d at 1321 ("[C]lerical tasks . . . are not compensable in the attorneys' fee award.").

InDyne also argues that Defendants cannot recover for time spent on issues unrelated to the lawsuit such as (1) February 2011 work researching Florida state law causes of action for which Abacus is not a "prevailing party;" (2) time spent answering "NASA IP questions;" (3) correspondence regarding insurance company reporting; (4) work related to Cost Accounting Standards Board ("CASB") documents; and (5) work relating to a "DCAA audit." Doc. 149-4.

In their Reply, Defendants argue time spent researching and preparing to defend against InDyne's state law claims – which were based on the same allegations as InDyne's copyright infringement claim (see Doc. 1 (InDyne's Complaint) at 11-18) – prior to the Court's June 2011 *sua sponte* Order declining to exercise supplemental jurisdiction over the claims (see Docs. 31, 34) were reasonably incurred in defense of this case. Also, time spent on matters involving Cost Accounting Standards and Defense Contract Audit Agency issues were directly relevant to Defendants' defense that NASA paid for software development and granted Abacus the right to use such software.  Doc. 158 at 9-10.

As to the time billed by local counsel Lowndes and Akerman, InDyne concedes that "much of the work supervised by Mr. Pittenger at Lowndes and Akerman was appropriate. Some, however, is subject to the same issues noted in connection with the Pillsbury billing records." such as block billing and vague or generic entries.  Doc. 149-4 (citing example of vague: "reviewing e-mail from

co-counsel"). InDyne acknowledges that these firms' use of such entries is much less extensive than those of Pillsbury or Kong, but nevertheless suggests a 10% reduction in the number of hours used to calculate the lodestar amount.

By far, InDyne's most significant criticism and reduction recommendation is to the time entries submitted by Mr. Kong. InDyne contends that none of Mr. Kong's time should be included in an award because his work was largely duplicative of work performed by other attorneys. Mr. Crosbie opines that Pillsbury's records indicate "that Mr. Kong needed significant guidance, and his work product required substantial editing" by Pillsbury lawyers[8], and Mr. Kong's purported value from his client relationship is not a proper justification for awarding fees for his unnecessary involvement, especially since Defendants were represented by two large law firms, and there is no evidence that the combination of these two firms lacked the requisite expertise or manpower to handle the litigation. Doc. 149-4.

If Mr. Kong's time is to be reimbursed at all, InDyne argues his hours should be significantly reduced because he expended an unreasonable amount of time on tasks that Pillsbury also performed, such as time spent reviewing documents, drafting a motion for reconsideration, and preparing for depositions. InDyne points to Mr. Kong's extraordinary amount of time spent preparing a "Hot Docs" list, for which he provided nearly identical billing descriptions for two hours of work each day for two months, even though Pillsbury's invoices indicate that the same work was performed by other attorneys; during the first few months of his engagement, he also spent dozens of hours working on some sort of "timeline" which is not adequately described, and may have comprised more than fifty hours. Doc. 149-4. InDyne also argues Mr. Kong's preparation for and participation in the mediation was unnecessary and duplicative of other attorneys' work and such hours must be discounted. Additionally, InDyne contends that Mr. Kong's hours must be reduced because his time entries lack

---

[8]Mr. Crosbie points out that "Ms. Van Over even had to explain to her clients the reasons for the extensive edits to Mr. Kong's work." Doc. 149-4 ¶ 18.

sufficient detail, such as eight entries with generic narrative, "Drafting Document Request," four of which are for the same amount of time (1.5 hours), or phone calls listed without substance, *e.g.*, descriptions of "call re: status," "call re: brief." Doc. 149-4 (citing entries between April 16 and April 25, 2011; calls from May 10, 12, 16, 17, and 19, 2011). InDyne contends the lack of detail in such entries renders it impossible to discern the nature and reasonableness of the tasks, or whether the four identical time entries represent duplicative work.

InDyne also argues that Mr. Kong's hours should be reduced because his confusing billing practices call into question the reasonableness of all of the time claimed in that, for nine months, he generated *two* different invoices for each month without justification or explanation, duplicating tasks identified in one invoice for a specific month on the second invoice for the same month, sometimes on different dates and with different amounts of time. Doc. 149-4 (citing identical entries for "Prepare for K. Nguyen depo (develop depo outline)" on 11/27 and 11/28 in separate invoices). InDyne argues that Mr. Kong's "inexplicable submission supports the complete elimination of Mr. Kong's time from any fee award." In their Reply, Defendants argue that Mr. Kong played an important role in the successful defense of the case, in responding to discovery, conducting depositions, conducting factual investigations and witness interviews, and contributing to briefing and oral argument preparations; and his rate resulted in considerable savings for the client. Doc. 158 at 9.

Defendants' submissions, including billing statements and expert affidavits, total more than 500 pages. Docs. 144 & 158. Because of the voluminous nature of the bills and exhibits presented, the Court is not required to review each entry to determine reasonableness. *Loranger v. Stierheim,* 10 F.3d 776, 783 (11th Cir. 1994) (when fee petition and supporting documentation are voluminous, hour by hour analysis unnecessary); *Lang v. Reedy Creek Improvement Dist.*, 1997 WL 809200, *3-4 (M.D. Fla. 1997). Rather, the Court has reviewed the Affidavits and exhibits, and has carefully considered the evidence in light of the principles set forth in *Hensley* and its progeny. The following

analysis notes specific and general issues and grounds for adjustment of the hours requested in Defendants' papers.

The proper remedy when there is a lack of adequate billing judgment is to reduce the hours awarded by a percentage intended to substitute for the exercise of billing judgment. *See Leroy v. City of Houston*, 831 F.2d 576, 586 (5th Cir. 1987) (reducing the award 13% where the billing records were completely devoid of any hours written off and were incomplete); *Walker v. U.S. Dept. of Housing and Urban Development,* 99 F.3d 761, 770 (5th Cir. 1996) (awarding 15% as the appropriate reduction for lack of billing judgment); *United States of America, ex rel. Albert D. Campbell v. Lockheed Martin Corporation*, Case No. 6:95-cv-549-Orl-28DAB, Doc. No. 559 (Report and Recommendation re: attorney's fees; reducing fees by 15% for overstaffing).

Like any litigants, Defendants were free within their means to employ whichever and however many attorneys they wish and to give them free rein in devoting resources in defending an action. *Corwin v. Walt Disney World Co.*, No. 6:02-cv-1377-Orl-19DAB, 2008 WL 754697, *26 (M.D. Fla. Mar. 18, 2008). When seeking to shift the cost of such a defense to a losing adversary, however, those choices are subject to scrutiny, and the fee to be shifted may be more limited than the amount reasonably billed to and accepted by a client. *Id.*

With the exception of certain redacted entries, the Pillsbury attorneys and local counsel at Lowndes/Akerman have done a reasonably good job of describing the specific tasks performed and the general scope of the litigation. As argued by InDyne, Mr. Kong's descriptions, however, are vague, generic, and fail to give sufficient detail in order for the Court to determine if the work was reasonable. InDyne's arguments about Mr. Kong's involvement and need for supervision, or revision to his work, are well-taken. While there is some justification for involving more than one law firm, the use of so many different billing timekeepers is unsupported.

There also is insufficient discussion explaining why so large a total fee can be justified in a case decided on summary judgment.  As this Court previously said in *Corwin* where the prevailing Defendant sought a $1.5 million fee, "the Court is left with a strong and unrefuted sense that the time and cost claimed is simply too large." *Corwin,* 2008 WL 754697 at *26. This case is one of those encountered with increasing and unfortunate frequency where the litigation effort expended by both sides seems incommensurate with the complexity and significance of the matters at issue. Where each side bears its own fees, the court has a slight role in minding the expenditure of legal resources. However, when called on to review the transfer of the burden of litigation costs to an adversary (even one who likely contributed to the overall high cost), the court must impose some limits.

After a thorough review of Defendant's counsel's fees in light of redundancies and duplication, the Court finds that counsel's submitted hours are, to a degree, excessive given the nature and circumstances of the case, and the Pillsbury hours should be reduced by 25%, the Lowndes/Akerman hours should be reduced by 10%, and Mr. Kong's time should be reduced by 80%. *See Norman*, 836 F.2d at 1301 (district court must use its discretion to exclude excessive or unnecessary work on given tasks).

In addition, where the most senior attorneys bill at their most expensive rates for tasks that should have been assigned to less-senior (and less-expensive) attorneys at their disposal, the division of labor is not reasonable. *See Corwin*, 2008 WL 754697 at *26. "Typically, in cases of any size and complexity, professional staffing is done with an eye toward efficiency, with work performed by the professional with the  appropriate level of training and experience.  Routine tasks are not more valuable simply because they are performed by a senior attorney." *Id.*

Here, Pillsbury's staffing was admittedly top heavy and the "blended rate" does not appropriately compensate for that.  There are many instances of senior counsel seeking premium rates for mundane aspects of the case that could, and should, have been handled by less costly, junior

attorneys.   A reduction in rate to $200 for 20% of the hours of these most-senior attorneys is appropriate.  *See id.* at *27.  Taking all of the various issues set forth above into account, the Court finds the following to be an appropriate award to Defendants for attorneys' fees in the District Court.

| ATTORNEY (YEARS. IN PRACTICE AS OF 2012) | ALLOWED RATES | CLAIMED HOURS | REDUCTION | ALLOWED HOURS | ADJUSTED AMOUNT |
|---|---|---|---|---|---|
| Joël Van Over (25+)[9] 80% of hours 20% of hours | 400 200 | 915 | 25% | 550 137 | $ 220,000 27,400 |
| Kelly Craven (6) | 200 | 129 | 25% | 97 | $19,400 |
| Evan Wesser (4) | 200 | 392 | 25% | 293 | $58,600 |
| Kristen Baker (3) | 200 | 252 | 25% | 189 | $37,800 |
| Stephen Kong (18) | 200 | 1717 | 80% | 343 | $68,600 |
| Todd Pittenger (24)[10] 80% of hours 20% of hours | 400 200 | 157 | 10% | 113 28 | $ 45,200 5,600 |
| Angela Miller (Sr. Assoc.) | 200 | 9 | 10% | 8 | $1,600 |
| Megan Devault (11) | 300 | 42 | 10% | 38 | $11,400 |
| Joshua Mize (2) | 200 | 4 | 10% | 4 | $800 |
| TOTAL | | 3,617 | | 1,800 | $496,400 |

## VI.  Appellate Fees

For work on the appeal, Defendants seek an award of $228,229.27 in reasonable attorney's fees plus $8,715.92 in other expenses.  Doc. 153.  InDyne argues that an award of $75,000 is reasonable, based exclusively on time billed by Pillsbury lawyers, and reduced as suggested.  Doc. 159.

---

[9]Applying the reduced rate to 20% of  Ms. Van Over's 687 hours (915 hours - 25%) results in 137 hours billed at $200 per hour for associate-level work and 550 hours billed at market rate of $400 per hour for senior partner level work.

[10]Applying the reduced rate to 20% of  Mr. Pittenger's 141 hours (157 hours - 10%) results in hours billed at $200 per hour for associate-level work and 170.1 hours billed at market rate of $300 per hour for senior partner level work.

Plaintiff's Notice of Appeal was filed on June 12, 2012 (Doc. 118), and the Eleventh Circuit decided the appeal on March 20, 2013.  Doc. 137.  The Eleventh Circuit transferred the Motion for Fees to the District Court, without deciding whether Defendants were entitled to an award of reasonable appellate attorney's fees pursuant to 17 U.S.C. § 505.  Doc. 153-1.  The substantive arguments concerning Defendants' entitlement to fees in both parties' briefs are nothing more than a rehash of the arguments in their briefs filed in the district court; thus, those arguments have been fully addressed above.  Docs. 153, 159.  For the reasons stated above, Defendants are entitled to recover their reasonable fees.

The appellate fees sought here are approximately the size and scope of the fees sought the copyright appeal of the summary judgment in the *Corwin* case, *i.e.*, $250,000.  2008 WL 754697 at *26.  The court said at that time:

> Having reviewed the record, the Court is frankly astounded at the size of the fees sought.  The number of timekeepers involved and the amount of time devoted to defending the judgment are unwarranted.  This case was decided on summary judgment.  The appeal was necessarily limited to the summary judgment record and the legal issues raised in the District Court proceedings.  While some new authorities may have been cited on appeal, the great bulk of required legal research should already have been completed
>
> No justification is given for four timekeepers devoting substantial time to preparing for oral argument with three high priced attorneys[11] actually attending the oral argument.  This is not a case tried by a courtroom specialist, justifying an appellate practitioner reviewing an extended record for the purpose of fashioning effective arguments on appeal.  Rather, it is a case decided on legal issues that were extensively briefed in the District Court.  The legal issues addressed by the Court of Appeals were largely the same as those decided below.  Worldco's own estimate of likely charges for the appeal is dwarfed by the charges actually claimed, and Worldco's explanation of the discrepancy is insubstantial.
>
> Because of the nature of work involved in preparing an appellate brief and delivering oral argument, it is not possible to pinpoint which time entries were redundant or unnecessary.  Instead, it is appropriate simply to reduce the fee claim to

---

[11]Attorneys who have spent substantial time working on a case have an understandable desire to see the appellate process play out by witnessing oral argument.  However natural this impulse may be, the circumstance of oral arguments on appeal severely limits any contribution by counsel other the one making the argument.  Absent justification not shown here, it is not appropriate to visit the cost of multiple attendees on one's adversary.

the maximum that the Court can find generally reasonable for an appeal of this kind and complexity.

As noted above, when seeking the posting of an appellate bond, Worldco's counsel estimated appellate fees and costs in the range of $120,000 to $150,000. Though these estimates seem high, they were accepted by this Court in setting a bond amount (Doc. No. 306 and 314). Had Plaintiff suspected he might be facing a fee claim double that estimate, it is as least theoretically possible he would have had second thoughts about pursuing the appeal. Worldco has not justified an award so in excess of its pre-appeal estimate. These considerations point to an appropriate allowable maximum fee.

Taking all these considerations into account, the Court recommends **$125,000.00** as an appropriate award to Worldco for attorney's fees incurred on appeal.

*Corwin*, 2008 WL 754697, *27-28.

The circumstances here are comparable. Although Defendants argue that "[o]n appeal, InDyne raised several nuanced issues, including new arguments, in an effort to escape the persuasive reasoning of the District Court . . . requir[ing] a comprehensive re-review of the record and additional research and analysis," the appeal could not have raised any *significant* new issues given the Eleventh Circuit's per curiam opinion. Any doubt about the Eleventh Circuit's narrow view of the issues raised in the appeal is dispelled by the court's per curiam two-page affirmance of Judge Conway's "thorough and well-reasoned opinion." Doc. 137. Defending the judgment rendered by this Court simply was not an enterprise that should have cost over a quarter of a million dollars. **Taking into account the nature and complexity of the issues and the matters at stake, a reasonable fee payable by an adversary in this case for the appeal is $100,000.**

## VII.  OTHER COSTS

Defendants seek to recover approximately $131,000 in additional costs[12] they incurred during the litigation and $8,715.92 on appeal. These amounts include the costs of computerized legal

---

[12]Costs allowable under § 28 U.S.C. § 1920 were taxed in the amount of $33,844.40 in the District Court. Doc. 129.

research, costs related to e-discovery, copying costs, travel expenses, postage, FedEx and courier costs, and the fees of a forensic expert. As Defendants concede, none of these costs are recoverable under 28 U.S.C. § 1821 or 28 U.S.C. § 1920.

InDyne argues Defendants cannot recover any costs beyond those costs they have already been awarded under 28 U.S.C. § 1920.  Costs that cannot be recovered under 28 U.S.C. § 1821 or 28 U.S.C. § 1920 generally cannot be recovered under Section 505 of the Copyright Act of 1976.  *See Artisan Contractors Ass'n of America, Inc. v. Frontier Ins. Co.*, 275 F.3d 1038 (11th Cir. 2001) (holding that Section 505 of the Copyright Act of 1976 does not permit the recovery of costs beyond the limitations specified in 28 U.S.C. § 1821 and 28 U.S.C. § 1920) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) ("absent explicit statutory or contractual authorization," the award of costs by federal courts "are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920")).  Defendants argue that other courts in the Eleventh Circuit have awarded out-of-pocket costs pursuant to 17 U.S.C. § 505.  Doc. 144 (citing *Hermosilla v. Coca-Cola Co.*, 2011 WL 9364952 at *18 (S.D. Fla. Jul. 15, 2011), *aff'd*, 492 Fed. Appx. 73 (11th Cir. 2012); *Simpleville Music v. Mizell*, 511 F. Supp. 2d 1158, 1165-66 (M.D. Ala. 2007).  However, the cases cited by Defendants are from other districts within the Eleventh Circuit, are non-binding, and are factually distinct.  Moreover, Judge Conway has specifically declined to award such costs.  *See Guetzloe Grp., Inc. v. Mask*, No. 6:06-cv-404-Orl-22JGG, 2007 WL 2479335, at *2 (M.D. Fla. Aug. 28, 2007) (Conway, J. adopting report and recommendation). Accordingly no further award for costs is recommended.

## VIII. Conclusion

It is respectfully **RECOMMENDED** that Defendants be awarded attorney's fees against InDyne only for the district court litigation of **$496,400**.  This award should be augmented by allowing interest (at the federal judgment rate) from the time Defendants originally filed their Motion for Attorney's Fees on June 18, 2012. (Doc. 117).

It is further respectfully **RECOMMENDED** that Defendants be awarded attorney's fees for the appeal of **$100,000.00**.  This award should be augmented by allowing interest (at the federal judgment rate) from the time the motion for fees was filed in the Eleventh Circuit on April 24, 2103 (Doc. 153).

Defendants should confer with opposing counsel and submit a proposed interest calculation, including any on-going per diem.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on December 6, 2013.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy