INDYNE, INC.,

        **Plaintiff,**

v.                                        **Case No: 6:11-cv-137-Orl-22DAB**

ABACUS TECHNOLOGY
CORPORATION, JERRY RENINGER
and MATTHEW BOYLAN,

        **Defendants.**

_____

## ORDER

This cause comes before the Court for consideration of the following:

1. Defendants Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan's ("Abacus") Second Renewed Motion for Attorney Fees and Full Costs (Doc. No. 144), filed on May 10, 2013;

2. Plaintiff InDyne, Inc.'s ("InDyne") Opposition to Abacus' Second Renewed Motion for Attorney Fees and Full Costs (Doc. No. 149), filed on June 7, 2013;

3. Abacus' Reply to InDyne's Response in Opposition for Attorney Fees and Full Costs (Doc. No. 158), filed on June 27, 2013;

4. Abacus' Motion for Attorney's Fees (Doc. No. 153), filed on June 12, 2013;

5. InDyne's Response in Opposition to Motion for Attorney Fees (Doc. No. 159), filed on July 10, 2013;

6. Abacus' Reply to InDyne's Response in Opposition for Attorney Fees (Doc. No. 162), filed on August 9, 2013;

7. InDyne's Objections to the Magistrate Judge's Report and Recommendations (Doc. No. 164), filed on December 20, 2013;

8. Abacus' Response to InDyne's Objection to the Magistrate Judge's Report and Recommendations (Doc. No. 165), filed on January 6, 2014;

9. InDyne's Motion to Strike Defendants' Response to Plaintiff's Objections (Doc. No. 166), filed on January 9, 2014; and

10. Abacus' Response in Opposition to InDyne's Motion to Strike Defendants' Response to Plaintiff's Objections (Doc. No. 167), filed on January 27, 2014.

On December 6, 2013, United States Magistrate Judge Baker submitted his report recommending that Abacus' motions for attorney's fees and costs (Doc. Nos. 144, 153) be GRANTED in part. (Doc. No. 163).

After an independent *de novo* review of the record in this matter, except for very minor changes in the fee calculation, the Court agrees entirely with the findings of fact and conclusions of law in the Report and Recommendation (the "R & R").

## I. <u>BACKGROUND</u>

### A. *Factual Background*[1]

From 2003 to 2008, InDyne contracted with NASA to deliver communications and information technology services at NASA's Kennedy Space Center ("KSC"). This contract was known as the Kennedy Integrated Communications Services ("KICS") contract. As a part of the KICS contract, InDyne utilized its Program Information Management System ("PIMS"), an umbrella system of modules for a contract environment that functions to allow program

---

[1] This background is largely taken from the Court's previous Order granting summary judgment in favor of Abacus. (Doc. No. 113) (internal citations and some footnotes omitted); *InDyne, Inc. v. Abacus Tech. Corp.*, 876 F. Supp. 2d 1278 (M.D. Fla. 2012), *aff'd*, 513 F. App'x 858 (11th Cir. 2013).

management staff and customers to see and use data in areas such as work management, work procurement, logistics, safety, and timesheets. Prior to the KICS contract, InDyne had utilized PIMS on at least five government contracts at NASA since 1996.

InDyne wrote the source code for the PIMS modules in ColdFusion, a code language, and the PIMS software suite changed over time as InDyne developed new features for its suite of modules. The first version of PIMS ("PIMS V.1") was written in June 1997. InDyne never registered PIMS V.1with the United States Copyright Office. In fact, InDyne did not maintain a copy of PIMS V.1. The alleged second version of PIMS ("PIMS V.2"), some variation of which was used during the KICS contract, was registered with the United States Copyright Office on November 17, 2008, and InDyne claimed on the registration form that the date of first publication was August 29, 2003. On its copyright registration form, InDyne also listed PIMS V.1 as a previous version that should be excluded from copyright protection.

InDyne relied heavily on PIMS to perform its KICS contract and constantly customized the PIMS modules to conform to the KICS contract as it did with all of its government contracts that employed PIMS. Thus, the PIMS modules were chameleon-like in nature, i.e. were constantly morphing over the years.

Unfortunately for InDyne, it failed to keep a copy of the PIMS V.2 code as it existed on the date of publication. Instead, by the time of its registration in 2008, InDyne only had some version adulterated by years of government contracts and customizations and no clear roadmap[2] by which to decipher what portions were paid for by which parties and what alterations were

---

[2] The Issue Tracker, InDyne's intranet application used by corporate IT to log software requests, did not provide a system during code development of the KICS contract that would track the checking-in and checking-out of code. Moreover, the Issue Tracker was not active during the first 15 months of the KICS contract.

made. In fact, thirty-six percent of the alleged copyrighted PIMS V.2 code files produced in discovery have "last modified" dates after the publication date.

At the end of the KICS contract period, NASA retained Abacus, instead of InDyne, to perform InDyne's previous functions along with additional duties under the new Information Management and Communications Service (IMCS) contract. In July 2008, during the ninety-day transition period between the contracts, NASA requested Abacus to implement an integrated portal management system similar to the one InDyne had used during the KICS contract because an imminent launch was to occur in October 2008 soon after Abacus' contract period was to begin officially. Eventually, the launch was delayed and NASA requested that Abacus make a new webpage, specifically making it compliant with the Americans with Disabilities Act.

During the ninety-day period when Abacus was attempting to replicate InDyne's website for the fast-approaching launch, Richard Petcol, Abacus' supervisor over the initial website creation, informed others in an email titled "KICS replacement webpage" that InDyne's transition person, Jerry Reninger[3] ("Reninger") offered to give Abacus all of the non-proprietary source code so Abacus could "stand up" the website as quickly as possible. At that time, Reninger was working for InDyne, aiding in the transition of software to Abacus.[4] On September 8, 2008, Matt Boylan ("Boylan"), an Abacus expert in ColdFusion, met with Reninger because he was told that Reninger would give him access to the InDyne files needed to "stand up" the IMCS website. While in Reninger's office, Boylan stated that Reninger directed him to the directories of files that Boylan needed to copy to a thumb drive. After transferring the files from

---

[3] During the transition period, Jerry Reninger accepted a position with Abacus under the IMCS contract. Multiple deponents testified that switching to different companies because of new contracts was not uncommon at NASA.

[4] As a part of the transition from InDyne to Abacus, InDyne was contractually obligated to provide Abacus all software and data NASA had the right to use or owned, and InDyne was to provide Abacus a list of software packages used by KICS personnel.

the thumb drive to his laptop, Boylan, through global changes rather than opening up each file, began rebranding the website with the IMCS logo, replacing the KICS logo. On September 18, 2008, because Boylan did not retrieve a complete set of the files during his first trip to Reninger's office, Boylan returned to Reninger's office to download the remaining files. Boylan explained that when he was copying the directories, *in toto*, he did not make a distinction between the directories nor did he know the specifics of each directory.

During this mass copying of the directories, Boylan and Reninger inadvertently copied onto the thumb drive some of InDyne's PIMS software, as it existed in September 2008. At the time, Reninger believed InDyne's PIMS software was proprietary. Soon after Abacus commenced its contract with NASA in October 2008, InDyne became aware of Abacus' temporary website and the copying of certain PIMS-related files.

Then, on November 17, 2008, InDyne sent to the United States Copyright Office a Request for Special Handling of its copyright request for PIMS V.2 because the work was "the subject of prospective litigation" and InDyne was "in a dispute with another party concerning unauthorized reproduction and use of the work." As a part of its application, InDyne's Chief Technology Officer, D. Fuji Nguyen, utilized for the first twenty-five pages of code filed with the United States Copyright Office a copy of the KICS PIMS V.2, as it existed at the end of the KICS contract. This copy of the KICS PIMS V.2 was saved to a server for InDyne's new contract at Cape Canaveral Air Force Station. Nguyen also pulled the last twenty-five pages for the registration from a corporate development server. Interestingly, when Nguyen provided a copy of the PIMS code during discovery from the same two servers, suddenly nineteen files contained metadata reflecting a date last modified after the November 2008 copyright

registration date. Nguyen was only able to determine that fifteen of these nineteen files were last modified prior to November 2008. There is no explanation for the other four files.

*B. The Court's Summary Judgment Order*

On June 1, 2012, the Court granted summary judgment in favor of Abacus. The Court found that Abacus had identified portions of the record, which demonstrated the absence of a genuine issue of material fact regarding the substantial similarity test component of a copyright infringement claim. As well, the Court determined that InDyne, as the non-movant bearing the burden at trial, neither showed that the record contained evidence that Abacus "overlooked or ignored" nor did InDyne come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. Importantly, the alleged evidentiary deficiency was that InDyne failed to produce a copy of PIMS V.2, as it existed on August 29, 2003, or a copy of PIMS V.1 for comparison purposes. Without those versions of the PIMS software, a jury could not conduct the necessary substantial similarity test used to determine a copyright infringement. Thus, even drawing all inferences from the evidence in the light most favorable to InDyne, the Court found that there was no basis upon which a jury could reasonably find for InDyne and the Court entered summary judgment in Abacus' favor. (Doc. No. 113). The Eleventh Circuit affirmed. *InDyne, Inc. v. Abacus Tech. Corp.*, 513 F. App'x 858 (11th Cir. 2013).

*C. Magistrate Judge Baker's Report and Recommendation*

Abacus, as the prevailing party in both the district and appellate courts, moved to recover its attorney's fees from InDyne pursuant to the Copyright Act, 17 U.S.C. § 505. (Doc. Nos. 144, 153). On December 6, 2013, Magistrate Judge Baker submitted his report recommending that "an award of fees is warranted under the Copyright Act." (Doc. No. 163 at p. 2).

Magistrate Judge Baker balanced the relevant factors as follows:

> When the circumstances of the overall case are taken into consideration here, the Court finds that imposing the fees will further the goals of the Copyright Act. It was objectively unreasonable for InDyne to file suit for copyright infringement without possessing sufficient evidence of its PIMS V.2 code as it existed on the publication date (August 29, 2003) in order to prove substantial similarity between its allegedly copyrighted work and the code allegedly copied by Defendants. Compelling or assuring that plaintiffs asserting copyright claims have producible evidence of their copyrighted material before asserting their copyright claims furthers the purposes of the Copyright Act . . . . Imposing fees on Plaintiff InDyne in this case would discourage the filing of suits containing objectively unreasonable claims in which the copyright holder does not have producible evidence of the copyrighted material to prove its claim.

(*Id.* at pp. 20-21) (citations omitted). After determining that an award of fees was appropriate, Judge Baker recommended that Abacus be awarded $496,400 for attorney's fees for the district court litigation, and $100,000 for attorney's fees on appeal. (*Id.* at pp. 40-41).

### D.  InDyne's Motion to Strike

As a preliminary matter, the Court must address InDyne's motion to strike. On December 20, 2013, InDyne filed its objections to the R & R (Doc. No. 164), to which Abacus filed a response. (Doc. No. 165). Shortly thereafter, InDyne filed a Motion to Strike Abacus' Response (Doc. No. 166), arguing that (1) Abacus' response was untimely and (2) Abacus improperly raised objections to the R & R in its response.

InDyne's first argument is without merit as it is based on a misinterpretation of the *Federal Rules of Civil Procedure* and the Local Rules of this Court. Magistrate Judge Baker issued the R & R on December 6, 2013. (Doc. No. 163). Under the Local Rules, "Within fourteen (14) days after such service, any party may file and serve written objections thereto; and any party desiring to oppose such objections shall have fourteen (14) days thereafter within which to file and serve a written response." Local Rule 6.02(a). InDyne timely filed its objection

on December 20, 2013. (Doc. No. 164). Thus, Abacus had fourteen (14) days thereafter to file and serve a response. However, per Rule 6(d), three days are added after the period for service when service is made under Rule 5(b) (which includes service by electronic means). *See* Fed. R. Civ. P. 6(d). Thus, three days are added after the period that would otherwise expire, *i.e.,* January 3, 2014, and Abacus timely filed its response on January 6, 2014. (Doc. No. 165).

Next, InDyne argues that the "fees" section of Abacus' response "starts with verbiage ostensibly directed toward InDyne's objections but quickly devolves into objections" to the R & R. (Doc. No. 166 at p. 2). InDyne furthers argues that it is prejudiced by these objections because there is no procedural vehicle that InDyne may now use to properly respond. (*Id.* at p. 3). In its response, Abacus does appear to raise objections to the R & R. Specifically, Abacus suggests that a ten (10) percent increase in Magistrate Judge Baker's recommendation for fees in both the trial and appellate court is "reasonable and is clearly supported by [Abacus'] expert, and the entire record." (Doc. No. 165 at p. 5). Abacus argues that InDyne "opened the door wide" for Abacus to request a modest fee increase in its response because of InDyne's "far flung challenge" to the R & R, and its "voluminous re-characterization of the case in a manner at odds with this Court's summary judgment opinion." (Doc. No. 167 at pp. 3-4).

As the Court ultimately agrees with Judge Baker's fee analysis, this issue is mostly inconsequential; however, upon consideration, the Court will grant InDyne's Motion to Strike to the extent Abacus raises objections to the R & R's calculation of fees.

## II. <u>INDYNE'S OBJECTIONS AND COURT'S ANALYSIS</u>

### A. *Standard of Review*

In the Eleventh Circuit, a district judge may accept, reject or modify a magistrate judge's report and recommendation after conducting a careful and complete review of the findings and

recommendations. 28 U.S.C. § 636(b)(1); *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982), *cert. denied*, 459 U.S. 1112, 103 S.Ct. 744 (1983). A district judge must conduct a *de novo* review of the portions of a magistrate judge's report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1)(C). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990) (citing H.R. Rep. No. 94-1609, 94th Cong., 2nd Sess., *reprinted in* 1976 U.S. Code Cong. & Admin. News 6162, 6163). A district judge reviews legal conclusions *de novo*, even in the absence of an objection. *See Cooper–Houston v. Southern Ry.*, 37 F.3d 603, 604 (11th Cir. 1994).

## B. Legal Standard for Fees Under § 505

The general rule in this country is that, unless Congress provides otherwise, parties are to bear their own attorney's fees. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). The Copyright Act provides, "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party . . . . Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. The Supreme Court has stated that for the purposes of § 505 "[p]revailing plaintiffs and prevailing defendants are to be treated alike, but attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Fogerty*, 510 U.S. at 534.

In exercising this discretion, the district court "should consider not whether the losing party can afford to pay the fees but whether imposition of fees will further the goals of the

Copyright Act." *Mitek Holdings, Inc. v. Arce Eng'g Co.*, 198 F.3d 840, 843 (11th Cir. 1999) (quoting *Fogerty*, 510 U.S. at 526-27). A court may consider several non-exclusive factors in its determination whether to award prevailing party attorney fees such as "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty*, 510 U.S. at 534 n.19 (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)). As these factors are non-exclusive, not every factor must weigh in favor of the prevailing party and the Court may also consider other factors as well.

### C. Abacus is the Prevailing Party

Inasmuch as InDyne argues that Abacus is not a "prevailing party" because it "did not prevail on the merits" (Doc. No. 164 at p. 1),[5] instead "escaping" and "avoiding" liability (*id.* at pp. 1-2) due to a "technical defense" (*id.* at p. 2), the Court disagrees. On June 1, 2012, the Court granted summary judgment in favor of Abacus and thereafter the Eleventh Circuit affirmed. Therefore, Abacus is clearly the prevailing party. *See Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 894 (6th Cir. 2004) ("[W]hen a defendant succeeds in having summary judgment entered in its favor on the copyright infringement claims asserted against it, that defendant can only be described as having 'prevailed.'").

### D. Consideration of the Non-Exclusive Factors

1. <u>Frivolousness and Objective Unreasonableness</u>[6]

"Cases applying the objectively unreasonable standard predictably run in both directions and are highly dependent on case specific facts and circumstances." *Corwin v. Walt Disney*

---

[5] *See also* (Doc. No. 164 at p. 19) ("In this case, Defendants did not prevail on the merits.").

[6] The Magistrate Judge found that "it does not appear that InDyne's claims can be considered frivolous." (Doc. No. 163 at p. 9). InDyne does not object to this conclusion and the Court need not address it any further until the final weighing of the factors.

*World Co.*, 6:02–cv–1377–Orl–19KRS, 2008 WL 754697, at *7 (M.D. Fla. Mar. 18, 2008), adopted at 6:02–cv–1377–Orl–19KRS, (Doc. No. 357).

The Second Circuit has recognized that "objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted" because "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." *Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 122 (2d Cir. 2001); *see also Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2nd Cir. 2007). "This is because such attorney fee awards may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law." *Ariel (UK) Ltd. v. Reuters Group PLC*, No. 05 Civ. 9646, 2007 WL 194683, at *1 (S.D.N.Y. Jan. 24, 2007) (citations omitted).

The district court in *Chivalry Film Productions v. NBC Universal, Inc.* generally discussed the reasoning behind the award of fees to a prevailing defendant in various post-*Fogerty* "objectively unreasonable" cases:

> The mere fact that a defendant has prevailed, however, does not necessarily equate with an objectively unreasonable claim. To hold otherwise would establish a *per se* entitlement of attorney's fees whenever issues pertaining to judgment are resolved against a copyright plaintiff . . . . This is not a correct construction of the law. Similarly, the fact that a defendant has prevailed on a motion to dismiss or on summary judgment does not require the court to award fees. However, if a copyright claim is clearly without merit or otherwise patently devoid of legal or factual basis, that claim ought to be deemed objectively unreasonable, and an award of fees and costs is then proper.
>
> . . . .
>
> Moreover, although the plaintiff in this case did not engage in a campaign of vexatious litigation, the need for deterrence against objectively unreasonable copyright claims is significant. Just as attorney fee awards may chill litigation of close cases, preventing the clear demarcation of the boundaries of copyright law, the denial of such awards in objectively unreasonable cases also disserves the

> purposes of copyright law, by failing to protect the owners of valid copyrights from the cost of frivolous litigation. Furthermore, the denial of fees and costs to a prevailing defendant in an objectively unreasonable copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to chill. Future litigants should be discouraged from comparable behavior.

No. 05 Civ. 5627(GEL), 2007 WL 4190793, at *2-3 (S.D.N.Y. 2007) (internal quotation marks and citations omitted).

Here, after reviewing this Court's analysis of the Abstraction-Filtration-Comparison test, as articulated in *Computer Associates International v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992), Judge Baker concluded, "[i]t was objectively unreasonable for InDyne to file suit for copyright infringement without possessing sufficient evidence of its PIMS V.2 code as it existed on the publication date (August 29, 2003) in order to prove substantial similarity between its allegedly copyrighted work and the code allegedly copied by Defendants." (Doc. No. 163 at p. 14). The undersigned judge agrees with this analysis.

Judge Baker's finding was based on the Court's previous holding that InDyne had not and could not possibly proffer evidence of PIMS V.1 or the August 2003 PIMS V.2. Once again, InDyne, referencing *Montgomery v. Noga*, 168 F.3d 1282 (11th Cir. 1999), argues that it could overcome this deficiency because the company "believed it could prove up the protectable portions of its source code based on testimony as to the changes in the source code over time." (Doc. No. 164 at p. 14). However, the Court previously distinguished *Montgomery* from the instant case and determined that it is inapplicable:

> In *Montgomery*, the Eleventh Circuit was able to find that [a specific version of computer software] "contained several additions and corrections that were not present in [a prior version]" and was able to cite a clear revision history for support. However, in the case at bar, there is no copy of PIMS V.1 or a clear revision history or even the August 2003 PIMS V.2 from which to compare the alleged differences in the CDs produced during discovery. Unlike the

> *Montgomery* court, this Court has no basis to find that the additions and corrections from PIMS V.1 were sufficiently original.

(Doc. No. 113 at p. 20) (citations omitted).

Next, InDyne objects because the R & R "notes this Court's reliance upon the *Airframe Systems*[*, Inc. v. L-3 Communications Corporation*, 658 F.3d 100 (1st Cir. 2011),] decision and appears to assume that decision put InDyne on notice that it could not sustain a copyright claim absent the ability to produce the PIMS source code as of the date of first publication." (Doc. No. 164 at p. 14). InDyne argues that the R & R fails to mention that the *Airframe* decision was issued after InDyne filed this suit and thus could not have informed InDyne's decision whether or not to proceed. (*Id.* at pp. 14-15). However, this argument is unavailing because the *Airframe Systems* decision supports the argument that *Montgomery* is inapplicable. Further, that decision did not alter copyright law in any significant way and the Court's application of *Airframe Systems* to the facts of this case did not "clarify the boundaries of copyright law," as InDyne suggests. On this topic, the Court also rejects InDyne's repeated assertions that the Court created a "heightened" or "new" standard, imposing a "*per se* rule requiring preservation of source code as it existed on the publication date listed in its copyright registration in order to sue for infringement of that copyright." (Doc. No. 164 at p. 14). To the contrary, the Court merely applied the law to the facts of this case. InDyne simply could not carry its burden because it failed to produce a copy of PIMS V.2, as it existed on August 29, 2003, or a copy of PIMS V.1 for comparison purposes. *See also* (Doc. No. 113 at p. 14) ("However, because there is no copy of PIMS V.1 or PIMS V.2 as it existed on its publication date, the golden nugget [of core protectable expression] is so obscured that not even a famed 49er, with herculean effort, could

uncover it."); (*id.* at pp. 18-19) ("In laymen terms, the PIMS code produced by InDyne in the present case is like a secret code without the secret decoder ring.").

Finally, InDyne suggests that none of the cases cited in the R & R support the conclusion that the filing of this case was objectively unreasonable because "none of those lawsuits involved the theft of proprietary source code by the defendant" or "involved extortionate behavior." (Doc. No. 164 at p. 16 n.6). However, this objection – that the R & R failed to cite to a case with precisely the same facts as the present case – is not well-taken because, as the Court previously noted, cases applying this standard are highly dependent on case-specific facts and circumstances. *Corwin v. Walt Disney World Co.*, 2008 WL 754697, at *7. As for InDyne's objection that this case does not fit within the "extreme fact patterns" of objectively unreasonable cases cited in the R & R, the Court finds it to be without merit for the same reason.

In short, it was objectively unreasonable for InDyne to file a copyright infringement claim even though it did not have a copy of the copyrighted material, i.e. PIMS V.1 or a clear revision history of the August 2003 PIMS V.2, to support its basic claims. This factor weighs heavily in favor of an award of fees. *See Matthew Bender*, 240 F.3d at 122 ("objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted.").

2.    Motivation

Regarding this factor, Abacus suggests that InDyne had a questionable motivation in filing and pursuing this case. (Doc. No. 144 at p. 10). Abacus claims that the "context in which [InDyne] filed and pursued this claim suggests that [InDyne's] primary motivation was, at least in substantial part, to attempt to overwhelm a smaller competitor." (*Id.*). To support this contention, Abacus argues that despite the lack of any evidence that Abacus used any software

code for any commercial purpose, coupled with Abacus' voluntary return of all allegedly infringing code and InDyne's pursuing this case without a copy of the software code allegedly infringed upon, InDyne aggressively pursued this case. (*Id.*). InDyne responds that its primary motive in bringing this suit was to stop the further spread of source code, and that it only filed suit as its last recourse. (Doc. No. 164 at p. 17). InDyne claims that it only brought suit after it was misled about the copying of the PIMS source code and after a forensic report indicated that the code may have been copied elsewhere. (*Id.*).

The Court agrees with Abacus and the Magistrate Judge's conclusion that InDyne may have begun with altruistic intentions toward Abacus, but by the time InDyne filed suit three years later, InDyne's motivation was questionable. This is particularly true in light of InDyne's forensic report showing that Abacus *may* have copied the code to additional media and the evidentiary deficiency described in detail above. Thus, Judge Baker's conclusion is not "pure speculation" as InDyne complains; rather it is supported by the Court's previous findings and the record before the Magistrate Judge. Thus, this factor weighs in favor of a fee award.[7]

3.  <u>Need to Advance Considerations of Compensation and Deterrence</u>

In considering this factor, the Magistrate Judge found, "future litigants who are copyright holders without producible evidence of their copyrighted computer source code should be deterred from choosing to sue for copyright infringement." (Doc. No. 163 at p. 20). InDyne objects to this conclusion because this statement "cannot be directed at InDyne." (Doc. No. 164 at p. 18). InDyne argues that such a "general deterrence" factor, as opposed to a "specific deterrence" factor against InDyne, is an inappropriate consideration in determining whether to award fees. (*Id.*). This objection is also not well-taken. As InDyne points out, certain courts have

---

[7] Even if this factor were neutral or weighed slightly in favor of InDyne, the Court would find that the other factors still weigh in favor of an award of fees in this case.

used "specific deterrence" as a factor in the fee analysis. However, other courts, including this one, have found what InDyne classifies as "general deterrence" to be an appropriate factor in a court's consideration. For example, in *Corwin v. Walt Disney World Co.*, 6:02–cv–1377–Orl–19KRS, 2008 WL 754697 (M.D. Fla. Mar. 18, 2008), Judge Baker stated,

> A large multi-national corporation . . . may be viewed as a "deep pocket" and a target for many baseless or objectively unreasonable suits. Awarding fees in this case will serve as a deterrent for those plaintiffs who submit ideas that are either unsolicited and rejected but bear some resemblance (in their minds at least) to a defendant's ultimately successful idea. An award of fees in this case will also deter other individuals from sitting on their rights of enforcement for forty years or waiting to enforce their rights until so much time has passed that not a single witness exists with personal knowledge of "access" to the alleged copying.

*Id.* at *13, adopted at 6:02–cv–1377–Orl–19KRS, (Doc. No. 357) (Fawcett, J.); *see also Amadasun v. Dreamworks, LLC*, 359 F. Supp. 2d 1367, 1376 (N.D. Ga. 2005) ("In addition, potential plaintiffs must be deterred from bringing frivolous and baseless suits. Specifically, the Court must deter plaintiffs from alleging copyright infringement when the works at issue are not even copyright protected."); *Chivalry Film Prods. v. NBC Universal, Inc.*, 05 Civ. 5627(GEL), 2007 WL 4190793, at *2 (S.D.N.Y. Nov. 27, 2007) ("[T]he need for deterrence against objectively unreasonable copyright claims is significant . . . . Future litigants should be discouraged from comparable behavior."). Thus, the Court agrees with the Magistrate Judge and this factor also weighs in favor of an award of fees.

4.     Balancing the Factors

Considering all the factors, the Court concludes that "imposition of fees will further the goals of the Copyright Act." *Mitek Holdings, Inc. v. Arce Eng'g Co.*, 198 F.3d 840, 843 (11th Cir. 1999). While it does not appear that InDyne's claims can be considered entirely frivolous, the Court agrees with the Magistrate Judge that it was objectively unreasonable for InDyne to file suit without possessing sufficient evidence of its PIMS V.2 code as it existed on the

publication date in order to prove substantial similarity. Further, InDyne may have begun with altruistic intentions toward Abacus, but by the time InDyne filed suit three years later, InDyne's motivation was questionable. Finally, future litigants who are copyright holders without producible evidence of their copyrighted computer source code should be deterred from choosing to sue for copyright infringement. On balance, the factors weigh in favor of an imposition of fees.

### III. CALCULATION OF THE FEES

Abacus initially requested $1,470,832.31 for fees in connection with work in the district court litigation (Doc. No. 144) and $228,229.27 in connection with work related to the case on appeal. (Doc. No. 153).[8] In response, InDyne suggested a fee of $500,521.71 as appropriate for work in the district court (Doc. No. 149), and $75,005 in fees for work related to the appeal. (Doc. No. 159). Judge Baker ultimately recommended that Abacus be awarded $496,400 for attorney's fees for the district court litigation, and $100,000 for attorney's fees on appeal. (Doc. No. 163 at pp. 40-41). Judge Baker also recommended that the Court decline Abacus' request for other costs[9] incurred during the litigation and appeal related to computerized research, e-discovery, copying, travel expenses, postage, and forensic experts. (*See* Doc. No. 163 at pp. 39-40).[10]

InDyne raises two objections to the fee calculation. Both will be overruled. First, InDyne argues that due to a "clerical error", the Magistrate Judge miscalculated the total adjusted amount

---

[8] Like the Magistrate Judge, the undersigned judge also notes that Abacus' filings contain insufficient discussion as to why such a large fee can be justified in a case that was decided at summary judgment.

[9] Costs permitted under 28 U.S.C. § 1920 were previously taxed against InDyne in the amount of $33,844.40. (*See* Doc. Nos. 125, 129).

[10] Neither party objects to this recommendation. The Court agrees that further award of costs is inappropriate and does not discuss the issue further.

of fees for attorney Todd Pittenger. (Doc. No. 164 at p. 20). To be sure, there is a discrepancy between the Magistrate Judge's fee calculation table for Mr. Pittenger's work and a footnote providing clarification on that calculation. (*See* Doc. No. 163 at p. 37). However, when put into context with the overall discussion, it is clear that the "market rate of $300 per hour for senior partner level work" in the footnote (*id.* at n.10) is nothing more than a typographical error. Mr. Pittenger's rates as calculated in the table at $400 per hour for 113 hours and $200 per hour for 28 hours are correct.[11]

Second, the Court rejects InDyne's argument that attorney Stephen Kong's time should be excluded entirely. On this issue, the Magistrate Judge found:

> With the exception of certain redacted entries, the Pillsbury attorneys and local counsel at Lowndes/Akerman have done a reasonably good job of describing the specific tasks performed and the general scope of the litigation. As argued by InDyne, Mr. Kong's descriptions, however, are vague, generic, and fail to give sufficient detail in order for the Court to determine if the work was reasonable. InDyne's arguments about Mr. Kong's involvement and need for supervision, or revision to his work, are well-taken. While there is some justification for involving more than one law firm, the use of so many different billing timekeepers is unsupported.

(Doc. No. 163 at p. 35). In light of this conclusion, InDyne now argues that Mr. Kong's time should be completely removed from the calculus. The Court does not agree and finds that further reduction of Mr. Kong's fees is not warranted. After review of Abacus' counsel's fees, the Court finds a reduction of Mr. Kong's fees by 80% is appropriate in light of the redundancies and duplication outlined in the R & R and Abacus' filings. *See Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1301 (11th Cir. 1988) ("In the final analysis, exclusions for excessive or unnecessary work on given tasks must be left to the discretion of the district court.").

---

[11] Even if this were not a typographical error, the Court would find $400 per hour to be the correct rate to apply to the 113 total hours of senior partner level work for Mr. Pittenger.

Finally, the Court notes InDyne's initial assertion that, if the Court determines Abacus is entitled to a fee award, "the appropriate total fee award is $500,521.71." (Doc. No. 149 at p. 25). Having conceded that a higher fee than Judge Baker ultimately recommends is appropriate, the Court is not persuaded to further reduce the amount. Therefore, the Court finds the following to be an appropriate award to Abacus for attorneys' fees in the district court.[12]

| ATTORNEY (YEARS IN PRACTICE AS OF 2012) | ALLOWED RATES | CLAIMED HOURS | REDUC-TION | ALLOWED HOURS | ADJUSTED AMOUNT |
|---|---|---|---|---|---|
| Joël Van Over (25+) 80% of hours 20% of hours | 400 200 | 916[13] | 25% | 550 137 | $ 220,000 27,400 |
| Kelly Craven (6) | 200 | 129 | 25% | 97 | $19,400 |
| Evan Wesser (4) | 200 | 392 | 25% | 294[14] | $58,800 |
| Kristen Baker (3) | 200 | 252 | 25% | 189 | $37,800 |
| Stephen Kong (18) | 200 | 1717 | 80% | 343 | $68,600 |
| Todd Pittenger (24) 80% of hours 20% of hours | 400 200 | 157 | 10% | 113 28 | $ 45,200 $5,600 |
| Angela Miller (Sr. Assoc.) | 200 | 9 | 10% | 8 | $1,600 |
| Megan Devault (11) | 300 | 42 | 10% | 38 | $11,400 |
| Joshua Mize (2) | 200 | 4 | 10% | 4 | $800 |
| TOTAL | | 3,618 | | 1,801 | $496,600 |

---

[12] All figures in this chart are rounded to the nearest whole number. For example, attorney Joshua Mize's 4 "claimed hours" was reduced by 10%, resulting in 3.6 hours. This figure was then rounded up to 4 hours in the "allowed hours" column.

[13] The Court notes that this figure differs from the R & R. Attorney Joël Van Over's claimed hours totals 915.5. (*See* Doc. No. 144-2 at p. 7). This figure is rounded to 916 claimed hours; however, the resulting adjusted amounts for attorney Van Over are not changed by this alteration.

[14] This figure also differs slightly from the R & R. After reducing attorney Evan Wesser's 392 claimed hours by 25%, the total allowed hours is 294, resulting in a total adjusted amount of $58,800 and not $58,600. The corresponding figures in the table are altered to reflect this minor change.

After *de novo* review, other than the very minor changes to the fee calculation noted above, the Court finds the Magistrate Judge's legal reasoning and factual findings are correct and adopts the same rationale set forth in the R & R. Accordingly, Defendants are awarded attorney's fees against InDyne for the district court litigation in the amount of $496,600, augmented by interest at the federal judgment rate from the time Defendants originally filed their Motion for Attorney's Fees on June 18, 2012. For the appeal, Defendants are awarded attorney's fees against InDyne in the amount of $100,000,[15] augmented by interest at the federal judgment rate from the time Defendants originally filed their Motion for Attorney's Fees in the Eleventh Circuit Court of Appeals on April 24, 2013.

## IV. CONCLUSION

Therefore, based on the foregoing, it is **ORDERED** as follows:

1.  Magistrate Judge Baker's Report and Recommendations (Doc. No. 163), filed on December 6, 2013, is **ADOPTED and CONFIRMED** and is made a part of this Order.

2.  InDyne's Motion to Strike Defendants' Response to Plaintiff's Objections (Doc. No. 166), filed on January 9, 2014, is **GRANTED in part.**

3.  Defendants Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan's Response in Opposition to InDyne's Objections to the Report and Recommendation (Doc. No. 165), filed on January 6, 2014, is **STRICKEN** to the extent Abacus raises objections to the calculation of attorney's fees.

---

[15] Neither party objected to this recommendation.

4. Defendants Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan's Second Renewed Motion for Attorney Fees and Full Costs (Doc. No. 144), filed on May 10, 2013, is **GRANTED in part**.

5. Defendants Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan's Motion for Attorney's Fees (Doc. No. 153), filed on June 12, 2013, is **GRANTED in part**.

6. InDyne's Objections to the Magistrate Judge's Report and Recommendations (Doc. No. 164), filed on December 20, 2013, are **OVERRULED**.

7. Attorney's fees are awarded in favor of Defendants Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan, and against Plaintiff InDyne, Inc. for the district court litigation in the amount of **$496,600**, plus interest at the then-prevailing federal judgment rate of .18% from the date Defendants originally filed their Motion for Attorney's fees (Doc No. 117) on June 18, 2012, which results in a per diem rate of $2.45, for a total prejudgment interest amount of **$1,511.65**.

8. Attorney's fees for the appeal are awarded in favor of Defendants Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan, and against Plaintiff InDyne, Inc. in the amount of **$100,000**, plus interest at the then-prevailing federal judgment rate of .13% from the time Defendants filed their Motion for Attorney's Fees in the Eleventh Circuit (Doc. No. 153), on April 24, 2013, which results in a per diem rate of $.36, for a total prejudgment interest amount of **$110.52**.

9. The Clerk is **SHALL ENTER** a final judgment as follows: Defendants Abacus Technology Corporation, Jerry Reninger, and Matthew Boylan are awarded attorney's fees in the amount of $596,600.00 against Plaintiff, InDyne Inc., along with prejudgment interest in the amount of $1,622.17, for a total sum of $598,222.17.

**DONE** and **ORDERED** in Orlando, Florida on February 25, 2014.


ANNE C. CONWAY
United States District Judge


Copies furnished to:

Counsel of Record
Unrepresented Parties
Magistrate Judge Baker